**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael S. Gallegos, | ) No. CV-01-1909-PHX-NVW |
| Petitioner, | ) <u>DEATH PENALTY CASE</u> |
| vs. | ) |
| Dora B. Schriro, et al., | ) **MEMORANDUM OF DECISION** |
| Respondents. | ) **AND ORDER** |

Before the Court is Petitioner Michael S. Gallegos's amended petition for writ of habeas corpus.  (Dkt. 74.)[1]  Petitioner alleges, pursuant to 28 U.S.C. § 2254, that he was convicted and sentenced to death in violation of the United States Constitution.  (*Id.*)

The amended petition raised 33 claims for relief.  (*Id.*)  Respondents filed an answer to the petition and Petitioner filed a traverse.  (Dkts. 68, 86.)  In an order denying Petitioner's requests for evidentiary development, the Court dismissed Claim 30 based on a procedural bar, Claim 31 on the merits, Claim 32 for failure to state a cognizable ground for habeas relief, and Claim 33 as premature.[2]  (Dkt. 106.)  This Order addresses the procedural status and/or the merits of the remaining claims and concludes, for the reasons set forth below, that Petitioner is not entitled to habeas relief.

---

[1]   "Dkt." refers to the documents in this Court's case file.

[2]   Petitioner acknowledges that Claim 10 is moot.  (Dkt. 86 at 60.)

**BACKGROUND**

In 1991, Petitioner was tried and convicted for the first degree murder of, and sexual conduct with, eight-year-old Kendall Wishon.[3]

The victim lived with her mother, Cynthia Wishon, and Petitioner's brother Jerry Gallegos (Gallegos) in Phoenix. In November 1989, the victim's half-brother, George Smallwood, moved to Flagstaff to live with Petitioner and Petitioner's family. Petitioner's parents became Smallwood's legal guardians. Petitioner and Smallwood were friends and attended high school together.

Smallwood visited his mother, Mrs. Wishon, and his half-sister, the victim, in Phoenix during holidays, and Petitioner sometimes accompanied him. Petitioner and Smallwood were on spring break in March 1990 and spent the week in the victim's home in Phoenix. They worked on their respective vehicles most of that week. In the afternoons, they were responsible for supervising the victim when she came home from school because both Mrs. Wishon and Gallegos worked during the day.

Gallegos worked at a truck and trailer repair shop in Phoenix. On Thursday, March 15, 1990, at about 4:30 p.m., Petitioner and Smallwood went to Gallegos's repair shop to work on their vehicles. After the other employees left for the day, Gallegos supervised both Petitioner's and Smallwood's repair work. They drank some beer and worked on their vehicles until about 9:30 p.m. On their way home, Gallegos purchased a case of beer. They arrived home about 10:00 p.m. and continued working on the vehicles until about 10:30. During this time, Gallegos shared a couple of beers from his case with them. When Petitioner and Smallwood came into the house at about 10:30 p.m., the victim was bathing; she went to bed shortly thereafter. Mrs. Wishon stopped by the victim's room to kiss her goodnight on her way to bed. Gallegos took a shower and then played a video game with

---

[3]        Except where otherwise indicated, the following background is based upon the facts as found by the Arizona Supreme Court on direct appeal from Petitioner's conviction. *State v. Gallegos*, 178 Ariz. 1, 6-8, 870 P.2d 1097, 1102-04 (1994) (*Gallegos I*).

1    Petitioner and Smallwood before he retired at about 11:30 p.m.  On his way to bed, Gallegos

2    checked the case of beer and found that the case was all "basically there."

3         As to the events that transpired later that night, Petitioner confessed on two occasions

4    and testified at trial as follows.  After Gallegos retired, Petitioner and Smallwood continued

5    playing video games and drank more beer.  Petitioner suggested that they go into the victim's

6    room to fondle her; Smallwood agreed.  Once they were inside the victim's room, Petitioner

7    lifted her nightgown and rubbed baby oil on the small of her back.  According to Petitioner,

8    when the girl began to awaken, Smallwood put his hand over her mouth and Petitioner put

9    his hand over Smallwood's hand and over the victim's nose.  She gasped for air, struggled,

10   and made sounds "like a little pig" before eventually going limp.  Believing that the victim

11   was dead, Petitioner and Smallwood decided to "finish her off."  They pulled her body off

12   the bed and placed her on the floor.  According to Petitioner, Smallwood attempted to insert

13   his penis into the victim's vagina.  Petitioner then had anal intercourse with her for 15 to 20

14   minutes.  During this time, Petitioner testified, Smallwood stuck his penis inside the victim's

15   mouth.  After Petitioner completed the sex act, the two carried the victim's naked body out

16   of the house and down the street where they dropped it under a tree.  They returned to the

17   house and went to bed.

18        Early the next morning, Mrs. Wishon and Gallegos got up to go to work.  The couple

19   did not attempt to awaken the victim, who did not have school that day.  Mrs. Wishon went

20   into Petitioner and Smallwood's room to give them money to buy milk.  Smallwood took the

21   money and went to the store.  When he returned, Petitioner went outside to work on his

22   vehicle.  After talking with Petitioner, Smallwood called Mrs. Wishon at work and told her

23   the victim was missing.  Mrs. Wishon left work and arrived back at the house at about 10:00

24   a.m.  Smallwood also contacted Gallegos and the police.  When Gallegos and the police

25   arrived, they began an extensive search of the neighborhood.  Petitioner and Smallwood

26   participated in the search but deliberately avoided the area where they had dropped the

27   victim's body.  At around 1:00 p.m., an unidentified boy alerted the police as to the body's

28

location.  The police found the victim's naked body under the tree where it had been left the night before.  Petitioner's confessions and testimony in his own defense are the only evidence implicating Smallwood.

The victim's body was located 250 feet from the house.  The victim was lying supine with her legs spread apart.  The body was dirty and covered with grass.  There was obvious trauma to the vaginal area and some type of oil located on one leg and in the vaginal area. The victim had sustained contusions to the left side of her face, her forehead, her right eye, and the right side of her nose.

The medical examiner determined that the victim died of asphyxiation due to suffocation.  He testified at trial that the victim's rectum was "marketedly dilated" and that the anal trauma occurred while the victim was alive.  He noted that the victim had various bruises and abrasions on her face and body, some of which were red, indicating that they occurred while the victim was still alive.  She had also suffered a blunt force injury to her head.  Mrs. Wishon testified that, before the night of the murder, the victim had no noticeable bruises or marks.

The police searched the victim's house and seized numerous articles of evidence, including her underwear, nightshirt, and bed sheet.  In the kitchen, the police found an empty beer bottle and two empty cardboard beer cartons in a plastic trash container.  They also found two empty beer cans on the dishwasher and noted several hard liquor bottles on the kitchen shelves.   In the carport, the police found another empty beer can and a large cardboard box filled with empty beer and soda cans.  The police photographed the victim's room and dusted it for fingerprints.

Because the house showed no signs of forced entry, the investigation focused on Petitioner and Smallwood.  The police transported them to the police station for questioning. Detectives Armando Saldate, Jr., and Michael Chambers escorted them into separate interview rooms.  Detective Saldate advised Petitioner of his *Miranda* rights and then questioned him while Detective Chambers questioned Smallwood.  After initially denying

1   any involvement in the victim's death, Petitioner confessed to Detective Saldate.  He later

2   confessed a second time in the presence of both Detective Saldate and Detective Chambers.

3   The trial court determined that these confessions were voluntary.

4       When Smallwood was confronted with Petitioner's confessions, he denied any

5   involvement in the victim's death.  He stated that if Petitioner had implicated him, it was only

6   because he did not want to take the blame alone.  The two were subsequently indicted for the

7   murder and sexual molestation of the victim.

8       The State submitted blood samples taken from Petitioner and Smallwood, along with

9   the evidence obtained at the crime scene, to a forensic laboratory for DNA testing.  The lab

10  later notified the State that Smallwood could not be included as a contributor to the evidence.

11  The State dismissed the case against Smallwood based on insufficient evidence.

12      During Petitioner's trial, the parties stipulated that a fingerprint removed from the

13  victim's bedroom matched Petitioner's right middle finger; that semen was detected on the

14  victim's panties, nightshirt, and bed sheet; that DNA testing showed that the stain on the

15  victim's panties contained a banding pattern that matched the pattern obtained from

16  Petitioner's blood; and that the probability that an individual other than Petitioner was the

17  source of the stain on the victim's panties was one in 10 million for Caucasians and one in

18  67 million for Hispanics.

19      Petitioner took the stand in his own defense and testified that he participated in the

20  victim's death.  He maintained that he was drunk and did not intend to kill her.  He also

21  testified that he believed the victim was dead at the time of the sexual penetration.  On cross-

22  examination, he was unable to explain the various bruises and abrasions on the victim's

23  body.  Petitioner was prepared to call Smallwood as a witness, but on the advice of counsel

24  Smallwood invoked his Fifth Amendment right not to testify.

25      The jury unanimously found Petitioner guilty of first degree murder and sexual

26  conduct with a minor.  The jury was divided, however, on whether the murder was

27  premeditated or felony murder.

28

In sentencing Petitioner, the trial judge found two aggravating circumstances, that Petitioner committed the murder in an especially heinous, cruel, or depraved manner, and that he was an adult at the time of the offense and the victim was under 15 years of age. The judge found one statutory mitigating factor, Petitioner's age of 18, and two non-statutory mitigating factors, Petitioner's remorse and the recommendations of leniency from Detectives Saldate and Chambers. After considering each of the mitigating circumstances, the trial judge found that they were not sufficiently substantial to outweigh the aggravating factors and call for leniency. The judge, noting that "[e]ach aggravating circumstance standing alone outweighs the total mitigation," sentenced Petitioner to death for the murder.

The Arizona Supreme Court affirmed the conviction on direct appeal but reversed and remanded for resentencing, holding that the trial court had failed to consider whether Petitioner's impairment at the time of the crime, coupled with his history of drug and alcohol abuse, constituted a non-statutory mitigating circumstance. *State v. Gallegos*, 178 Ariz. 1, 5, 21, 870 P.2d 1097, 1101, 1117 (1994) (*Gallegos I*). A resentencing hearing was held by the trial court on October 24, 1994.[4] The court found that Petitioner's impairment and history of alcohol and drug abuse constituted additional non-statutory mitigation. However, it concluded that the mitigating circumstances were not sufficiently substantial to call for leniency and re-sentenced Petitioner to death. The Arizona Supreme Court affirmed. *See State v. Gallegos*, 185 Ariz. 340, 343, 916 P.2d 1056, 1059 (1996) (*Gallegos II*).

Petitioner thereafter filed a petition for state post-conviction relief (PCR) and a supplemental petition in the trial court. (PCR docs. 188, 204.)[5] The court denied relief on

---

[4]     John Antieau represented Petitioner on appeal and at resentencing. Greg Clark represented Petitioner at trial and the initial sentencing.

[5]     "PCR doc." refers to documents filed in the state PCR proceedings (Case No. CR1990-3339). "PR doc." refers to documents filed with the Arizona Supreme Court in connection with Petitioner's petition for review from the denial of post-conviction relief (Case No. CR-01-0054-PC). "ROA" refers to the trial court record for Petitioner's direct appeal (Case No. CR-94-389-AP). "RT" refers to the reporter's transcripts and "ME" to the

most of the claims, but set an evidentiary hearing regarding Petitioner's claims of ineffective assistance of counsel.  (ME 9/28/00.)  Following the evidentiary hearing, the court denied those claims on the merits.  (PCR doc. 227; *see* PR doc. 10.)  Petitioner filed a petition for review in the Arizona Supreme Court, which summarily denied relief.  (PR docs. 1, 12).  Thereafter, Petitioner initiated the instant habeas proceedings.

## EXHAUSTION AND PROCEDURAL DEFAULT

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991).  To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971).

The principle of exhaustion requires that a petitioner clearly alert the state court that he is alleging a specific federal constitutional violation.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("The mere similarity between a claim of state and federal error is insufficient to establish exhaustion.").  A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319

---

minute entries of the trial court.  The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court.  (Dkts. 14, 18.)

1  F.3d 1153, 1158 (9th Cir. 2003) (en banc); *cf. Fields v. Washington*, 401 F.3d 1018, 1022

2  (9th Cir. 2005) (mere citation to a state case that conducts both a state and federal law

3  analysis does not, by itself, satisfy exhaustion).

4       In Arizona, there are two procedurally appropriate avenues for petitioners to exhaust

5  federal constitutional claims: direct appeal and post-conviction relief proceedings.  Rule 32

6  of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a

7  petitioner is precluded from relief on any claim that could have been raised on appeal or in

8  a prior PCR petition.  Ariz. R. Crim. P. 32.2(a)(3).  The preclusive effect of Rule 32.2(a) may

9  be avoided only if a claim falls within certain exceptions and the petitioner can justify why

10  the claim was omitted from a prior petition or not presented in a timely manner.  *See* Ariz.

11  R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

12       A habeas petitioner's claims may be precluded from federal review in two ways.

13  First, a claim may be procedurally defaulted in federal court if it was actually raised in state

14  court but found by that court to be defaulted on state procedural grounds.  *Coleman*, 501 U.S.

15  at 729-30.  The procedural bar relied on by the state court must be independent of federal law

16  and adequate to warrant preclusion of federal review.  *See Harris v. Reed*, 489 U.S. 255, 262

17  (1989).  Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536

18  U.S. 856, 860 (2002) (per curiam), and the Ninth Circuit has repeatedly determined that

19  Arizona regularly and consistently applies its preclusion rules such that they are an adequate

20  bar to federal review of a claim.  *See Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998)

21  (finding Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094,

22  1106 (9th Cir. 1997) (same).

23       Second, a claim may be procedurally defaulted if the petitioner failed to present it in

24  state court and "the court to which the petitioner would be required to present his claims in

25  order to meet the exhaustion requirement would now find the claims procedurally barred."

26  *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz*, 149 F.3d at 931 (district court must consider

27  whether the claim could be pursued by any presently available state remedy).  If no remedies

28

1   are currently available pursuant to Rule 32, the claim is "technically" exhausted but

2   procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-

3   62.

4          Because the doctrine of procedural default is based on comity, not jurisdiction, federal

5   courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

6   468 U.S. 1, 9 (1984).  As a general matter, the Court will not review the merits of a

7   procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure

8   to properly exhaust the claim in state court and prejudice from the alleged constitutional

9   violation, or shows that a fundamental miscarriage of justice would result if the claim were

10  not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

11         Finally, pursuant to 28 U.S.C. § 2254(b)(2), the Court may dismiss plainly meritless

12  claims regardless of whether the claim was properly exhausted in state court. *See Rhines v.*

13  *Weber*, 544 U.S. 269,  277 (2005) (holding that a stay is inappropriate in federal court to

14  allow claims to be raised in state court if they are subject to dismissal under § 2254 (b)(2) as

15  "plainly meritless").  Therefore, the Court will undertake an analysis of the procedural status

16  of Petitioner's claims only where necessary.

17                          **AEDPA STANDARD FOR RELIEF**

18         Petitioner's habeas claims are governed by the applicable provisions of the

19  Antiterrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy*, 521 U.S.

20  320, 336 (1997). The AEDPA established a "substantially higher threshold for habeas relief"

21  with the "acknowledged purpose of 'reducing delays in the execution of state and federal

22  criminal sentences.'" *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting

23  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential

24  standard for evaluating state-court rulings' . . . demands that state-court decisions be given

25  the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)

26  (quoting *Lindh,* 521 U.S. at 333 n.7).

27         Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

28

"adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's

1    clearly established precedents if the decision applies a rule that contradicts the governing law

2    set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

3    Supreme Court on a matter of law, or if it confronts a set of facts that is materially

4    indistinguishable from a decision of the Supreme Court but reaches a different result.

5    *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In

6    characterizing the claims subject to analysis under the "contrary to" prong, the Court has

7    observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

8    facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

9    clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

10    Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

11    may grant relief where a state court "identifies the correct governing legal rule from [the

12    Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

13    "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

14    where it should not apply or unreasonably refuses to extend that principle to a new context

15    where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

16    application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner

17    must show that the state court's decision was not merely incorrect or erroneous, but

18    "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at

19    25.

20    Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

21    court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*,

22    545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

23    determination will not be overturned on factual grounds unless objectively unreasonable in

24    light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340

25    (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In

26    considering a challenge under § 2254(d)(2), state court factual determinations are presumed

27    to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

28

1   convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El*
2   *II*, 545 U.S. at 240.  But it is only the state court's factual findings, not its ultimate decision,
3   that are subject to 2254(e)(1)'s presumption of correctness.  *Miller-El I,* 537 U.S. at 341-42
4   ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection
5   pertains only to state-court determinations of factual issues, rather than decisions.").

6        As the Ninth Circuit has noted, application of the foregoing standards presents
7   difficulties when the state court decided the merits of a claim without providing its rationale.
8   *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,
9   1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those
10  circumstances, a federal court independently reviews the record to assess whether the state
11  court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d
12  at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal
13  court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167
14  (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state
15  court did not decide the merits of a properly raised claim will the claim be reviewed de novo,
16  because in that circumstance "there is no state court decision on [the] issue to which to
17  accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,
18  1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

19                                          **DISCUSSION**
20        **Claim 1        Violation of *Ring v. Arizona***
21        Petitioner contends that he was entitled to be sentenced by a jury under *Ring v.*
22  *Arizona*, 536 U.S. 584, 609 (2002). (Dkt. 74 at 33-35.)  In *Ring*, the Supreme Court held that
23  Arizona's aggravating factors, as elements of the offense of capital murder, must be found
24  by a jury.  In *Schriro v. Summerlin*, 542 U.S. 348 (2004), however, the Court held that *Ring*
25  does not apply retroactively to cases already final on direct review.  Because direct review
26  of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief premised
27  on that ruling.  Therefore, Claim 1 is without merit and will be denied.

28

1

**Claim 2          Judicial bias on resentencing**

2          Petitioner alleges that his due process right to a fair and impartial tribunal was violated

3    because the trial judge was biased against him when he heard the case on remand.[6]  (Dkt. 74

4    at 35-41.)   For this proposition, Petitioner cites comments made by the judge indicating

5    "antagonism" toward Petitioner and "contempt" for the resentencing proceedings. (*Id.* at 35-

6    36.) He further contends that judicial bias was manifest in the "procedural irregularities" that

7    occurred on resentencing – namely, the judge's failure to hold a "separate" sentencing

8    hearing after receiving the new mitigation evidence. (*Id.* at 36.)  Respondents counter that

9    the claim is unexhausted and meritless.

10          Background

11          At the end of the resentencing hearing, the victim's mother made a statement to the

12    court in which she described the emotional trauma caused by the ongoing legal process,

13    stating that "every time something like this comes up, it's just one more knife that gets

14    jabbed into me and my family and friends . . . and it's a constant never ending hell."  (RT

15    10/24/94 at 171-72.)  She concluded, "I beg of you not to change anything that has been

16    handed down already, because with all this going on, there seems like there's no end, that

17    there's just no end." (*Id.* at 172.)  The trial judge responded with the following comments,

18    which included a reference to the dissenting opinion in *Gallegos I*:

19                    Let me apologize to everyone involved here for the obvious emotional
             trauma.  Here we are these many years later and the matter has to be dragged
20            up again.  Justice Martone has referred to this – coming back to this court for
             resentencing as a triumph of form over substance.  This is simply a legal
21            exercise, technicality type of situation, and again I wanted to apologize to
             everyone for my part in the fact that the supreme court determined that a
22            remand hearing was necessary.

23    (*Id.* at 172.)

24          After the parties' closing arguments, the judge proceeded to pronounce sentence.

25    Prior to reading the portion of his special verdict dealing with nonstatutory mitigating factors,

26    _____

27          [6]      Maricopa County Superior Court Judge Jeffrey A. Hotham presided over
     Petitioner's trial, both sentencing proceedings, and the PCR proceedings.

28

1    the judge remarked, "I honestly can say that I don't understand the Supreme Court's ruling,

2    but I will abide by their ruling and I will do exactly that." (RT 10/24/94 at 188.) Citing

3    testimony elicited at the resentencing hearing, the court found that Petitioner's impairment

4    at the time of the murder and his history of substance abuse constituted a nonstatutory

5    mitigating circumstance in addition to the circumstances previously found but concluded that

6    all of mitigating evidence considered cumulatively was not sufficiently substantial to

7    outweigh the aggravating factors and call for leniency. (*Id.* at 182-89.) In a final comment

8    noted by Petitioner, the judge stated that "even if the Arizona Supreme Court told this court

9    to weigh the alcohol and drug history and impairment ten times, this court would still find

10   that each aggravating circumstance standing alone would outweigh all collective mitigation."

11   (*Id.* at 189-90.)

12          Analysis

13          Petitioner asserts that he exhausted his claim of judicial bias by raising it in his initial

14   and supplemental PCR petitions and in his petition for review (PR). (Dkts. 74 at 35, 86 at

15   35.) The Court disagrees and finds that the claim is procedurally barred.

16          Petitioner's initial PCR petition contained the allegation that Judge Hotham should

17   have recused himself at resentencing because he was unable or unwilling to "genuinely

18   reweigh" the aggravating and mitigating circumstances and failed to do so. (PCR doc. 188

19   at 19.) The supplemental PCR petition raised the claim that "[t]here was no separate

20   sentencing hearing, as required by law." (PCR doc. 204 at 21.) The PR simply alleged that

21   the trial court erred because it "failed to exercise its discretion in weighing aggravating and

22   mitigating circumstances on remand." (PR doc. 1 at 5.) The PR sought "review of all claims

23   raised" in the PCR petitions (*id.* at 2) and included an appendix containing the petitions. In

24   none of these filings did Petitioner allege a violation of his federal constitutional rights based

25   upon the sentencing court's bias. The claim is therefore not exhausted. *See Casey v. Moore*,

26   386 F.3d 896, 913 (9th Cir. 2004); *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

27          In addition, the PCR court found Petitioner's recusal claim "precluded pursuant to

28

Rule 32.2(a)(3) (waived because not raised at trial or on appeal), and, alternatively was necessarily determined by Judge Reinstein in denying Defendant's motion for change of judge filed at the beginning of the post-conviction relief proceeding."[7]  (PR doc. 10 at 1.) This preclusion ruling rests on an independent and adequate state procedural bar.[8]  *See Smith*, 536 U.S. at 860 (Arizona's Rule 32.2(a) is independent of federal law); *Ortiz*, 149 F.3d at 931-32 (Rule 32.2(a)(3) is an adequate procedural bar).

---

[7]     Petitioner filed a motion seeking to remove Judge Hotham from the PCR proceedings, alleging that he had an "interest or prejudice that prevented him from being fair and impartial in further proceedings." (PCR doc. 187 at 1.)  The motion cited the judge's comments and rulings at resentencing. (*Id.* at 2-4.)  Judge Reinstein, to whom the issue was assigned, denied the motion, writing:

> [T]he Court does not find the defendant's allegations to constitute a claim of interest or prejudice. . . .  The sentencing judge did not refuse to apply the instructions from the opinion of the Arizona Supreme Court.  His agreement with the dissenting opinion did not mean he would not consider the mitigating circumstances.  In fact, it is clear that he did, but found the aggravating circumstances to outweigh <u>all</u> of the collective mitigation presented.
>
> As to the sentencing court's "apology" for the resentencing, while one could question the choice of words, in effect, the Court was apologizing as much for its failure to recognize the need to consider the defendant's impairment on the night of the homicide and the defendant's alcohol and drug history as non-statutory mitigating circumstances at the original sentencing.
>
> Contrary to the defendant's position, the sentencing court did reweigh the aggravating and mitigating circumstances.  Of particular note is that the Supreme Court subsequently affirmed the defendant's death sentence.  The sentencing judge afforded the defendant a full resentencing hearing . . . despite his explanation that the hearing was "simply a legal exercise, technicality type situation."  While these remarks and others made may have been ill-advised, they do not constitute a showing of interest or prejudice such that a fair and impartial hearing cannot be had in the defendant's Rule 32 proceedings.

(PCR doc. 192 at 1-2.)

[8]     The fact that Judge Hotham alternatively discussed the merits of the claim does not affect the application of Rule 32.2(a)(3) because the judge "explicitly invoke[d] a state procedural bar as a separate basis for decision."  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

1    As cause to overcome the default, Petitioner asserts the ineffectiveness of appellate

2    counsel.  (Dkt. 86 at 38.)  Before ineffectiveness of appellate counsel may be used to

3    establish cause for a procedural default, it must have been presented to the state court as an

4    independent claim.  *See Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000); *Murray v.*

5    *Carrier*, 477 U.S. at 489-90; *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988).

6    Petitioner contends (*see* Dkt. 86 at 38) that he exhausted a claim of ineffective assistance of

7    appellate counsel by alleging, in his initial PCR petition, "The denial of the Constitutional

8    Right of representations [sic] by a competent lawyer at every stage of the proceedings" (PCR

9    doc. 188 at 2).  The Court disagrees.  The remainder of the initial PCR petition raises no

10   claim of ineffectiveness of appellate counsel; nor does the supplemental PCR petition or the

11   PR.  (PCR doc's 188, 204; PR doc. 1.)  Because the Arizona Supreme Court has not had a

12   fair opportunity to rule on Petitioner's ineffectiveness claim alleged as cause, and Petitioner

13   may not exhaust those claims now, such claims are technically exhausted but procedurally

14   defaulted.  *See Gray*, 518 U.S. at 161-62; *Coleman*, 501 U.S. at 735 n.1.  Therefore,

15   Petitioner's allegations of ineffective appellate counsel cannot constitute cause to excuse the

16   default.  *See Carpenter*, 529 U.S. at 453 (ineffective counsel as cause can itself be

17   procedurally defaulted).

18   Even if Petitioner had properly exhausted a claim of ineffective assistance of

19   appellate counsel, he would not be entitled to relief on this claim. Where ineffective

20   assistance of appellate counsel is raised as cause for excusing a procedural default,

21   application of *Strickland v. Washington*, 466 U.S. 668 (1984), requires the Court to look to

22   the merits of the omitted issue.  *Hain v. Gibson*, 287 F.3d 1224, 1231 (10th Cir. 2002);

23   *United States v. Cook,* 45 F.3d 388, 392 (10th Cir. 1995) (to determine if appellate counsel

24   provided ineffective assistance by failing to raise an issue on appeal "we examine the merits

25   of the omitted issue").  If the omitted issue is meritless, counsel's failure to appeal does not

26   constitute a Sixth Amendment deprivation.  *Cook*, 45 F.3d at 392-93.  Because the Court has

27   determined that the claim is without merit, the Court need not determine whether ineffective

28

1   assistance of appellate counsel caused the default.

2       To succeed on a judicial bias claim, a petitioner must "overcome a presumption of

3   honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47

4   (1975).  "In the absence of any evidence of some extrajudicial source of bias or partiality,

5   neither adverse rulings nor impatient remarks are generally sufficient to overcome the

6   presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or

7   even hostile to, counsel, the parties, or their cases.'" *Larson v. Palmateer*, 515 F.3d 1057,

8   1067 (9th Cir. 2008) (quoting *Liteky v. United States,* 510 U.S. 540, 555 (1994)).  In addition,

9   as the Supreme Court explained in *Liteky,* "It has long been regarded as normal and proper

10  for a judge to sit in the same case upon its remand, and to sit in successive trials involving

11  the same defendant." 510 U.S. at 555; *cf. Withrow*, 421 U.S. at 57 (having the same judge

12  retry a case after remand does not violate due process).

13      On federal habeas review, the Court "must ask whether the state trial judge's behavior

14  rendered the trial so fundamentally unfair as to violate federal due process under the United

15  States Constitution." *Duckett v. Godinez,* 67 F.3d 734, 740 (9th Cir. 1995). "To sustain a

16  claim of this kind, there must be an 'extremely high level of interference' by the trial judge

17  which creates 'a pervasive climate of partiality and unfairness.'" *Id.* (quoting *United States*

18  *v. DeLuca,* 692 F.2d 1277, 1282 (9th Cir. 1982)).

19      Read in the context of the entire resentencing proceeding, the judge's comments

20  neither suggested that he had a personal grievance against Petitioner nor created a pervasive

21  climate of partiality and bias.  As Respondents note, in apologizing for the necessity of

22  holding the resentencing proceedings, the judge quoted from Judge Martone's dissent in

23  *Gallegos I*.  His comments were not directed against Petitioner but expressed frustration on

24  behalf of the victim's family and regret at his role in prolonging the proceedings.  The

25  judge's other comments, while hyperbolic, simply reflect his conclusion regarding the weight

26  to be ascribed to Petitioner's impairment and substance abuse history as a nonstatutory

27  mitigating circumstance.  The remarks did not reveal opinions of "such a high degree of

28

- 17 -

1    favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555.

2        Finally, even assuming that the judge was biased, there was no prejudice because the

3    Arizona Supreme Court independently reviewed the sentence and determined that the death

4    penalty was appropriate.  *Gallegos II*, 185 Ariz. at 348, 916 P.2d at 1064.

5        <u>Conclusion</u>

6        Claim 2 is both procedurally barred and meritless.  Petitioner is not entitled to habeas

7    relief.

8        **Claims 3-9   Ineffective Assistance of Counsel**

9        Petitioner alleges that defense counsel performed in a constitutionally ineffective

10   manner during the guilt and penalty stages of his trial.  The PCR court denied these claims

11   after holding an evidentiary hearing.  (PCR doc. 227; *see* PR doc. 10 at 2.)

12       <u>Clearly established federal law</u>

13       For claims of ineffective assistance of counsel, the applicable law is set forth in

14   *Strickland v. Washington*, 466 U.S. 668.  To prevail under *Strickland*, a petitioner must show

15   that counsel's representation fell below an objective standard of reasonableness and that the

16   deficiency prejudiced the defense.  *Id.* at 687-88.  Review of counsel's performance under

17   *Strickland* is "extremely limited."  *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.

18   1998), *judgment rev'd on other grounds*, 525 U.S. 141 (1998).  "The test has nothing to do

19   with what the best lawyers would have done.  Nor is the test even what most good lawyers

20   would have done. We ask only whether some reasonable lawyer at the trial could have acted,

21   in the circumstances, as defense counsel acted at trial."  *Id.*

22       The inquiry under *Strickland* is highly deferential, and "every effort [must] be made

23   to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

24   challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  466

25   U.S. at 689.  Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant

26   must overcome "the presumption that, under the circumstances, the challenged action might

27   be considered sound trial strategy."  *Id.*  For example, while trial counsel has "a duty to make

28

1   reasonable investigations or to make a reasonable decision that makes particular

2   investigations unnecessary, . . . a particular decision not to investigate must be directly

3   assessed for reasonableness in all the circumstances, applying a heavy measure of deference

4   to counsel's judgments." *Id.* at 691.  To determine whether the investigation was reasonable,

5   the court "must conduct an objective review of [counsel's] performance, measured for

6   reasonableness under prevailing professional norms, which includes a context-dependent

7   consideration of the challenged conduct as seen from counsel's perspective at the time."

8   *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted).  The

9   Supreme Court has reiterated, "In judging the defense's investigation, as in applying

10  *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective

11  at the time' investigative decisions are made" and by applying deference to counsel's

12  judgments.  *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at

13  689).

14       Because an ineffective assistance claim must satisfy both prongs of *Strickland*, the

15  reviewing court  "need not determine whether counsel's performance was deficient before

16  examining the prejudice suffered by the defendant as a result of the alleged deficiencies."

17  *Strickland*, 466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on the

18  ground of lack of sufficient prejudice . . . that course should be followed").  A petitioner must

19  affirmatively prove prejudice.  *Id.* at 693.  To demonstrate prejudice, he "must show that

20  there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

21  proceeding would have been different.  A reasonable probability is a probability sufficient

22  to undermine confidence in the outcome."  *Id.* at 694.  In assessing prejudice, the court

23  should presume "the judge or jury acted according to law," and "should proceed on the

24  assumption that the decision-maker is reasonably, conscientiously, and impartially applying

25  the standards that govern the decision."  *Id.* at 694-95.

26       "When a defendant challenges a conviction, the question is whether there is a

27  reasonable probability that, absent the errors, the factfinder would have had a reasonable

28

- 19 -

doubt respecting guilt." *Id.* at 695.  In answering that question, a reviewing court necessarily considers the strength of the state's case.  *See Allen v. Woodford,* 395 F.3d 979, 999 (9th Cir. 2005) ("even if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [the petitioner] cannot establish prejudice"); *Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997) (where state's case is weak, there is a greater likelihood that the outcome of the trial would have been different in the absence of deficient performance).

Also inherent in the prejudice analysis demanded by *Strickland* is the principle that in order to demonstrate that counsel failed to litigate an issue competently, a petitioner must prove that the issue was meritorious.  *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986).  For example, with respect to allegations that counsel was ineffective for failing to file a motion, in order to demonstrate prejudice a petitioner "must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him."  *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Morrison,* 477 U.S. at 373-74); *see Boyde v. Brown*, 404 F.3d at 1173-74.

Finally, the Court notes that under the AEDPA its review of the state court's decision is subject to another level of deference.  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  In order to merit habeas relief, therefore, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*.  28 U.S.C. § 2254(d)(1).

### Claim 3        Counsel "abandoned" Petitioner at trial by conceding guilt

Petitioner alleges that trial counsel's strategy of conceding Petitioner's role in the victim's death, together with his negative comments to the jury about Petitioner and his actions, amounted to an abandonment of all defenses such that prejudice is presumed under *United States v. Cronic*, 466 U.S. 648 (1984).  (Dkt. 74 at 41-56.)  He contends that the PCR court erred in applying the *Strickland* standard in rejecting this claim.  Finally, he argues that even under *Strickland* counsel's performance was ineffective.

Background

*Trial*

In his opening statement, counsel spoke of the "uncomfortable position" he was in defending Petitioner, the difficulty of the jurors' role, the horrific nature of the crime, and its tragic effects on the victim's family. (RT 3/7/91 at 47-49.) He continued: "What my client has done is despicable. He's absolutely responsible for the death of Kendall Wishon in this case, and at the end of this case I'm going to ask you to convict my client, but we're not quite at that point yet." (*Id.* at 47.) Cousnel also indicated that Petitioner would testify, explaining that he "is the key in this case":

> You will hear from Mr. Gallegos. He will tell you what I have told you. It will be difficult. It will be ugly. It will be horrible. But nonetheless, in order for me to paint my picture, in order for me to paint that picture of events as it truly happened, you have to hear from him . . .

> You can't make that decision in a case of this magnitude, I believe, unless you hear from him. And you will. He will get up and tell you what he told Detective Saldate. He will tell you of his responsibility in this case; that he is responsible. He will tell you of Mr. Smallwood. My client will get up there and he will literally bear his soul to you so that you can make a fair and adequate decision in this case.

(*Id.* at 49-50.)

Counsel concluded his opening statement by reiterating that the State had the burden of proving "beyond a reasonable doubt . . . that what they say is true, what they have accused Michael Gallegos of doing is the truth, and that what they are asking you to convict him of is first degree murder and sexual conduct with a minor." (*Id.* at 51.) Counsel then stated:

> I am asking you to be fair. I'm asking you to convict my client. I'm asking you to make a fair and realistic assessment of the facts as they will be represented to you. And I think that's all I can ask. That's all the court and the system can demand of you. It's a very difficult duty, and I hope you do it well.

(*Id.*)

At trial, counsel vigorously cross-examined Dr. Bolduc, the medical examiner, attempting to cast doubt on his testimony that the victim's injuries indicated she was sexually assaulted pre-mortem. (RT 3/11/91 at 51-65.) Counsel presented Petitioner's testimony on

the last day of trial.  Petitioner testified that he was extremely intoxicated at the time of the crime, that Smallwood was an equal participant, that the victim's death was accidental, that he believed the victim was dead when he penetrated her, and that he was sorry for what he had done.  (RT 3/13/01 at 46-72.)

The next day, during his closing argument, counsel explained to the jury:

> Yesterday, I put my client on the stand and I treated him with taming [sic] contempt.  I don't normally do that.  But I though it was called for in this case.  You needed to see Michael Gallegos.  You needed to see that he is not the person that the State has portrayed to you.  You needed to see that he's a child.  He's a man-child.  He's pathetic, he's despicable, but he's a child.

> You needed to see what Detective Saldate saw. . . .  He told you he believed Michael Gallegos.  Michael told him that he never intended for this to happen.  And he told you that he believed him.

(RT 3/14/91 at 28.)

Counsel further informed the jury:

> I told you in my opening that I felt uncomfortable.  I do.  Several times throughout the course of this trial, that was willfully [sic] apparent.  And I'm sorry for that.  But I don't think to characterize the situation in any other manner other than it's very, very real.  Stark reality is fair.  I think I would insult you. . . .  I didn't want to get up here and on behalf of my client deny things that are not in dispute.  The facts, as Mr. Stalzer [the prosecutor] related them to you are not in dispute.  His theory is, though.

(*Id.* at 25-26.)

Counsel again acknowledged that Petitioner was "absolutely responsible for the taking of Kendall Wishon's life," adding: "That is extremely difficult for me to say.  It's probably extremely difficult for a lot of people to hear.  But it's true."  (*Id.* at 26.)

However, counsel proceeded to attack the allegation that Petitioner "knew he would cause the death of Kendall and that he did so with premeditation."  (*Id.*)  Counsel argued:

> The State's theory in this case is that George Smallwood, Michael Gallegos were playing Nintendo, two 18-year-old high school boys, were playing Nintendo and that when they walked into the bedroom of Kendall Wishon, that they experienced those feelings.  I think that that is absurd.  I don't believe that the evidence in any way, shape, or form showed you that that was the case.

(*Id.* at 26-27.)

Counsel urged the jury to set aside its passions and "make a fair and just assessment

of the facts." (*Id.* at 27.)  He then continued his attack on the first degree murder charge and

argued for conviction on a lesser count:

> One of the instructions that you are going to receive is an instruction that deals with the crime of reckless manslaughter, and what that says is if the defendant caused the death of another person by conduct showing a conscious disregard of a substantial and unjustifiable risk of death, then you can find him guilty of that.  I submit to you that all of the facts that you have heard certainly show that that was the case.

> Mr. Stalzer has told you about premeditation.  To me that's just that somehow my client was cunning, he was cold, he was calculating when he did this.   I would simply ask you to think of what he told you, think of what he told Detective Saldate, think of what Saldate said about him.  He was telling the truth.

(*Id.* at 29.)

Next counsel discussed the medical examiner's testimony:

> We've had some testimony from Dr. Bolduc about post-mortem injuries, about time of death, about the injuries that were present on the body of young Kendall.  I think you have heard enough to make the decision in that regard for yourself.

(*Id.* at 30-31.)

Counsel concluded his closing argument by again apologizing to the jurors for the

difficulty of their task and asking the jury to be fair.  (*Id.* at 30.)

*PCR proceedings*

Testifying at the evidentiary hearing before the PCR court, counsel disputed the

allegation that he had provided constitutionally ineffective assistance at trial.  (RT 12/1/00

at 6.)  He explained that his strategy in conceding Petitioner's responsibility for the victim's

death was to ask the jury "to consider very seriously not finding him responsible for a first

degree murder but something lesser."  (*Id.* at 10.)  He described his theory of the case as

follows:

> [T]hat given Michael's age, given his alcohol consumption, given his . . . prior history, his upbringing, that this was in no way shape or form a premeditated act.  It was a lesser . . . type of situation, and we couldn't escape, given his statements, . . . the fact that he beared [sic] some responsibility, but it was just an effort to characterize that.

(*Id.* at 39.)

Counsel defended his negative comments about Petitioner in his opening statement as an attempt to prepare the jury for the horrific facts they were going to hear and to maintain the defense's credibility:

> [I]t was going to draw the string with some very horrible facts that were going to come in. We needed to set the stage for what was going to happen because his statements [to Detective Saldate] were going to come in. We had already litigated those . . . and I think you lose a lot of ground in a trial by simply by trying to say, you know, it's red when it's really black. . . . This was going to come down to the credibility of Michael and the believability of Michael. And to . . . characterize what had happened in any type of a fashion less than what it was, I think would have been . . . certainly ineffective. I mean, you can't dance around the issues in every case. And I think this was one that called for us to simply step up to the plate and confront them and call them what they were because otherwise I think . . . given the facts as they were about to unfold at that point, given the pretrial rulings, we knew we had a tough road. And I think to simply ignore things at that point would have been a disservice, and I think would have clearly been . . . a less than adequate job.

(*Id.* at 25-26.)

Counsel added that his comments during opening were "not an attempt to vilify or distance myself from Michael. I mean, I think quite the opposite. We needed to . . . strongly characterize what had happened accurately and then . . . explain the reasons for the conduct." (*Id.* at 34.) Counsel also testified that he had discussed this approach with Petitioner. (*Id.* at 41-42.)

Counsel acknowledged that in his opening statement, when he conceded Petitioner's guilt and asked the jury to convict him, he did not qualify his statements by specifying a charge less than first degree murder. (*Id.* at 27.) He testified that he did so purposely. (*Id.* at 28.) He indicated that his strategy was "to present to the jury the facts and arguments from which they would find him guilty of a lesser offense." (*Id.* at 41.) Counsel testified that his approach to the case was a "reasonable tactic based on [his] experience." (*Id.* at 42.)

The PCR court, in denying Petitioner's claims of ineffective assistance, determined that the applicable standard was *Strickland*, not *Cronic*, because "trial counsel's performance did not constitute abandonment." (PCR doc. 227 at 2.) The court then set forth its application of *Strickland*'s two-pronged standard:

As to the first prong, the Court finds that Petitioner has not sufficiently

shown that trial counsel's performance was deficient.  Because of the overwhelming evidence of Defendant's guilt, it was reasonable for trial counsel to adopt a strategy that could result in a conviction for a lesser-included offense such as second degree murder or manslaughter, thereby avoiding the death penalty. . . .  To make a request for manslaughter, as trial counsel did in closing argument here, it was important for him to maintain credibility with the jurors, which might explain his tactics and choice of wording during his opening statement.  His words about the "despicable conduct" of the Defendant were harsh, but probably added to counsel's credibility with the jury when pleading for manslaughter; there simply is no way to sugar-coat the sodomization and murder of an eight year old female child.

(*Id.*)

The court then explained that even if counsel's performance had been deficient, Petitioner would not be entitled to relief under *Strickland* because he failed to prove prejudice:

[T]he State's evidence was completely overwhelming: The Defendant confessed twice to two different police detectives, and the DNA evidence in Kendall's rectum linked to the Defendant was devastating to the defense; all the other evidence corroborated the Defendant's guilt.  There is no reasonable probability that, but for any errors made by trial counsel, the result of the trial would have been any different.

(*Id.* at 3.)

<u>Analysis</u>

In *United States v. Cronic*, the Supreme Court created an exception to the *Strickland* standard for egregious cases evidencing an actual breakdown in the adversarial process at trial.  466 U.S. at 656-58.  In such cases, the prejudicial impact of counsel's performance is presumed and need not be proved.  *Id.* at 659-60; *see United States v. Swanson*, 943 F.2d 1070, 1072-74 (9th Cir. 1991).  Petitioner argues that *Cronic*, rather than *Strickland*, provides the appropriate analytical framework for evaluating defense counsel's efforts.  Controlling case law dictates otherwise.

In *Florida v. Nixon*, 543 U.S. 175, 176 (2004), the Court held that defense counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt during a capital trial did not automatically render counsel's performance deficient.  The Court rejected the assertion that counsel's effectiveness should be evaluated under the *per se* prejudice

standard of *Cronic,* explaining that the *Cronic* standard is a "narrow exception to *Strickland*'s holding" and is "reserved for situations in which counsel has entirely failed to function as the client's advocate." *Id.* at 189-90. Instead, the Court applied the *Strickland* standard and held that, under the circumstances of the case, counsel's concession strategy was reasonable. *Id.* at 188-89.

Similarly, in *United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005), defense counsel, faced with overwhelming evidence, conceded his client's guilt in an effort to enhance the defendant's credibility while attempting to avoid conviction on other charges. The Ninth Circuit, citing *Nixon*, held that counsel's performance did not descend to the level of a complete failure to subject the prosecution's case to meaningful adversarial testing such that it was presumptively prejudicial. *Id.*; *see Trice v. Ward*, 196 F.3d 1151, 1162 (10th Cir. 1999) (in light of overwhelming evidence of guilt "it was an entirely reasonable strategy for [defendant's] trial counsel to concede [that defendant raped the victim] and focus his efforts on persuading the jury that [the defendant] did not have the intent to commit first-degree murder, and/or persuading the jury to spare [his] life").

In Petitioner's case, counsel actively advocated on his client's behalf throughout the trial, examining the State's witnesses, including the medical examiner, and presenting Petitioner's testimony in an attempt to advance the theory that Petitioner, while responsible for the victim's death and therefore guilty of lesser-included offenses, should not be convicted of first degree murder. *See Milliner v. Adams*, 376 F.3d 520, 523 (6th Cir. 2004) ("Throughout the trial, petitioner's attorney was an active participant: he cross-examined witnesses, made proper objections, and presented a closing argument. This level of representation does not fall below the low threshold required by *Cronic.*"); *Hooper v. Mullin*, 314 F.3d 1162, 1175 (10th Cir. 2002) (*Cronic* inapplicable where "[d]efense counsel cross-examined the State's guilt-stage witnesses, made objections to the State's evidence, presented some evidence in Petitioner's defense, and made opening and closing arguments").

Moreover, counsel articulated a strategic purpose for his concession of Petitioner's

guilt and his acknowledgment of the egregious nature of the crime; namely, he was attempting to establish credibility with the jury.  Courts have recognized this as a valid strategy rather than a form of abandonment that would trigger the *Cronic* presumption of prejudice.  *See Thomas*, 417 F.3d at 1058 (counsel "had a sensible reason for not contesting Thomas's participation in the . . . robbery: it was, for all practical purposes, incontestible, and he believed that doing so would enhance his credibility on counts where the evidence was somewhat less clear and the penalties significantly greater"); *Hovey v. Ayers*, 458 F.3d 892, 906 (9th Cir. 2006) (counsel conceded his client's guilt to protect his own credibility and avoid conviction on other charges).

Because counsel subjected the State's case to meaningful adversarial testing and had a strategic basis for his concession of guilt, the *Cronic* presumption of prejudice does not apply, and the Court will evaluate Claim 3 using the *Strickland* standard.

It is not necessary for the Court to assess the quality of counsel's performance because it is clear that Petitioner cannot satisfy *Strickland*'s prejudice prong.  *Strickland*, 466 U.S. at 697.  Uncontested evidence, including Petitioner's confessions and corroborative DNA evidence, established that Petitioner killed the victim and sexually assaulted her.  Given this evidence, there was not a reasonable probability that the jury would have returned a different verdict if counsel had adopted a different defense theory or used different tactics at trial.  *See Thomas*, 417 F.3d at 1059; *see also Haynes v. Cain*, 298 F.3d 375, 382-83 (5th Cir. 2002) (counsel's failure to obtain defendant's consent before conceding in opening argument that defendant was guilty of second-degree murder did not prejudice defendant where prosecution possessed nearly conclusive evidence that defendant committed offense.); *Parker v. Head*, 244 F.3d 831, 840 (11th Cir. 2001) (counsel's strategic decision to concede defendant's guilt did not amount to ineffective assistance in light of overwhelming evidence of guilt, including defendant's admissible confession).

Conclusion

The PCR court's rejection of this claim did not constitute an unreasonable application

of *Cronic* and *Strickland*.  Therefore, Petitioner is not entitled to relief on Claim 3.

**Claim 4        Failure to introduce exculpatory photographic evidence**

Petitioner alleges that counsel performed ineffectively by failing to introduce photographic evidence showing George Smallwood's fingernails and the scratches on the victim's face.  (Dkt. 74 at 56-59.)  According to Petitioner, as a "chronic nail biter" his fingernails, in contrast to Smallwood's, were too short to have caused the scratches, a fact which would have corroborated Petitioner's testimony, supported a conviction on a lesser count, and established several mitigating factors.  (*Id.*)

At the evidentiary hearing, counsel testified that Petitioner had short nails as a result of his nail-biting habit and that photographs had been taken of his and Smallwood's hands.  (RT 12/1/00 at 14.)  Counsel acknowledged that Petitioner's testimony might have been corroborated by evidence showing that Smallwood's nails were more capable of causing the scratches on the victim's face.  (*Id.* at 15.)  However, counsel was concerned because the photos of Petitioner showed cuts to the back of his hands; the State could have argued that the injuries were caused in Petitioner's struggle with the victim.  (*Id.* at 16.)  At the evidentiary hearing counsel also noted that he had presented testimony from Petitioner's mother that Petitioner had a habit of biting his fingernails.  (*Id.* at 35; *see* RT 3/13/91 at 29-30.)  Finally, counsel testified that Petitioner's nails, while chewed down, were capable of leaving scratches. (RT 12/1/00 at 43)

The PCR court found that there was "no merit" to this claim.  (PCR doc. 227 at 3.)  This ruling is not an unreasonable application of *Strickland* because Petitioner can show neither deficient performance nor prejudice.  Counsel explained that he was aware of the photos and made a tactical decision not to open the door to evidence of injuries to Petitioner's hands.    According to *Strickland*, such strategic choices are "virtually unchallengeable." 466 U.S. at 690.  Petitioner himself acknowledged that he participated with Smallwood in smothering the victim, so little relevance would have attached to evidence that his nails were shorter than Smallwood's and perhaps less likely to have left the scratches

1    on the victim's face.  To the extent that such evidence had any value, counsel realized it

2    through the testimony of Petitioner's mother.

3         Petitioner is not entitled to relief on Claim 4.

4    **Claim 5        Failure to prepare for cross-examination of medical
                      examiner**

5
     **Claim 6        Failure to retain independent expert to challenge medical
6                     examiner**

7         Petitioner alleges that counsel performed ineffectively in his presentation of the theory

8    that Petitioner had sex with a corpse rather than a human being. (Dkt. 74 at 60-63.)  Pursuant

9    to this theory, Petitioner was technically not guilty of sexual conduct with a minor because

10   the offense required both a living victim and a belief on Petitioner's part that the victim was

11   alive.[9]   Petitioner faults counsel for failing to prepare for his cross-examination of the

12   medical examiner and for failing to retain an independent expert to support the defense

13   theory.  (*Id.*)

14        <u>Analysis</u>

15        The PCR court found these claims meritless.  (PCR doc. 227 at 3.)  This decision was

16   not an unreasonable application of *Strickland* because Petitioner cannot establish that

17   counsel's performance was deficient or prejudicial.

18        With respect to Claim 5, the record refutes Petitioner's argument that counsel was

19   unprepared to cross-examine Dr. Bolduc.  As previously noted, defense counsel questioned

20   the medical examiner regarding the timing of the victim's injuries, challenging Dr. Bolduc's

21   testimony that the anal penetration occurred prior to death.  (RT 3/11/91 at 51-65.)

22        In support of his allegation that counsel was unprepared, Petitioner cites an incident

23   during Dr. Bolduc's testimony when counsel became aware that certain notes and diagrams

24   _____

25        [9]    The applicable statute, A.R.S. § 13-1405(A), provides: " A person commits

26   sexual conduct with a minor by intentionally or knowingly engaging in sexual intercourse
     or oral sexual contact with any person who is under eighteen years of age."

27        As discussed in Claim 20, the Arizona Supreme Court rejected Petitioner's theory in
     *Gallegos I* on "public policy" and other grounds.  178 Ariz. at 8-10,  870 P.2d at 1104-06.

28

from Dr. Bolduc's report had not been disclosed.  Counsel moved to exclude the materials; the court took a recess to allow counsel to review the information, which documented blunt force trauma to the victim's head.  (*Id.* at 31-37.)   After reviewing the documents, counsel withdrew his motion, informing the court:

> Based upon my discussions with [Dr. Bolduc] . . . it appears that the items are not going to make much of a difference to his opinions as it relates to the typed version [which was disclosed to counsel].  I take it from speaking to him there is going to be no surprise.  Obviously I will listen closely; if there is, I will jump up.  But based upon what he's told me, I'm not going to be surprised about anything.

(*Id.* at 37-38.)

At the post-conviction evidentiary hearing, counsel reiterated that the omitted material was "not significant because clearly it was referred to within the body of the report, and it was not something that I did not know about." (RT 12/1/01 at 47.) Counsel further indicated that his focus when cross-examining Dr. Bolduc was the injury to the victim's rectum and whether it was consistent with pre- or post-mortem sexual assault, explaining that his goal was to point out inconsistencies in Dr. Bolduc's testimony regarding the timing of the victim's death.  (*Id.* at 44-45.)  Based upon this record, Petitioner has not shown that counsel performed at a constitutionally ineffective level with respect to his handling of Dr. Bolduc's testimony.

Regarding Claim 6, counsel did not present a defense expert to testify on Petitioner's behalf.  At the PCR evidentiary hearing, counsel testified that he made efforts to retain an independent medical examiner, contacting a pathologist in Los Angeles.  (RT 12/1/00 at 11.) However, counsel "was unable to secure an opinion that would have directly contradicted Dr. Bolduc's opinion" that the penetration occurred pre-mortem.  (*Id.* at 48.)

Petitioner offers nothing but speculation that an expert witness could have been found whose testimony would have supported the defense theory.  This is insufficient to support an allegation of ineffective performance or prejudice, particularly in light of counsel's efforts to locate such an expert and his substantial cross-examination of Dr. Bolduc. *See Bower v. Quarterman*, 497 F.3d 459, 471-72 (5th Cir. 2007) (decision not to call an expert witness to

rebut the state's ballistics evidence did not constitute deficient performance where counsel felt the evidence was weak and brought out those weaknesses in cross-examination of the state's experts); *see also Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (speculation as to what expert might say "is insufficient to establish prejudice"); *Grisby v. Blodgett,* 130 F.3d 365, 373 (9th Cir. 1997) (same); *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir. 2002) ("complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative" and "to demonstrate the requisite *Strickland* prejudice, [petitioner] must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.") (citations omitted).

For the reasons set forth above, Petitioner is not entitled to relief on Claims 5 and 6.

### Claim 7          Requiring Petitioner to testify

Petitioner alleges that counsel rendered ineffective assistance by requiring him to testify without valid strategic or tactical reasons and without a full investigation and well-developed defense theory. (Dkt. 74 at 64-66.) He contends that his testimony was harmful and unnecessary, given that Detective Saldate had already related all the details of his confession to the jury. (*Id.*) Petitioner also asserts that counsel expressed contempt for him and that the decision to put him on the stand was the product of a conflict of interest stemming from counsel's desire to ingratiate himself with the jury and distance himself from Petitioner. (*Id.*)

Background

At the evidentiary hearing before the PCR court, counsel disagreed with the contention that Petitioner's testimony offered nothing beneficial to the defense:

> [I]t was my feeling that the jury in this case and in this type of case, given the facts of the case and given the elements of what we were dealing with, really needed to hear from Michael. They needed to make their own assessment of him and make those critical credibility judgments that they had to make given what we were asking them to do.

(RT 12/1/00 at 10.) When asked why he did not rely solely on Detective Saldate's testimony

1   to put Petitioner's version of events before the jury, counsel responded:

2           Well, you know, coming from a police officer that's somewhat cold-
        hearted and dispassionate, and it is a little bit worse, you know, than coming
3       from a defendant. I think in Michael's situation he was a young man. He was
        eighteen years old. . . . He was not sophisticated. He was not somebody that
4       was cold-blooded and uncaring, and I thought the jury needed to see that, to
        see that he was literally a child. That he was not, you know, the man the State
5       was trying to portray him as. I mean, he was not that type of person.

6   (*Id.* at 49-50.)

7           Counsel further explained that Petitioner's testimony was necessary to demonstrate

8   his remorse, to detail his history of alcohol abuse, and to generate sympathy from the jury

9   by showing that he was "an honest and polite young person" who came from a "good, strong

10  family" and had "good support." (*Id.* at 50-51.) Counsel stated that he "was hoping . . . that

11  . . . those values would come out and be apparent in front of a jury and maybe they would

12  realize that here was a poor young man who made a tragic mistake." (*Id.* at 51.) According

13  to counsel, Petitioner's testimony was also required to support the defense theory that the

14  victim was dead at the time of the sexual contact. (*Id.*)

15          When asked to characterize his demeanor toward Petitioner when Petitioner testified

16  at trial, counsel answered:

17          You know, it kind of went back and forth. . . . I put Michael on, and at
        times it's my recollection during his testimony – I mean, he and I had talked
18      about areas that we were going to directly confront, and he needed to let this
        jury see him address those issues. And, you know, he was – he was certainly
19      very scared about it. He certainly . . . had some, I guess, reluctance to talk, and
        I pushed him. I pushed him when he was on the stand because . . . I felt that
20      the jury needed to make . . . a real critical assessment of him. . . . He had a lot
        of things going for him, and he had simply made a bad mistake, and they
21      needed . . . to make that assessment. And it is hard to make that assessment of
        someone if they are sitting there being mute and emotionless, and that's who
22      we tried to get out of Michael in front of the jury.

23  (*Id.* at 22-23.) Counsel acknowledged being "forthright" with Petitioner, asking "very direct

24  questions" and not "babying him when he was on the stand," but he denied treating Petitioner

25  with contempt. (*Id.* at 23.)

26          Counsel also testified that, contrary to Petitioner's assertions, he did not force or

27  require Petitioner to testify:

28
                                    - 32 -

> [M]y recollection is that I didn't force . . . Michael or put Michael – that was a decision that we made. Before my opening statement we had discussed it for some time because I would never have said what I said in my opening statement . . . that he was going to take the stand, that these people were going to hear from him unless I had discussed that, and I explicitly have a very clear memory of discussing it with Michael, of writing a letter to Michael memorializing our discussions with respect to what I was going to do in opening because I told Michael I didn't want to have any surprises. . . . [W]e talked about him taking the stand and, you know, that type of point, you know, this room is not a room to be timid in, and we decided . . . that, heck, this is how we were going to play it.

(*Id.* at 21-22.)

In contrast, Petitioner testified that he did not recall receiving a letter from counsel, that the decision that he would testify was made on short notice, and that he had mixed feelings about testifying but acceded to counsel's advice. (*Id.* at 85-86.)

Applying *Strickland*, the PCR court found that the decision to offer Petitioner's testimony was a strategic matter and did not amount to deficient performance:

> Calling the Defendant as a witness was also reasonable strategy because that was the only way to emphasize the Defendant's extreme intoxication that night, which was very important to defeat the State's claim of premeditation and specific intent. The Defendant's testimony also raised the issue of George Smallwood's complicity and the fact that it was George who put his hand over Kendall's mouth, causing her death by asphyxiation.

(PCR doc. 227 at 3.) The court also found that Petitioner had not demonstrated prejudice in light of the overwhelming evidence of his guilt. (*Id.*)

Analysis

The decision of the PCR court did not represent an unreasonable application of *Strickland*. Counsel's performance was not deficient. He explained that there were strategic reasons for calling Petitioner as a witness. Petitioner was able to provide first-hand information in support of key elements of the defense: his level of intoxication, the accidental nature of the victim's death, the extent of Smallwood's participation, the assertion that the victim was dead at the time he penetrated her, and Petitioner's remorse. Counsel also believed that Petitioner would be a sympathetic witness and that in order to humanize him and explain his actions to the jury he would have to testify.

The record indicates that counsel's strategy was fully considered, developed in

consultation with Petitioner, and "the result of reasonable professional judgement." *Strickland*, 466 U.S. at 690.  As the Ninth Circuit recently reiterated:  "To declare that it was wrong because in hindsight it proved unsuccessful and must have been uninformed is not what the Supreme Court intended when we analyze a *Strickland* claim after the fact." *Pinholster v. Ayers*, 525 F.3d 742, 761 (9th Cir. 2008) ("Given the evidence presented by the State, trial counsel's tactical decision to advise [petitioner] to testify was reasonable.").

Having found that counsel's performance was not deficient under *Strickland*, it is unnecessary to address the question of prejudice.  Nevertheless, the Court notes that Petitioner's allegations of prejudice are unpersuasive.  Petitioner asserts that the decision to present his testimony was harmful because the trial court and the Arizona Supreme Court relied on the testimony to find that he acted with foresight and appreciated the wrongfulness of his conduct and to establish cruelty as an aggravating factor.  To the contrary, the information most damaging to Petitioner's defense was contained in Detective Saldate's testimony.  To the extent  Petitioner's testimony offered additional information, it tended to reduce his culpability by emphasizing his level of impairment and the absence of any intent to kill the victim.

Claim 7 is without merit and will be denied.

**Claim 8        Denial of right to counsel at resentencing**

Petitioner alleges that the trial court denied his right to the effective assistance of counsel by its handling of his pro per motion for new counsel.  (Dkt. 74 at 66-68.)

At the resentencing hearing, the court discussed with Petitioner and counsel a letter Petitioner had sent to the court requesting a new attorney.  (RT 10/24/94 at 108-10.)  During the discussion, Petitioner first told the judge that he would like the letter to be entered into the record.  (*Id.* at 108.)  He then indicated, however, that he and his attorney had "resolved" the issue and Petitioner had "agreed to keep him on as my attorney" and wanted him to handle the hearing.  (*Id.* at 109.)  After Petitioner told the judge he was withdrawing his request for new counsel, the judge gave him back the letter and it was not entered into the

record.  (*Id.* at 110.)

The PCR court found this claim "precluded pursuant to Rule 32.2(a)(3) (waived because not raised at trial or on appeal), and alternatively, . . . not colorable." (PR doc. 10 at 1.)  This preclusion ruling rests on an independent and adequate state procedural bar. *See Smith*, 536 U.S. at 860; *Ortiz*, 149 F.3d at 931-32.

Petitioner alleges that the procedural default of this claim is excused by the ineffective performance of his appellate counsel. (Dkt. 86 at 57-58.)  As stated above with respect to Claim 2, because Petitioner failed to exhaust an independent claim of ineffective assistance of appellate counsel in state court, such an allegation cannot constitute cause for the procedural default of Claim 8.  In addition, the issue omitted by appellate counsel is meritless.  Petitioner withdrew his request for new counsel after discussing the matter with current counsel.  The record clearly indicates that he was not, as he now contends, dissuaded from filing his letter, but agreed to withdraw the document when the judge informed him that he could do so if he wished. (RT 10/24/94 at 110.)  To the extent Petitioner alleges that his counsel was ineffective at resentencing, that claim will be discussed below.

**Claim 9        Failure to investigate and present mitigating information at sentencing**

Petitioner alleges that trial and resentencing counsel provided ineffective assistance by failing to sufficiently investigate and present evidence concerning his mental health and personal history.  (Dkt. 74 at 68-77.)

Petitioner raised this claim in his supplemental PCR petition, alleging that counsel performed ineffectively by failing to explore Petitioner's mental health background, specifically the "origins, extent and implications of Petitioner's learning disability." (PCR doc. 204 at 22-23.)  The PCR court denied the claim, finding neither deficient performance nor prejudice.  (PR doc. 10 at 2.)

This Court previously found the claim exhausted but denied Petitioner's requests for evidentiary development. (Dkt. 106.)  Having reviewed the merits of the claim, the Court

finds, for the reasons set forth below, that Petitioner is not entitled to habeas relief.

Background

*Initial sentencing*

At the guilt phase of trial, Petitioner's mother testified about his learning disability and alcohol consumption. (RT 3/13/91 at 23-32.) Petitioner himself testified that he suffered from a learning disability; he also detailed his alcohol consumption on the day of the crimes. (*Id.* at 34-35, 37-41, 42-58, 84-90, 112-16.)

Following Petitioner's conviction, counsel moved for a "diagnostic evaluation" of Petitioner pursuant to Rule 26.5 of the Arizona Rules of Criminal Procedure. (ROA 119.) The court granted the motion and appointed Dr. John DiBacco to evaluate Petitioner and determine whether, at the time of the crime, his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to requirements of the law was significantly impaired, but not so impaired as to constitute a defense to the prosecution."[10] (ROA 122.) Counsel prepared a sentencing memorandum and attached to it the predispositional reports written by Petitioner's juvenile probation officer. (ROA 127.) These reports detailed Petitioner's status as a learning disabled student. Specifically, the reports stated:

Mike is a Special Education student . . . currently enrolled in the 12th grade. Mike was diagnosed as a Learning Disabled Student during Elementary School. Mrs. Gallegos reports that Mike is able to learn things that require the use of his hands, but book material takes a long time for Mike to understand. Mrs. Gallegos reports that Mike does well in Mechanics, while Math gives him the most difficulty.

Mike's attendance has been poor. Attendance reports indicate an excessive number of truancies and 21 classes missed due to Out of School Suspension.

Mike's grade report for the 1988-89 school year reflect the following: Weight Training F; Resource English D; Resource U.S. History B; Independent Study C; Welders Helper C and Resource Math F.

. . . .

It is this Officer's opinion that Mike Gallegos is a young man who

---

[10]   This language reflects the statutory mitigating factor set forth in A.R.S. § 13-703(G)(1).

apparently has not developed the ability to think before he acts. Mike tends
to behave impulsively and allows himself to become involved in a situation
without considering the consequences. Mike's actions do not appear to be
vicious, just thoughtless. Once he is confronted with his mistake, it is this
Officer's experience that Mike will choose to deny his actions and attempt to
avoid consequences instead of admitting his mistake.

(*Id.*, Ex. at 5.)

At the sentencing hearing, counsel called as witnesses Petitioner's father, mother, brother, and sister Margaret, all of whom testified that Petitioner was a good kid from a good family and was remorseful for his actions. (RT 5/24/91 at 21-30.) Petitioner's juvenile probation officer also testified. (*Id.* at 10-20.) He expressed his opinion that Petitioner was the least likely of his clients to commit this type of crime. (*Id.* at 16.) He also testified, reiterating comments made in his written reports, that Petitioner tended to act impulsively. (*Id.* at 15.) He further explained that Petitioner was a follower, not a leader; he "had always been the type of person who would get involved with somebody else, and he always seemed to be the person who was led rather than be the leader himself." (*Id.* at 19-20.) Next, Detectives Chambers and Saldate testified that they did not believe the death penalty was the appropriate sentence for Petitioner. (*Id.* at 30-41.) Detective Chambers testified that he strongly opposed the death penalty for Petitioner. (*Id.* at 37.) He indicated that Petitioner's "age is still a question in my mind. I'm aware of his chronological age, but I'm not certain of his – his actual maturity. My impression in my brief contact with this young man was of him, one, being unsophisticated, and, two, being at some point less than his chronological age." (*Id.* at 39-40.) Finally, Petitioner took the stand, reading a statement that expressed his remorse for the victim's death and attributing his actions to drug and alcohol impairment. (*Id.* at 42-43.)

Counsel also submitted Dr. DiBacco's report (*id.* at 57-58, 65) and dozens of letters advocating a life sentence rather than the death penalty. Also before the court was the presentence investigation report, which included sections on Petitioner's substance abuse history and mental health. (ROA 131.) The latter section included the comments of Dr. J.J. Singer, who counseled Petitioner while he was on juvenile probation. (*Id.* at 6.) Dr. Singer

described Petitioner as "definitely a follower and not a leader" who "[w]hen he got into trouble it was because he was following his peers in order to be accepted." (*Id.*)

In its special verdict, the trial court stated that it had considered in mitigation Petitioner's "documented" history of drinking and substance abuse and the fact that Petitioner had "a documented learning disability." (RT 10/24/94 at 184-85.) The Arizona Supreme Court likewise noted that Petitioner "presented evidence that he had a history of alcohol and drug abuse, as well as a documented learning disability." *Gallegos I*, 178 Ariz. at 18, 870 P.2d at 1114.

*Resentencing*

As previously noted, the Arizona Supreme Court remanded the case for resentencing with the directive that the trial court assess Petitioner's impairment as a nonstatutory mitigating circumstance. *Id.* at 23, 870 P.2d at 1119.

Prior to the resentencing hearing, counsel sought and the court authorized the appointment of mitigation investigator Mary Durand and Dr. C.J. Shaw, an addiction specialist. (ROA 154.) Dr. Shaw prepared a report opining, based upon information provided by Petitioner, that Petitioner's blood alcohol level at the time of the crimes was 0.2 or higher. (ROA 161; *see* RT 10/24/94 at 142.)

At the resentencing hearing, counsel presented testimony from Petitioner and his family and friends regarding his drug and alcohol use, learning disability, and passive, non-violent personality.

Petitioner testified that he suffered from a learning disability and was placed in special education classes starting in the fourth grade. (RT 10/24/94 at 5-6.) He testified that he began drinking alcohol at age 12 or 13, and began using marijuana in sixth or seventh grade and methamphetamine in tenth or eleventh grade. (*Id.* at 6-7.) Petitioner stated that his conduct deteriorated when George Smallwood arrived at his home in Flagstaff; he drank more, used drugs, and skipped school. (*Id.* at 8-9.) He explained that on the day of murder he and Smallwood drank half a bottle of scotch, schnapps, and beer in the morning, smoked

two joints, and then drank beer throughout the afternoon and night. (*Id.* at 11-12.) He testified that the crimes would not have happened if he had not been impaired and if Smallwood had not been present. (*Id.* at 13.)

Petitioner's mother testified that from second grade on he had attended special education classes due to his learning disability. (*Id.* at 54.) She stated that Petitioner had a tendency to take the blame for things other people did. (*Id.* at 55.) Mrs. Gallegos became aware of Petitioner's drug use when he was in junior high. (*Id.* at 56.) According to her testimony, Smallwood was violent and a bad influence; he exerted control over Petitioner and Petitioner followed his lead. (*Id.* at 58.)

Petitioner's sister Margaret testified that she was aware of his drug and alcohol use in the years before the murder. (*Id.* at 63-64.) She stated that Petitioner was nonviolent and mellow when he was intoxicated. (*Id.* at 64-65.) She testified that after Smallwood arrived Petitioner's behavior changed; he became more sullen, withdrawn, and hateful, and abandoned his old friends in favor of Smallwood. (*Id.* at 66.)

Petitioner's sister Maria Covarrubiaz became aware of his drug and alcohol use when he was in seventh grade. (*Id.* at 71.) She too indicated that Petitioner became quiet and mellow when drinking; he did not get into fights or arguments. (*Id.* at 72.) She described Petitioner as a follower who was led by other people; he did not stand up for himself or resist peer pressure. (*Id.* at 72-73.) Smallwood was the leader and Petitioner followed him. (*Id.* at 74.) She indicated that Smallwood had a bad influence on Petitioner, who began to drink more and became rebellious and hateful toward his parents. (*Id.* at 76.)

Carlos Covarrubiaz, Petitioner's brother-in-law, testified that Petitioner began drinking at age 13 or 14. (*Id.* at 83.) He too had observed that Petitioner became mellow under the influence of drugs. (*Id.*)

Michelle Emig, Petitioner's niece, testified that Petitioner started drinking in junior high. (*Id.* at 96.) According to Emig, Petitioner began to drink every day and used marijuana and crystal meth. (*Id.*) She indicated that Petitioner was mellow when drunk. (*Id.* at 97.)

Emig explained that Petitioner became "snobby and rude" when Smallwood arrived. (*Id.*) She testified that Smallwood was the leader and Petitioner the follower. (*Id.* at 98.) She also testified that Smallwood expressed resentment of the victim and thought she was spoiled. (*Id.* at 99.)

Todd Emig, Michelle's husband and a school friend of Petitioner, testified that he began drinking with Petitioner three years before the murder. (*Id.* at 86.) Like the other witnesses, he testified that Petitioner was quiet and laid back when intoxicated. (*Id.* at 87.) He further testified that Petitioner used marijuana, acid, and mushrooms, under the influence of which he remained mellow and did not become argumentative or violent. (*Id.* at 88.) Petitioner began drinking more and became distant from family and friends after Smallwood's arrival. (*Id.*) Petitioner would go along with Smallwood's ideas even if he did not really want to; he never stood up to Smallwood. (*Id.* at 89.)

Greg Weiber, another friend of Petitioner, testified that they drank a lot and smoked marijuana and crystal meth. (*Id.* at 116.) According to Weiber, they used marijuana 10 times a day, crystal meth two or three times a week, and alcohol whenever they had the next day off from work or school. (*Id.*) Petitioner became passive and mellow under the influence of drugs and alcohol; he went along with the crowd, never initiated anything, and was never violent. (*Id.* at 117-18.) Weiber testified that Smallwood was in control of the relationship with Petitioner; he was stronger-willed and manipulative. (*Id.* at 119.)

David Harvey, an acquaintance of Petitioner, testified that he never saw Petitioner drink but did smoke marijuana with him. (*Id.* at 128.) Petitioner never became violent. (*Id.*) Harvey also testified that Smallwood dominated the relationship with Petitioner. (*Id.* at 129-30.)

Anthony Duran, another Flagstaff friend, testified that he drank and used drugs with Petitioner and that Petitioner was "easygoing" when under the influence. (*Id.* at 136.) Duran indicated that Petitioner became less happy after Smallwood's arrival. (*Id.* at 138.) According to Duran, Petitioner was generally unable to resist Smallwood's influence. (*Id.*

at 138-39.)  Duran characterized Petitioner as a follower who was easy to manipulate.  (*Id.* at 140.)

In addition to these witnesses, counsel again presented the testimony of Detectives Saldate and Chambers in opposition to a death sentence.  Detective Saldate testified, however, that he did not believe Petitioner was significantly intoxicated at the time of the murder.  (*Id.* at 36-37.)  Detective Chambers testified in support of a life sentence based on his feeling that the killing was accidental; he believed Petitioner had been drinking.  (*Id.* at 43-45.)

In rebuttal, the State called Dr. Alexander Don to critique Dr. Shaw's report and his conclusion that Petitioner was intoxicated at the time of the crime with a high blood alcohol level.  (*Id.* at 148-54.)  The State also called the victim's mother, who testified that she did not observe signs that Petitioner was impaired on the night of the murder.  (*Id.* at 161.)

At the close of the hearing, the court indicated that it would consider mitigating evidence from the first sentencing hearing, including the testimony of Petitioner's juvenile probation officer.  (*Id.* at 170.)

In sentencing Petitioner, the court again rejected impairment as a statutory mitigating factor.  (*Id.* at 185.)  In doing so, the court repeated its finding that Petitioner "has a documented learning disability.  His testimony is that it affects his math and spelling but not his reading or understanding.  There is no evidence that the defendant is mentally deficient."  (*Id.*)  The court found that Petitioner's impairment and substance abuse history constituted nonstatutory mitigation but that it, together with the other mitigating circumstances, did not outweigh the aggravating factors.  (*Id.* at 188-90.)

In *Gallegos II*, the Arizona Supreme Court affirmed the trial court's findings regarding the aggravating and mitigating factors, including the mitigating value of Petitioner's impairment and history of substance abuse.  185 Ariz. at 344, 916 P.2d at 1060.

*PCR evidentiary hearing*

At the evidentiary hearing on Petitioner's ineffective assistance claims, counsel at

Petitioner's trial and initial sentencing testified on cross-examination that he had been assisted by mitigation specialist Mary Durand.  (RT 12/1/00 at 51.)  Counsel had asked Ms. Durand to identify "areas of mitigation that we could utilize on behalf of [Petitioner], . . . school records, psych records, . . . disciplinary records, work history records, things like that."  (*Id.* at 51-52.)  Counsel testified that he had no reason to believe that Petitioner suffered from "mental problems"; he "didn't have any indication from the family or any records to suggest that."  (*Id.* at 53.)  In addition to Ms. Durand, counsel was assisted by another investigator, who was referred to him by Petitioner's family; this investigator was able to find little mitigating information.  (*Id.*)

Despite raising the claim in his PCR petition, during the evidentiary hearing PCR counsel did not ask trial counsel any questions about his performance during the initial sentencing proceedings or otherwise address the issue of ineffective assistance at sentencing.[11]

Analysis

*Clearly established federal law*

The right to effective assistance of counsel applies not just to the guilt phase but "with equal force at the penalty phase of a bifurcated capital trial."  *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision. *Strickland*, 466 U.S. at 689-90.  The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'"  *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland,* 466 U.S. at 687).

---

[11]    Mr. Antieau, Petitioner's counsel on appeal and at resentencing, had passed away prior to the evidentiary hearing. (*See* RT 12/1/00 at 90.)

With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  466 U.S. at 695.  In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."  539 U.S. at 534.  The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding."  *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

The clearly-established federal law governing this claim includes the Supreme Court's decision in *Bell v. Cone*, 535 U.S. 685, which, as indicated above, clarifies the standard this Court must apply in reviewing the PCR court's rejection of Petitioner's sentencing-stage ineffective assistance claim.  In *Cone* the Supreme Court, after noting the deferential standards set forth in the AEDPA and required by its own precedent, explained that for a habeas petitioner's ineffective assistance claim to succeed:

> he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.  Rather, he must show that [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-99 (citation omitted).

In reviewing Petitioner's allegations of ineffective assistance, this Court further notes that the judge who presided over the trial, sentencing, and resentencing also presided over the PCR proceedings.  Thus, in considering Petitioner's ineffective assistance claims, Judge Hotham was already familiar with the record and the evidence presented at trial and sentencing.  The judge's familiarity with the record provides this Court with an additional reason to extend deference to the PCR court's ruling.  *See Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998).  As the Ninth Circuit explained in *Smith*, when the judge who governed the post-conviction proceeding is the same as the trial and sentencing judge, the court is

considerably less inclined to order relief; doing so "might at least approach 'a looking-glass exercise in folly.'" *Id.* (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)).

*Application of Strickland to Claim 9*

Petitioner contends that if his attorneys had conducted a constitutionally adequate investigation into his mental health history, "they would have discovered that [Petitioner's] family, friends and teachers would have provided evidence, including significantly more corroborating evidence than either counsel presented at sentencing or resentencing." (Dkt. 74 at 70.) Specifically, witnesses could have addressed Petitioner's "learning disability, placement in special education classes, and designation as being Emotionally Handicapped," as well as the "embarrassment and low self esteem" he experienced as a result of his placement in special education, and the fact that he was a "follower, incapable of standing up to others, especially George Smallwood." (*Id.* at 70-72.) Petitioner further contends that he was prejudiced by counsel's failure to present corroborating evidence of Petitioner's drug and alcohol use. (*Id.* at 73.)

Petitioner has failed to demonstrate that counsel's sentencing-stage performance was either deficient or prejudicial, let alone that the PCR court's rejection of the claim was objectively unreasonable. First, it is clear that resentencing counsel did not perform deficiently in presenting evidence of Petitioner's history of drug and alcohol abuse and passive personality. As the Arizona Supreme Court noted, "At the resentencing hearing, defendant and 9 lay witnesses testified concerning defendant's past substance abuse, and Dr. Shaw's report discussed defendant's self-report of past substance abuse." *Gallegos II*, 185 Ariz. at 345, 916 P.2d at 1061. As described above, nearly all of these witnesses also testified that Petitioner did not become violent when under the influence of drugs and alcohol, that he had the personality of a follower, and that he was manipulated by Smallwood. It is difficult to envision how counsel could have presented a more complete picture of Petitioner's impairment and history of substance abuse, as well as his passive personality and the dynamics of his relationship with Smallwood. Moreover, both the trial

court and the Arizona Supreme Court found that Petitioner's impairment and substance abuse history constituted nonstatutory mitigation, so even if counsel could have presented additional corroborating evidence, Petitioner was not prejudiced by this aspect of counsel's performance.

Similarly, counsel did not perform ineffectively with respect to the presentation of evidence concerning Petitioner's intellectual capacity. Petitioner's trial counsel retained the services of Mary Durand, who subsequently assisted resentencing counsel, to review Petitioner's school and medical records in search of mitigating information to present at the initial sentencing hearing. (RT 12/1/00 at 51-52.)  At both the initial sentencing and at resentencing, Petitioner's attorneys made the court aware that Petitioner suffered from a learning disability and had been placed in special education classes throughout his school years.

Nonetheless, Petitioner contends that counsel performed deficiently by relying on Dr. DiBacco's report at the first sentencing hearing because Dr. DiBacco originally misdiagnosed Petitioner and because his revised report, which did address Petitioner's learning disability, was ignored by the court. (Dkt. 92 at 13.) This argument is unpersuasive. Again, both the trial court and the Arizona Supreme Court acknowledged Petitioner's disability.   In discussing Petitioner's youth as a mitigating factor, the supreme court explained:

> The weight that age should receive as a mitigating factor depends on the defendant's intelligence, maturity, and life experiences. In this case, defendant was in special education classes beginning in second grade, which could indicate that his intelligence was below average.  A psychological expert's report concluded, however, that defendant has "at least average fluid intelligence," that he is "not mentally deficient," and that he can understand the consequences of his behavior.

*Gallegos II*, 185 Ariz. at 345, 916 P.2d at 1061 (citations omitted).  The court concluded, however, that given Petitioner's "extensive and prolonged" participation in the criminal acts, his conduct was not the product of impulsivity and immaturity and therefore his age was "a statutory mitigating circumstance worthy of some weight," but was "discount[ed] . . . by the

extent of defendant's participation in the murder." *Id.*

Because evidence regarding Petitioner's mental functioning was presented to and considered by the trial court and the state supreme court, Petitioner cannot establish that he was prejudiced by counsel's performance. *See Hedrick v. True*, 443 F.3d 342, 353 (4th Cir. 2006) ("the connection [petitioner] would have had his trial counsel make between his low intelligence, being easily led, and being prone to substance abuse . . . was nearly identical to evidence presented"). Any further evidence that Petitioner was a slow learner who required special education classes would have been cumulative to the evidence already presented. *See Babbit*, 151 F.3d at 1176 (no prejudice where evidence omitted at sentencing was "largely cumulative of the evidence actually presented"). Other evidence, such as that Petitioner suffered from ADHD and an "inability to process language,"[12] which Petitioner now contends should have been presented, would not have altered the basic sentencing profile provided to the judge. *See Strickland*, 466 U.S. at 699-700; *see also Henley v. Bell*, 487 F.3d 379, 387-88 (6th Cir. 2007) (no prejudice resulting from counsel's failure to call a psychiatric expert to testify during sentencing phase of capital murder trial that defendant had learning disabilities, had dropped out of school, and at the time of the offense was depressed and acting out of character).

In *Eddmonds v. Peters*, 93 F.3d 1307 (7th Cir. 1996), the Seventh Circuit held that the habeas petitioner was not prejudiced by trial counsel's performance at sentencing. Eddmonds had been convicted of deviate sexual assault and murder and sentenced to death for smothering a nine-year-old boy to death while raping him. *Id.* at 1311-12. The killing was unintentional. *Id.* at 1322. At sentencing, counsel presented the testimony of a psychiatrist who recounted Eddmonds's history of mental illness, which included a diagnosis of schizophrenia. *Id.* Counsel also offered a brief closing argument asking the court for

---

[12]     This information is contained in the report of Nancy Cowardin (Dkt. 92, Ex. 1), one of the documents as to which the Court denied Petitioner's motion to expand the record (Dkt. 78; *see* Dkt. 106).

mercy. *Id.* at 1322. Eddmonds alleged that counsel's performance was ineffective because he did not seek additional psychological evaluations or present evidence of Eddmond's extreme mental and emotional disturbance at the time of the crime or information concerning his troubled upbringing and history of drug use. *Id.* at 1319-20.

In rejecting this claim of ineffective assistance, the Seventh Circuit reviewed the proffered mitigation evidence and found that "none of this would have helped had counsel expressly raised it at sentencing." *Id.* at 1321. The court concluded that "we are certain counsel's failure to throw a few more tidbits from the past or one more diagnosis of mental illness onto the scale would not have tipped it in Eddmonds' favor." *Id.*

Likewise, in Petitioner's case there was not a reasonable probability of a different sentence if counsel had presented to the sentencer additional details regarding Petitioner's intellectual limitations or substance abuse history.

Conclusion

The PCR court, having presided over the trial, the initial sentencing, and the resentencing proceedings, rejected the claim that Petitioner's right to effective assistance of counsel was violated by the penalty-phase performance of his attorneys. This decision was not an unreasonable application of *Strickland*. Therefore, Petitioner is not entitled to relief on Claim 9.

**Claim 11    Unconstitutionality of cruel, heinous, or depraved aggravating factor**

Petitioner contends that the aggravating factor set forth in A.R.S. § 13-703(F)(6) is facially overbroad and was applied to his sentence in an unconstitutional manner.[13] (Dkt. 74 at 78-90.)

Background

At sentencing, the trial court found that Petitioner committed the murder in an

---

[13]    Petitioner also asserts that application of this factor was invalid under *Ring*. (Dkt. 74 at 90-93.) As explained above in Claim 1, the holding in *Ring* does not apply retroactively so this allegation is meritless.

especially cruel, heinous and depraved manner pursuant to § 13-703(F)(6).  (ROA 132 at 2-4.)  The court found that the murder was especially cruel based upon the victim's physical and mental suffering.  (*Id.*)  In finding the murder especially heinous or depraved, the court noted the helplessness of the victim and the senselessness of the crime, as indicated by the victim's small size, trusting relationship with Petitioner, and the fact that Petitioner could have accomplished his sexual goals without taking the victim's life.  (*Id.* at 3.)  The court further described the crime as "marked by debasement and perversion," citing Petitioner's admission "that he had anal intercourse with the victim thinking that since she was already dead, he might as well finish what he started."  (*Id.*)  Finally, the court found that Petitioner "actively participated in the killing" and in fact "killed Kendall."  (*Id.* at 8-9.)

On direct appeal, the Arizona Supreme Court considered and rejected both the facial and as-applied challenges to (F)(6).  In upholding the constitutionality of the factor, the court explained:

> The United States Supreme Court has upheld the constitutionality of this statutory provision, and has found that we have construed its operative terms "in a manner that furnishes sufficient guidance to the sentencer." *Walton v. Arizona*, 497 U.S. 639, 655, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990). The trial judge specifically applied our limited construction of the terms especially "heinous," "cruel," and "depraved" in its special verdict. We therefore find no support in the record for defendant's contention that the judge applied this factor without adhering to statutory requirements.

*Gallegos I*, 178 Ariz. at 14, 870 P.2d at 1110 (citation omitted).

The court also rejected Petitioner's argument that the (F)(6) aggravating factor was inapplicable without proof that he physically performed the actions that caused the victim's death, finding that Petitioner "actively participated in the killing." *Id.*

Finally, the court denied Petitioner's claim that the trial court erred in finding that the murder was committed in an especially heinous or depraved manner.  The court detailed its findings:

> Heinousness and depravity focus on defendant's mental state and attitude at the time of the offense as evidenced by his words and actions. *State v. Salazar*, 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992). In determining whether the murder was committed in a heinous or depraved manner, we consider 5 factors: (1) whether defendant relished the murder, (2) whether

defendant inflicted gratuitous violence on the victim, (3) whether defendant mutilated the victim, (4) the senselessness of the crime, and (5) the helplessness of the victim.  *State v. Gretzler,* 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983).  "The mere existence of senselessness or helplessness of the victim, in isolation, need not always lead to a holding that the crime is heinous or depraved. . . ."  *Gretzler,* 135 Ariz. at 52-53, 659 P.2d at 11-12.  "Either or both of these factors [senselessness and helplessness], considered together with other circumstances present in a particular case, may lead to the conclusion that an offense was heinous or depraved."  *Gretzler,* 135 Ariz. at 52, 659 P.2d at 11.  Here, we have more.  *See Runningeagle,* 176 Ariz. at 65, 859 P.2d at 175.

We believe that the record in this case supports a finding of senselessness, helplessness, and gratuitous violence. The victim was helpless; she was an 8-year-old girl who stood a mere 4 feet 5 inches tall and weighed only 57 pounds. Defendant, an 18-year-old male who was in a trust relationship with the victim, stole into the victim's room while she was asleep and senselessly suffocated her. We agree with the trial judge that the victim "never had a chance."

We further find that defendant inflicted gratuitous violence on the victim. Recently, we held that a defendant's act of necrophilia "without question" constituted the infliction of gratuitous violence on the victim. *State v. Brewer,* 170 Ariz. 486, 502, 826 P.2d 783, 799 (1992).  Here, the trial court noted that the medical examiner testified that the "injuries to [the victim's] rectum were inflicted either premortem or contemporaneously with her death [perimortem]."  Defendant, however, testified that he had anal intercourse with the victim for about 15 to 20 minutes after she went limp and *after* he believed she was dead.  Thus, defendant believed he was committing an act of necrophilia. Defendant explained his conduct in a statement made during the presentence investigation:

> He stated that he went ahead and finished the act because "it wasn't like she was going to tell anybody." He sodomize[d] the victim because it was like "why not." He knew he was going to get caught the next day.

This statement evinces the depravity of defendant's mental state. Moreover, other evidence of gratuitous violence exists. After defendant sodomized the victim, he dumped her naked body under a tree where it was found, bruised and battered, the next day.

We think the record supports the trial judge's finding that the murder was committed in an especially heinous or depraved manner. We therefore need not address the judge's finding of cruelty.

*Gallegos I*, 178 Ariz. at 14-15, 870 P.2d at 1110-11.

<u>Analysis</u>

As the Arizona Supreme Court explained, the United States Supreme Court has upheld the (F)(6) aggravating factor against allegations that it is vague and overbroad, rejecting a

claim that Arizona has not construed it in a "constitutionally narrow manner." *See Lewis v. Jeffers*, 497 U.S. 764, 774-77 (1990); *Walton v. Arizona*, 497 U.S. 639, 649-56 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002).  Petitioner's facial challenge to the factor is therefore without merit.

With respect to the state courts' application of the factor to Petitioner's sentence, habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Jeffers*, 497 U.S. at 780.  In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Petitioner contends that the state courts erred in finding that he committed the murder in an especially heinous and depraved manner because there no proof that he actually killed the victim and because he believed she was dead when he sexually assaulted her.  He further contends that the heinousness or depravity of his actions must be "evaluated in light of his age and limited intellectual ability."  (Dkt. 74 at 88.)

The relevant issue in applying the heinous or depraved prong of (F)(6) is the defendant's state of mind; nevertheless, the determination is based not on his subjective mental state but on his "words and acts." *See State v. Fulminante*, 161 Ariz. 237, 255, 778 P.2d 602, 620 (1988).  As the Arizona Supreme Court explained, five non-exclusive factors are used to determine if a murder was heinous or depraved: relishing of the murder, the infliction of gratuitous violence, mutilation of the victim's body, the senselessness of the murder, and the helplessness of the victim. *Gallegos I*, 178 Ariz. at 14-15, 870 P.2d at 1110-11 (citing *State v. Gretzler,* 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983)).  A defendant's intellectual status is not assessed in applying the factor.

Additionally, it is clear, notwithstanding Petitioner's assertion to the contrary, that a rational factfinder could have determined that Petitioner actually killed the victim.  Petitioner

testified that, with Smallwood's hand already on the victim's mouth, he placed his hand over her nose and kept it there as she gasped for air, struggled and flailed, and then went limp. (RT 3/13/91 at 63-66, 103-04.)  He testified that he knew he had killed her "by suffocation." (*Id.* at 97.)  He acknowledged that he "actively participated in the killing of Kendall." (*Id.* at 127.)

With respect to the heinous or depraved prong of (F)(6), a rational trier of fact could also find, based upon Petitioner's words and actions, several of the *Gretzler* factors.  A factfinder could determine that the purpose of the crime was sexual assault, and that the murder was not necessary to achieve that goal.  Therefore, the murder was senseless.  The age and size disparity between Petitioner and the victim support the finding that she was helpless.  Finally, as the Arizona Supreme Court explained, Petitioner's prolonged act of perceived necrophilia constituted gratuitous violence, the depravity of which was further indicated by Petitioner's comments about his conduct.

A rational fact finder could have determined that Petitioner's actions were heinous and depraved in satisfaction of the (F)(6) aggravating factor.  Therefore, the Arizona Supreme Court's denial of this claim was not an unreasonable application of *Jackson*.  Claim 11 is denied.

### Claims 12-18    Application of mitigating evidence

Petitioner alleges that the trial court refused to weigh, or gave inadequate weight to, several mitigating circumstances, including his lack of intent to kill the victim (Claim 12), his intoxication and substance abuse history (Claim 13), his age (Claim 14), his lack of a serious criminal record (Claim 15), the recommendations of leniency from two detectives (Claim 16), the "aberrant" nature of the crime (Claim 17), and the cumulative impact of all the mitigating evidence (Claim 18).  (Dkt. 74 at 93-114.)

Background

As the Arizona Supreme Court noted, *Gallegos II*, 185 Ariz. at 343, 916 P.2d at 1059, over the State's objection the trial court held a full resentencing hearing and allowed

Petitioner to present any mitigation evidence that he desired.  The trial court again found two aggravating circumstances, that Petitioner was an adult and the victim under 15 and that the murder was especially heinous, cruel, and depraved.  (ROA 163 at 2-4.)  The court again found that Petitioner had proved that his age and relative immaturity constituted a statutory mitigating circumstance.  (*Id.* at 7-9.)  The court found that Petitioner failed to prove by a preponderance of the evidence three other statutory mitigating circumstances: impairment, under A.R.S. § 13-703(G)(1); that he was legally accountable for the conduct of another and that his participation in the crime was relatively minor, under (G)(3); and that he could not reasonably have foreseen that his conduct would cause death, under (G)(4).  (*Id.* at 5-9.)

The court further found that Petitioner proved four non-statutory mitigating circumstances: remorse, recommendations of leniency by the police, a history of alcohol and drug abuse, and alcohol impairment.  (*Id.* at 9-10.)  The court found that Petitioner did not prove as a non-statutory mitigating factor the disparity in how he and Smallwood were treated.  (*Id.* at 10.)

Before resentencing Petitioner, the trial court considered the evidence introduced at trial, mitigation evidence from the first sentencing hearing, the mitigation evidence Petitioner presented at the resentencing hearing, and the presentence report and attachments.  (*Id.* at 2.)  The court ultimately determined that the mitigating circumstances were not sufficiently substantial to call for leniency and resentenced Petitioner to death.  (*Id.* at 11.)

In *Gallegos II*, the Arizona Supreme Court considered Petitioner's arguments that he was entitled to leniency based on each of his proven mitigating circumstances. 185 Ariz. at 344, 916 P.2d at 1060.  The court affirmed the findings of the trial court.  *Id.* at 347-48, 916 P.2d at 1063-64.

Analysis

A sentencing court is required to consider any mitigating information offered by a defendant, including non-statutory mitigation.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996).  In *Lockett* and *Eddings v.*

*Oklahoma*, the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence."); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence).

On habeas review, a federal court does not evaluate the substance of each piece of evidence submitted as mitigation. Instead, it reviews the state court record to ensure the state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir.1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence).

As described above, the judge considered and made findings regarding the mitigating factors urged by Petitioner. (*See* ROA 163 at 5-10.) While Petitioner disagrees with these findings, the court considered the evidence, which is the constitutional issue. Moreover, the judge clearly articulated that he considered all the mitigation presented, nonstatutory as well as statutory, and found that it did not warrant leniency. *See Parker v. Dugger*, 498 U.S. 308, 314-15, 318 (1991) (sentencing court properly considered all information, including nonstatutory mitigation, where court stated that it considered all the evidence and found no mitigating circumstances that outweighed the aggravating circumstances); *Moormann v. Schriro,* 426 F.3d 1044, 1055 (9th Cir. 2005) ("the trial court need not exhaustively analyze

each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant").

In sum, there is a distinction between "a failure to consider relevant evidence and a conclusion that such evidence was not mitigating." *Williams v. Stewart,* 441 F.3d 1030, 1057 (9th Cir. 2006). Contrary to Petitioner's arguments, the latter determination does not implicate his federal constitutional rights. The fact that the court found the proffered mitigating evidence "inadequate to justify leniency . . . did not violate the Constitution." *Ortiz*, 149 F.3d at 943; *Eddings*, 455 U.S. at 114-15.

Moreover, the Arizona Supreme Court independently reviewed the record and "conclude[d] that the mitigation is insufficiently substantial to call for leniency." *Gallegos II,* 185 Ariz. at 348, 916 P.2d at 1064. Even if the trial court had committed constitutional error at sentencing, a proper and independent review of the mitigation and aggravation by the Arizona Supreme Court cured any such defect. *See Clemons v. Mississippi*, 494 U.S. 738, 750, 754 (1990) (holding that appellate courts are able to fully consider mitigating evidence and are constitutionally permitted to affirm a death sentence based on independent re-weighing despite any error at sentencing).

Claims 12 through 18 will be denied.

### Claim 19        Erroneous jury instructions

Petitioner alleges that his trial was rendered fundamentally unfair when the trial court provided erroneous jury instructions on the element of premeditation and the charge of sexual conduct with a minor. (Dkt. 74 at 114-21.)

### Premeditation instruction

Petitioner contends that the premeditation jury instruction provided by the trial court relieved the State of proving the element of actual reflection necessary for first degree murder. (*Id.* at 114-17.) This allegation is both procedurally barred and meritless.

He first raised the claim in his PCR petition. (PCR doc. 188 at 4.) The entirety of the claim was contained in a heading which cited an Arizona Court of Appeals case and

made no allegation of a federal constitutional violation.[14]  The PCR court rejected the claim, finding it "precluded pursuant to Rule 32.2(a)(3) (waived because not raised on appeal)" and "not colorable." (PR doc. 10 at 2.)  In making this ruling, the Court invoked Arizona's adequate and independent state procedural bar.  *See Smith*, 536 U.S. at 860; *Ortiz*, 149 F.3d at 931-32.

Petitioner alleges that the procedural default of this claim is excused by the ineffective performance of appellate counsel.  (Dkt. 86 at 80.) As previously indicated, because Petitioner failed to exhaust an independent claim of ineffective assistance of appellate counsel, such an allegation cannot constitute cause for the procedural default of this claim.  In addition, for the reasons set forth below, the claim is meritless.

A challenge to jury instructions does not generally state a federal constitutional claim. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, an error in jury instructions "cannot be merely 'undesirable, erroneous, or even universally condemned,' but must violate some due process right guaranteed by the fourteenth amendment." *Prantil v. State of California,* 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).   To prevail on this claim, therefore, Petitioner must demonstrate that the instructions provided by the trial court "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp*, 414 U.S. at 147); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

"It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147).  In reviewing an ambiguous

---

[14]     Claim VIII, as set forth in the initial PCR petition, consisted of the following heading: "THE JURY WAS IMPROPERLY INSTRUCTED REGARDING PREMEDITATION (ACTUAL REFLECTION NOT REQUIRED; *STATE v. RAMIREZ*, 249 Ariz. Adv. Rpt. 16, 945 P.2d 376) AND THEREFORE THE CONVICTION SHOULD BE SET ASIDE. (NO ARGUMENT SUPPLIED BECAUSE OF TIME CONSTRAINTS)."  (PCR doc. 188 at 4.)

instruction, a reviewing court inquires "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Estelle*, 502 U.S. at 72-73 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).  Harmless error analysis is ordinarily applied to trial errors, including an erroneous jury instruction. *See Neder v. United States*, 527 U.S. 1, 8 (1999); *Johnson v. United States*, 520 U.S. 461, 468-69 (1997).

> At the conclusion of the parties' closing arguments, the court instructed the jury that:

> "Premeditation" means that the defendant's knowledge existed before the killing long enough to permit reflection.  However, the reflection differs from the knowledge that conduct will cause death.  It may be as instantaneous as successive thoughts in the mind, and it may be proven by circumstantial evidence.  It is this period of reflection, regardless of its length, which distinguishes first degree murder from knowing second degree murder.

(RT 3/14/91 at 35; *see* ROA 117.)  The court did not include the provision, set forth in A.R.S. § 13-1101(1), that "[a]n act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion."  (RT 3/14/91 at 35; *see* ROA 117.)  Arguably, this omission, combined with the phrase "instantaneous as successive thoughts," rendered the instruction erroneous under state law.  *See State v. Ramirez,* 190 Ariz. 65, 67-68, 945 P.2d 376, 378-79 (Ct. App. 1997) (instruction that omitted the "balancing language" contained in the "instant effect" provision allowed the State to "mis-argue" that "an act can be both impulsive and premeditated"); *State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d 420, 478 (2003) (discouraging use of "instantaneous as successive thoughts" phrase).

Nonetheless, the court's instruction on premeditation did not render Petitioner's trial fundamentally unfair.  The instruction does not, on its face, permit a finding of premeditation based solely on the passage of time, but specifically states that first degree murder requires a "period of reflection."  Nothing in the prosecutor's argument or the remainder of the court's instructions inaccurately suggested that the State needed only to prove the time element of reflection in lieu of actual premeditation.  In fact, in his closing argument the prosecutor characterized the question of premeditation in this case as "difficult," but emphasized, as opposed to the mere passage of time, Petitioner's "successive thoughts of the mind, that

period of reflection, that awareness, that knowledge" that occurred prior to and during Petitioner's smothering of the victim.  (RT 3/14/91 at 11.)

In addition, the jury was instructed on both felony murder and premeditated murder theories of first degree murder.  The jury convicted Petitioner of first degree murder, but its verdict was not unanimous as to whether Petitioner was guilty of premeditated murder or felony murder.  (ROA 116.)  The jury also convicted Petitioner of the predicate felony of sexual conduct with a minor.  (ROA 115.)  Given these circumstances, the fairness of Petitioner's trial was not affected by the premeditation instruction.  The killing occurred in the course of the sexual assault, so the predicate for felony murder was met, notwithstanding any potential jury confusion regarding the premeditation theory of first degree murder.  *See Carriger v. Lewis*, 971 F.2d 329, 335 (9th Cir. 1992).

**Sexual conduct with a minor instruction**

The trial court provided the jury with written instructions on all of the counts, including the charges of sexual conduct with a minor and attempted sexual conduct with a minor.  (ROA 117.)  The instruction for sexual conduct stated:

> The crime of sexual conduct with a minor under age fifteen requires proof of the following two things:
>
> 1.   The defendant knowingly penetrated the anus of another person with a part of his body; *and*
>
> 2.   The other person had not reached her fifteenth birthday.

(*Id.*)  The instruction regarding attempted sexual conduct stated:

> The crime of Attempted Sexual Conduct with a Minor requires proof of one of the following:
>
> 1.   The defendant intentionally engaged in conduct which would have been a crime if the circumstances relating to the crime were as the defendant believed them to be; <u>or</u>
>
> 2.   The defendant intentionally committed any act which was a step in a course of conduct which the defendant planned would end or believed would end in the commission of a crime; <u>or</u>
>
> 3.   The defendant engaged in conduct intended to aid another person to commit a crime, in a manner which would make the defendant an accomplice, had the crime been committed or attempted by the other

person.

(*Id.*)

When the trial judge verbally instructed the jury on the latter count, he omitted the word "attempted" from the title of the offense.  (RT 3/14/91 at 38.)  However, his verbal instructions on the elements of the offense conformed to the written instructions and included the word "attempted."  (*Id.*)  The judge did not define either the term "accomplice" or the theory of accomplice liability.  Defense counsel did not object to the instructions.

Petitioner asserts that the verbal instructions might have confused the jury and caused it erroneously to convict him of sexual conduct with a minor rather than attempted sexual conduct with a minor.  (Dkt. 74 at 118-21.)

The Arizona Supreme Court rejected the allegation that Petitioner was prejudiced by any confusion caused by the trial court's verbal instructions.  *Gallegos I*, 178 Ariz. at 10-11, 870 P.2d at 1106-07.  The court reiterated that "a copy of the *written* instructions was given to the jury, was available during its deliberations, was correct, and properly included the word 'attempted.'" *Id.* at 10, 870 P.2d at 1106.  The court also noted that the jury was given separate verdict forms for the crimes of sexual conduct with a minor and attempted sexual conduct, and returned a guilty verdict on the former count.  *Id.*  The court further explained that there was no evidence suggesting that the jury was confused by the instructions, and concluded that "[m]ere speculation that the jury was confused is insufficient to establish actual jury confusion.  We therefore find that, taking the instructions as a whole, the jury was adequately instructed and defendant suffered no prejudice from the omission of the word 'attempted' in the verbal instructions."  *Id.* at 10-11, 870 P.2d at 1106-07.  In addition, the court held that "[o]verwhelming evidence in the record supports the jury's verdict" and therefore found "beyond a reasonable doubt that the error had no effect on the jury's verdict." *Id.* at 11, 870 P.2d at 1107.

This decision is not an unreasonable application of clearly established federal law.  In Petitioner's case, there was "uncontested" and "overwhelming" evidence, *Neder*, 527 U.S. at 17, that he engaged in sexual conduct with the minor victim.  In light of this evidence, and

- 58 -

viewing the instructions as a whole, including the correct version of the written instructions, it is clear that the verdict would have been the same if the trial court's verbal instructions had not omitted the word "attempted" and if the instructions had provided a definition of accomplice. *Id.* Therefore, any error in the instructions was harmless, and Petitioner is not entitled to habeas relief.

For the reasons set forth above, Claim 19 is denied.

**Claim 20       Insufficient evidence of sexual conduct with a minor**

As discussed above, Petitioner contends that there was insufficient evidence to support his conviction for sexual conduct with a minor because the victim was already dead at the time of the penetration, or Petitioner mistakenly believed that she was dead. (Dkt. 74 at 121-24.) The Arizona Supreme Court denied this claim, rejecting Petitioner's analysis of the mistake-of-fact issue:

> In reviewing the sufficiency of the evidence, we examine the evidence in the light most favorable to sustaining the verdict, and we resolve all reasonable inferences against defendant. Dr. Bolduc, the medical examiner who performed the autopsy, testified that the anal trauma occurred while the victim was alive. This uncontradicted expert testimony defeats the argument that the victim was not a person at the time of the sexual penetration.
>
> We likewise reject defendant's contention that he did not possess the mental state of "knowingly" because he believed that the victim was dead at the time of the sexual penetration. Sufficient evidence establishes that defendant formed the intent to sexually assault the victim before her death. Officer Saldate's testimony regarding defendant's confessions, although not entirely consistent with defendant's trial testimony, included the following additional details. Officer Saldate testified that defendant had discussed with George [Smallwood] his previous acts of sexual intercourse before entering the victim's room. Defendant further stated that he thought about fondling the victim's "ass." Defendant got the baby oil from the bathroom, which he eventually applied to his penis and the victim's anus to facilitate the penetration. Defendant also stated that once he and George thought that the victim was dead, they decided that they "might as well finish."
>
> · · · ·
>
> We also repudiate defendant's argument for public policy reasons. We refuse to apply a strict, literal interpretation to Arizona's Criminal Code as defendant would have us do. If the criminal code is to have any meaning, we must fairly construe its provisions to promote justice and give effect to the objects of the law. This is not a case where defendant happened upon a dead body. Defendant beat and suffocated the victim in the course and furtherance of a sexual offense. We do nothing to promote justice by allowing a sex offender, who forcibly renders his victim unconscious before committing the

sexual offense and ultimately kills her, to avoid conviction because he says that he mistakenly thought the victim was dead. Embracing such a concept would only encourage sex offenders to first kill their victims or render them unconscious before committing the sexual offense.

Also, defendant contends that if a mistaken belief that the victim was over 18 years old is a defense to sexual conduct with a minor, A.R.S. § 13-1407(B), then a mistake as to the victim's vitality likewise must constitute a defense. If the legislature had intended to establish such a defense, which we doubt for the reasons previously stated, then it could expressly have done so.

*Gallegos I*, 178 Ariz. at 9-10, 870 P.2d at 1105-06 (citations and footnote omitted).

<u>Analysis</u>

In reviewing a claim of insufficient evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. In reaching its determination as to the sufficiency of the evidence, this Court may not substitute its determination of guilt for that of the factfinder and may not weigh the credibility of witnesses. *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993); *Jackson*, 443 U.S. at 319 n.13. Moreover, a state court's construction of its own statute is binding on this court. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law"). "These factors combine to suggest that AEDPA deference may well be at its highest when a habeas petitioner challenges a state court's determination that the record evidence was sufficient to satisfy the state's own definition of a state law crime." *Policano v. Herbert*, 453 F.3d 79, 92 (2d Cir. 2006).

It is plain that a rational factfinder could have determined that all of the elements of sexual conduct with a minor had been proved. The Arizona Supreme Court detailed the "overwhelming evidence" against Petitioner:

Defendant confessed on two occasions and testified at trial that he sexually penetrated the victim's anus. The stained material on the victim's panties contained a DNA banding pattern that matched the banding pattern of defendant's blood. Defendant's fingerprint was lifted from the victim's room. In addition, no evidence was presented that George [Smallwood] or anyone else penetrated the victim's anus. Defendant's only defense was that the victim was dead. As defendant admits, Dr. Bolduc's uncontradicted testimony

- 60 -

indicated that anal trauma occurred while the victim was alive.

*Gallegos* 178 Ariz. at 11, 870 P.2d at 1107.

This evidence, together with the court's interpretation of the relevant statute and its rejection of Petitioner's arguments about his state of mind and the timing of the victim's death, renders Claim 20 meritless.

**Claims 21-29    Death Penalty Challenges**

Petitioner challenges the constitutionality of the death penalty in general and Arizona's capital sentencing scheme in particular.  (Dkt. 74 at 124-49.)  He asserts that Arizona's death penalty statute suffers from the following constitutional infirmities: it does not adequately channel the sentencer's discretion (Claim 21); the Arizona Supreme Court abandoned the procedural safeguard of proportionality review (Claim 22); it fails to narrow the class of death eligible defendants (Claim 23); it establishes an unconstitutional burden of proof (Claim 24); it makes the death penalty mandatory and establishes a "presumption of death" (Claim 25); and the prosecutor has "unbridled" discretion to seek the death penalty (Claim 26).  Petitioner also contends that the death penalty is not a deterrent (Claim 27) and is imposed in a discriminatory manner against poor minority males (Claim 28).  Finally, he argues that Arizona's death penalty scheme violates his substantive due process rights (Claim 29).  These claims are baseless, and the Arizona Supreme Court's rejection of them, *Gallegos II*, 185 Ariz. at 348, 916 P.2d at 1064, was neither contrary to nor an unreasonable application of clearly established federal law.

Respondents contend that these claims have not been properly exhausted.   As previously noted, pursuant to 28 U.S.C. § 2254(b)(2), the Court may dismiss plainly meritless claims regardless of whether the claim was properly exhausted in state court.  *See Rhines v. Weber*, 544 U.S. at 277.

Analysis

Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not

adequately narrow the sentencer's discretion.  *See Jeffers*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996).  The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith*, 140 F.3d at 1272.

As Petitioner acknowledges, there is no federal constitutional right to proportionality review of a death sentence, *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984)), and the Arizona Supreme Court discontinued the practice in 1992, *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992).  The Ninth Circuit has explained that the interest implicated by proportionality review – the "substantive right to be free from a disproportionate sentence" – is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja*, 97 F.3d at 1252.

In *Smith*, the Ninth Circuit also disposed of the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at 1272; *see Gregg v. Georgia,* 428 U.S. 153, 199 (1976) (pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional); *Silagy v. Peters*, 905 F.2d 986, 993 (7th Cir. 1990) (holding that the decision to seek the death penalty is made by a separate branch of the government and is therefore not a cognizable federal issue).

In *Walton*, the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution."  497 U.S. at 651; *see Delo v. Lashley*, 507 U.S. 272, 275 (1993) (per curiam) (stating that "we recently made clear that a State may require the defendant to bear the risk of nonpersuasion as to the existence of mitigating circumstances").  *Walton* also rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for

leniency.  497 U.S. at 651-52 (citing *Blystone v. Pennsylvania*, 494 U.S. 299 (1990); *Boyde*, 494 U.S. 370); *see Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith*, 140 F.3d at 1272 (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply the beyond-a-reasonable-doubt standard).

With respect to Petitioner's contention that the death penalty in Arizona is imposed in a discriminatory manner against poor males, clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey v. Kemp*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)).  Therefore, to prevail on this claim Petitioner "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.*  Petitioner does not attempt to meet this burden.  He offers no evidence specific to his case that would support an inference that his sex or economic status played a part in his sentence. *See Richmond v. Lewis*, 948 F.2d 1473, 1490-91 (1990), *vacated on other grounds,* 986 F.2d 1583 (9th Cir. 1993) (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socio-economic background is insufficient to prove that decisionmakers in petitioner's case acted with discriminatory purpose).

Also unsupported by Supreme Court precedent is the claim that the death penalty is unconstitutional because it fails to serve as a deterrent to crime.  In *Gregg*, 428 U.S. at 183, the Court explained that the death penalty serves two potential functions, retribution and deterrence.  Regarding deterrence as a justification for capital punishment, the Court, upholding Georgia's death penalty statute, observed:

> The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts.
>
> In sum, we cannot say that the judgment of the Georgia Legislature that

capital punishment may be necessary in some cases is clearly wrong. Considerations of federalism, as well as respect for the ability of a legislature to evaluate, in terms of its particular State, the moral consensus concerning the death penalty and its social utility as a sanction, require us to conclude, in the absence of more convincing evidence, that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe.

*Id.* at 186-87 (citation omitted).

Finally, there is no clearly established federal law holding that the death penalty violates substantive due process. The Unites States Supreme Court has never held that the death penalty per se is unconstitutional. *See Gregg*, 428 U.S. at 177, 186-87; *Roper v. Simmons*, 543 U.S. 551, 568-69 (2005) (noting that the death penalty is constitutional when applied to a narrow category of crimes and offenders); *cf. Herrera*, 506 U.S. at 398 (declining to hold that the execution of an innocent person would constitute an independent due process violation); *see also United States v. Quinones*, 313 F.3d 49, 61-70 (2d Cir. 2002) (rejecting argument that death penalty is inherently unconstitutional); *In re West*, 119 F.3d 295, 296 (5th Cir. 1997) (summarily rejecting argument that death penalty statutes violate substantive due process, because Supreme Court had previously decided that such statutes do not violate the Eighth Amendment).

Petitioner is not entitled to relief on Claims 21 through 29.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims. Therefore, Petitioner's Amended Petition for Writ of Habeas Corpus will be denied and judgment entered accordingly.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability (COA) to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of the merits of Claim 9. For the reasons stated in this Order and in the Court's Order regarding Petitioner's request for evidentiary development filed on October 6, 2004 (Dkt. 106), the Court declines to issue a COA with respect to any other claims.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 74) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on October 16, 2001 (Dkt. 5), is **VACATED.**

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues: Whether the Court erred in determining that Claim 9, alleging ineffective assistance of counsel at sentencing, lacked merit.

1

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order

to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

AZ 85007-3329.

DATED this 29th day of September, 2008.

_____

Neil V. Wake
United States District Judge