1    WO

6              IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

9    Michael Gallegos,                    No. CV-01-01909-PHX-NVW

10                  Petitioner,            **ORDER**

11   v.

12   David Shinn, et al.,

13                  Respondents.

        This case is on remand from the Ninth Circuit Court of Appeals. (Doc. 131.) The
Court is directed to consider whether Gallegos can demonstrate, pursuant to *Martinez v.*
*Ryan*, 566 U.S. 1 (2012), cause and prejudice to excuse the procedural default of his claim
that counsel failed to investigate and present mitigating evidence of Gallegos's organic
brain damage. (*Id.*) The issue has been fully briefed, as has Gallegos's request for
evidentiary development. (Docs. 152, 154, 155.)

I.    **BACKGROUND**

        In 1990, Gallegos raped and killed an eight-year-old girl. He was convicted of first-
degree murder and sexual conduct with a minor and sentenced to death.[1] On direct appeal,
the Arizona Supreme Court affirmed the convictions but remanded for re-sentencing on
the murder conviction. *State v. Gallegos* (*Gallegos I*), 178 Ariz. 1, 870 P.2d 1097 (1994).
On remand, the trial judge re-sentenced Gallegos to death on the murder count. The

_____
[1] The Court discussed the facts of the crime in its order denying Gallegos's habeas petition.
(Doc. 111 at 2–5.)

Arizona Supreme Court affirmed.  *State v. Gallegos* (*Gallegos II*), 185 Ariz. 340, 916 P.2d 1056 (1996).

Gallegos filed a petition for post-conviction relief ("PCR") and a supplemental petition in the trial court.  The court denied relief on most of the claims but set an evidentiary hearing on the claims of ineffective assistance of counsel.  Following the evidentiary hearing, the court denied those claims on the merits.  Gallegos filed a petition for review in the Arizona Supreme Court, which denied relief.

Gallegos filed a habeas petition in this Court in 2001 and an amended petition in December 2002.  (Docs. 1, 74.)  The Court denied relief.  (Doc. 111.)

On appeal to the Ninth Circuit, Gallegos raised claims of ineffective assistance of counsel at the guilt and sentencing phases of trial.  *Gallegos v. Ryan*, 820 F.3d 1013, 1025 (9th Cir. 2016).  The court rejected the claims that had been raised in appellate briefing, but granted Gallegos's motion to remand for consideration of a *Brady* claim.[2]  *Id.* at 1015–16.  The court denied Gallegos's motion for a stay and partial remand in light of *Martinez*. *Id.*  Gallegos moved for rehearing, alleging that he could show cause and prejudice to excuse the procedural default of his claim that resentencing counsel failed to present mitigating evidence of Gallegos's brain damage.  On November 30, 2016, the Ninth Circuit amended its opinion, granted Gallegos's petition for rehearing, and ordered a limited remand of the case to this Court.  *Gallegos v. Ryan*, 842 F.3d 1123 (9th Cir. 2016).

Pursuant to the Ninth Circuit's remand order, Gallegos filed a motion requesting a stay so that he could pursue his *Brady* claim in state court and permission to supplement his habeas petition with the claim.  (Doc. 130.)  The Court denied the motion.  (Doc. 147.)  The Court also set a briefing schedule on the remanded *Martinez* claim.  (*Id.*)

## II.    APPLICABLE LAW

Federal review is generally not available for a claim that has been procedurally defaulted.  In such situations, review is barred unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S.

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

722, 750 (1991). *Coleman* also held that ineffective assistance of counsel in PCR proceedings does not establish cause for the procedural default of a claim. *Id.* at 752.

In *Martinez*, however, the Court announced a new, "narrow exception" to the rule set out in *Coleman*. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 422–23 (2013). In Arizona, claims of ineffective assistance of trial counsel must be raised in PCR proceedings.

Accordingly, under *Martinez* an Arizona petitioner may establish cause and prejudice for the procedural default of an ineffective assistance of trial counsel claim by demonstrating that (1) PCR counsel was ineffective and (2) the underlying ineffective assistance claim has some merit. *See Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *Ramirez v. Ryan*, 937 F.3d 1230, 1242 (9th Cir. 2019).

In *Ramirez*, the Ninth Circuit provided the following summary of the appropriate analysis under *Martinez*:

> [T]o establish "cause" under *Martinez* . . . [a petitioner] must demonstrate that post-conviction counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney*, 813 F.3d at 819. In turn, *Strickland* requires demonstrating "that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id.* (citation omitted). Determining whether there was a reasonable probability that the result of the post-conviction proceedings would be different "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.*
>
> To establish "prejudice" under *Martinez*'s second prong of the "cause and prejudice" analysis, [a petitioner] must demonstrate that his underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez*, the Supreme Court defined substantial to be a "claim that has some merit," and explained the procedural default of a claim will not be excused if the

- 3 -

ineffective assistance of counsel claim "is insubstantial, *i.e.*, it does not have any merit or [ ] it is wholly without factual support." *Martinez*, 566 U.S. at 14–16.

*Ramirez*, 937 F.3d at 1241. To determine whether a claim is "substantial" for purposes of establishing prejudice under *Martinez*, the court undertakes a "general assessment" of the merits of the underlying ineffective assistance of trial counsel claim. *Id.* (citing *Cook*, 688 F.3d at 610 n.13).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88. The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15, 16 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689.

With respect to *Strickland*'s second prong, a defendant must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)) (emphasis omitted).

////

### III.    DISCUSSION

### A.    Background

#### 1.    Initial sentencing

Greg Clark represented Gallegos at his trial and initial sentencing.  At the guilt phase of trial, Gallegos's mother testified about his learning disability and alcohol consumption. (RT 3/13/91 at 23–32.)  Gallegos himself testified that he suffered from a learning disability; he also detailed his alcohol consumption on the day of the crimes.  (*Id.* at 34–35, 37–41, 42–58, 84–90, 112–16.)

Following Gallegos's conviction, counsel moved for a "diagnostic evaluation" pursuant to Rule 26.5 of the Arizona Rules of Criminal Procedure.  (ROA 119.)  The court granted the motion and appointed Dr. John DiBacco to evaluate Gallegos and determine whether, at the time of the crime, his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to requirements of the law was significantly impaired, but not so impaired as to constitute a defense to the prosecution."  (ROA 122; *see* Doc. 152-7, Ex. 59.)  Dr. DiBacco found Gallegos competent but detailed his learning disability, substance abuse problems, poor judgment and insight, and impulsivity.  (Doc. 152-7, Ex. 59 at 4–6.)  Dr. DiBacco also noted that during his exam Gallegos was experiencing pain from an ATV accident.[3]  (*Id.* at 2.)

Counsel prepared a sentencing memorandum and attached pre-dispositional reports written by Gallegos's juvenile probation officer.  (ROA 127.)  These reports noted Gallegos's status as a learning-disabled student with poor attendance and poor grades.  One of the officers wrote that "Mike Gallegos is a young man who apparently has not developed the ability to think before he acts" and opined that Gallegos "tends to behave impulsively and allows himself to become involved in a situation without considering the consequences."  (*Id.*, Ex. at 5.)

At the sentencing hearing, counsel called Gallegos's father, mother, brother, and sister, all of whom testified that Gallegos was a good kid from a good family and was

---

[3] An All Terrain Vehicle, sometimes referred to as an All Terrain Cycle ("ATC").

remorseful for his actions. (RT 5/24/91 at 21–30.) Gallegos's juvenile probation officer also testified. (*Id.* at 10–20.) He expressed his opinion that Gallegos was the least likely of his clients to commit this type of crime. (*Id.* at 16.) He also testified that Gallegos tended to act impulsively, and that Gallegos was a follower rather than a leader. (*Id.* 15, 19–20.)

Next, Detectives Michael Chambers and Armando Saldate, Jr., the lead investigators in the case, testified that they did not believe the death penalty was appropriate for Gallegos. (*Id.* at 30–41.) Detective Chambers testified that in his view Gallegos was "unsophisticated" and "less than his chronological age." (*Id.* at 39–40.)

Finally, Gallegos took the stand, reading a statement that expressed his remorse for the victim's death and attributing his actions to drug and alcohol impairment. (*Id.* at 42–43.)

Counsel also submitted Dr. DiBacco's report (*id.* at 57–58, 65) and letters advocating a life sentence rather than the death penalty. Also before the court was the presentence investigation report, which included information about Gallegos's substance abuse history and mental health. (ROA 131.) The report also included the comments of Dr. J.J. Singer, who counseled Gallegos while he was on juvenile probation. (*Id.* at 6.) Dr. Singer described Gallegos as "definitely a follower and not a leader." (*Id.*)

In its special verdict, the trial court stated that it had considered in mitigation Gallegos's "documented" history of drinking and substance abuse and the fact that Gallegos had "a documented learning disability." (RT 10/24/94 at 184–85.) The Arizona Supreme Court likewise noted that Gallegos "presented evidence that he had a history of alcohol and drug abuse, as well as a documented learning disability." *Gallegos I*, 178 Ariz. at 17, 870 P.2d at 1113.

### 2. Resentencing

The Arizona Supreme Court remanded the case for resentencing, directing the trial court to assess Gallegos's impairment as a potential nonstatutory mitigating circumstance.

*Id.* at 23, 870 P.2d at 1119. John Antieau represented Gallegos on appeal and during his resentencing proceedings.[4]

Prior to the resentencing hearing, counsel sought and the court authorized the appointment of mitigation investigator Mary Durand and Dr. C.J. Shaw, an addiction specialist. (ROA 154.) Dr. Shaw prepared a report opining, based on information provided by Gallegos, that Gallegos's blood alcohol level at the time of the crimes was 0.2 or higher. (ROA 161; *see* RT 10/24/94 at 142.)

At the resentencing hearing, counsel presented testimony from Gallegos and his family and friends regarding his drug and alcohol use, learning disability, and passive, nonviolent personality.

Gallegos testified that he suffered from a learning disability and was placed in special education classes starting in the fourth grade. (RT 10/24/94 at 5–6.) He testified that he began drinking alcohol at age twelve or thirteen and began using marijuana in sixth or seventh grade and methamphetamine in tenth or eleventh grade. (*Id.* at 6–7.) Gallegos also stated that his conduct deteriorated when Smallwood arrived at his home in Flagstaff.[5] (*Id.* at 8–9.) He explained that on the day of murder he and Smallwood drank half a bottle of scotch, schnapps, and beer in the morning, smoked two joints, and then drank beer throughout the afternoon and night. (*Id.* at 11–12.) He testified that the crimes would not have happened if he had not been impaired and Smallwood had not been present. (*Id.* at 13.)

Gallegos's mother testified that from second grade on he had attended special education classes due to his learning disability. (*Id.* at 54.) She also stated that Gallegos had a tendency to take the blame for things other people did. (*Id.* at 55.)

Mrs. Gallegos became aware of Gallegos's drug use when he was in junior high. (*Id.* at 56.) According to her testimony, Smallwood was violent and a bad influence; he exerted control over Gallegos and Gallegos followed his lead. (*Id.* at 58.)

---

[4] Antieau passed away in 2000.
[5] George Smallwood, a friend of Gallegos and the victim's half-brother, was present with Gallegos during the crimes but was not charged.

Gallegos's sister testified that she was aware of his drug and alcohol use in the years before the murder.  (*Id.* at 63–64.)  She stated that Gallegos was nonviolent and mellow when intoxicated.  (*Id.* at 64–65.)  She testified that after Smallwood arrived Gallegos's behavior changed; he became more sullen, withdrawn, and hateful, and abandoned his old friends in favor of Smallwood.  (*Id.* at 66.)

Another sister testified that became aware of Gallegos's drug and alcohol use when he was in seventh grade.  (*Id.* at 71.)  She too indicated that Gallegos became quiet and mellow when drinking.  (*Id.* at 72.)  She described Gallegos as a follower.  (*Id.* at 72–73.)  Smallwood was the leader and Gallegos followed him.  (*Id.* at 74.)  She indicated that Smallwood had a bad influence on Gallegos, who began to drink more and became rebellious and hateful toward his parents.  (*Id.* at 76.)

Gallegos's brother-in-law testified that Gallegos began drinking at age 13 or 14.  (*Id.* at 83.)  He too had observed that Gallegos became mellow under the influence of drugs.  (*Id.*)

Gallegos's niece testified that he started drinking in junior high.  (*Id.* at 96.)  He began to drink every day and used marijuana and crystal meth.  (*Id.*)  She indicated that Gallegos was mellow when drunk.  (*Id.* at 97.)  She explained that Gallegos became "snobby and rude" when Smallwood arrived.  (*Id.*)  She testified that Smallwood was the leader and Gallegos the follower.  (*Id.* at 98.)

Several other friends and acquaintances also testified that they drank and used drugs with Gallegos.  They testified that Gallegos was mellow and non-combative when under the influence.  (*Id.* 87, 117–18, 128, 136.)  They also testified that Gallegos was a passive follower in his relationship with Smallwood.  (*Id.* at 89, 119, 129–30, 138–39.)

In addition to these witnesses, counsel again presented the testimony of Detectives Saldate and Chambers who opposed the death sentence for Gallegos.  Detective Chambers testified in support of a life sentence based on his feeling that the killing was accidental; he believed Gallegos had been drinking at the time of the crimes.  (*Id.* at 43–45.)

In rebuttal, the State called Dr. Alexander Don to critique Dr. Shaw's conclusion that Gallegos was intoxicated at the time of the crime. (*Id.* at 148–54.) The State also called the victim's mother, who testified that she did not observe signs that Gallegos was impaired on the night of the murder. (*Id.* at 161.)

At the close of the hearing, the court indicated that in making its decision it would also consider mitigating evidence from the first sentencing hearing, including the testimony of Gallegos's juvenile probation officer. (*Id.* at 170.)

In sentencing Gallegos, the court again rejected impairment as a statutory mitigating factor. (*Id.* at 185.) The court repeated its finding that Gallegos "has a documented learning disability. His testimony is that it affects his math and spelling but not his reading or understanding. There is no evidence that the defendant is mentally deficient." (*Id.*) The court found that Gallegos's impairment and substance abuse history constituted nonstatutory mitigating circumstances but that they, together with the other mitigation evidence, did not outweigh the aggravating factors. (*Id.* at 188–90.)

The Arizona Supreme Court affirmed the trial court's findings regarding the aggravating and mitigating factors, including the mitigating value of Gallegos's impairment at the time of the crimes and his history of substance abuse. *Gallegos II*, 185 Ariz. at 347–48, 916 P.2d at 1063–64.

As Gallegos notes, during the resentencing proceedings, the Arizona Capital Representation Project ("the Project") offered Antieau assistance, which he accepted. (Doc. 152-8, Ex. 70.) Project staff discussed the need to present a mitigation case that differed from what had been presented at the original sentencing. (*Id.*, Ex. 71.) On August 2 and 3 of 1994, Melodee Nowatzki, the mitigation specialist for the Project, faxed Antieau memoranda from nine witness interviews Project staff had conducted. (*Id.*, Ex. 76.) These documents contained information indicating that Gallegos had been injured in ATV accidents. (*Id.*) Antieau did not present this evidence at resentencing.

3.    PCR proceedings

Gallegos was represented by Richard Gierloff during the PCR proceedings. In his

PCR petition, Gierloff raised several ineffective assistance of counsel claims related to the guilt phase of Mr. Gallegos's trial. (Doc. 152-3, Ex. 29.) Gierloff also asserted that trial and resentencing counsel performed deficiently during the penalty proceedings by failing to conduct an adequate mitigation investigation. This claim, however, consisted solely of the following heading:

> VII. Insufficient Mental and Personal History Mitigation Were Conducted Previously, therefore, Petitioner Received Ineffective Assistance of Counsel at the Penalty Phase. (No Argument Supplied Because of Time Constraints.)

(*Id.* at 3.)

Six months later, Gierloff filed a supplemental petition. (*Id.*, Ex. 30.) He again failed to present any legal authority or factual support for his claim alleging ineffective assistance of counsel at the penalty phase, asserting instead:

> It is apparent that Petitioner's mental health history has been insufficiently explored. . . . The origin, extent and implications of Petitioner's learning disability should be fully explored to illuminate, if possible, Petitioner's behavior. . . . [Counsel] has been precluded from discovering what further steps, if any, were taken to explore this area, due to trial counsel's failure to produce his case file.

(*Id.* at 22–23.)

At an evidentiary hearing on Gallegos's claims of ineffective assistance of counsel, Gierloff presented two witnesses: Gallegos and trial counsel Clark. (RT 21/1/00.) Gallegos testified that Antieau did not meet with him or return his calls. (*Id.* at 83.) Beyond that, Gierloff presented no testimony on the issue of ineffective assistance of penalty-phase counsel and thus offered no support for his claim that counsel failed to conduct an adequate mitigation investigation at either the original sentencing or resentencing. (*Id.*)

The PCR court summarily denied all of Gallegos's claims, stating, with respect to the claims of ineffective assistance of counsel at sentencing and resentencing, only that "Petitioner's other claims regarding ineffective assistance of counsel have no merit." (Doc. 152-4, Ex. 36 at 3.)

Gierloff filed a petition for review. (*Id.*, Ex. 37.) He raised a claim of "Ineffective Assistance of Counsel at Resentencing," which stated only that "[t]he death of appellate [and resentencing] counsel prior to hearing precluded meaning [sic] inquiry into this area." (*Id.* at 5.) The Arizona Supreme Court denied the petition. (*Id.*, Ex. 38.)

**B.    New evidence**

Habeas counsel hired Dr. Robert Heilbronner, a neuropsychologist, who conducted a complete neuropsychological evaluation of Gallegos and prepared a report dated December 12, 2011. (Doc. 152-6, Ex. 51.) Dr. Heilbronner reviewed evaluations by other experts, interviewed Gallegos, and administered a battery of neuropsychological tests. (*Id.* at 3–4.)

In a subsequent report, dated October 3, 2017, Dr. Heilbronner recounted three ATV accidents Gallegos was involved in between the ages of about 15 and 17. (*Id.*, Ex. 52 at 1.) In each accident, Gallegos suffered "moderate to severe trauma to the brain." (Ex. 52 at 1–2.) According to Dr. Heilbronner, traumatic brain injuries affect adolescents' brains more severely than adults'; "the greatest challenges many adolescents with brain damage face are changes in their abilities to think and learn and to develop socially appropriate behaviors." (*Id.* at 2.)

Neuropsychological testing detected impaired cognitive functions in several areas, including attention, concentration, working memory, mental flexibility, and response inhibition, thus revealing "objective evidence of cognitive dysfunction reflecting brain-based disturbances in functioning." (*Id.* at 5, 7.) Dr. Heilbronner also found "that Mr. Gallegos' brain damage was present at the time he committed the crimes." (*Id.*)

As a result of his brain damage, Gallegos has difficulty with planning, organization, and considering the consequences of his actions. (*Id.* at 7.) According to Dr. Heilbronner, "in combination with the cognitive and psychosocial effects of a learning disability," brain damage compromised Gallegos's ability to inhibit or stop behavior once begun and made him susceptible to the influence of others. (*Id.*; Ex. 52 at 3.) Dr. Heilbronner explained that Gallegos:

demonstrated a rather concrete approach to solving problems and limited cognitive flexibility, thereby limiting his capacity to come up with alternative solutions to problems. . . . It is conceivable that these abilities would have been even poorer back in 1990 when the crime was committed as Mr. Gallegos's brain was even less developed, given his age and the associated lack of neural maturation that is evident in the brains of adolescents, especially those with learning disabilities and in those who have sustained brain damage as a result of multiple head injuries.

(*Id.*, Ex. 52 at 3.)

Dr. Heilbronner further diagnosed Gallegos with Cognitive Disorder, Not Otherwise Specified, and opined that Gallegos could have been similarly diagnosed at the time of his resentencing. (*Id.*, Ex. 51 at 4, 7.) He further opined that with proper testing Gallegos's "widespread brain dysfunction" could have been detected at the time of resentencing. (*Id.* at 4.)

Dr. Nancy Cowardin, Ph.D., was also retained by habeas counsel to conduct psycho-educational testing. In her report, dated October 11, 2002, Dr. Cowardin noted that in fourth grade, Gallegos lagged behind his peers by one-and-a-half to two-and-a-half years. (Doc. 152-6, Ex. 7 at 1–2.) By tenth grade, his text comprehension was four years behind that of his peers. (*Id.* at 2.) Gallegos continued to demonstrate significant deficits when tested by Dr. Cowardin at age 30: "Today, Michael's academic age equivalent falls at approximately the 10½ year level, his language fundamentals at age 8, and overall information processing is estimated just below age 10 years, with lapses to the 6 year level in specific auditory tasks." (*Id.* at 18.) Dr. Cowardin further opined that "it is reasonable to conclude that at the time this crime was committed, Michael operated cognitively in much the same manner as a far younger child. . . . At 18, the youth did not function in the least like a competent adult defendant." (*Id.* at 5, 19.)

Gallegos has also presented an affidavit from Dr. Davis Fassler, a child and adolescent psychiatrist. (*Id.*, Ex. 54.)

In his declaration, dated October 6, 2017, Dr. Fassler explained that the region of the brain "responsible for instinctual behavior, such as aggression, anger, pleasure and

fear," develops first, while the frontal cortex, the region "responsible for planning, strategizing, and judgment," develops last and continues to mature into the mid-20s. (*Id.*, ¶¶ 12, 13.) Before the frontal cortex is fully developed, "young adults [are] more likely to act on instinct or impulse," and it is "harder for them to modulate emotional responses, regulate behavior, control impulses, assess risks or fully consider the consequences of their actions." (*Id.* ¶ 15.)

Brain development can be impaired by substance abuse. (*Id.* ¶¶ 17–21.) Adolescents are more susceptible to long-lasting impacts of alcohol than adults, and alcohol use in adolescents "may result in alterations in normal brain development leading to permanent brain damage." (*Id.* ¶¶ 19, 21.) Traumatic brain injuries in adolescents can result in both cognitive and behavioral deficits. (*Id.* ¶¶ 24–25.)

Dr. Fassler also noted that "Gallegos has a genetic disposition to substance abuse, as evidenced by his multiple-generational family history." (*Id.*, ¶ 55.)

According to Dr. Fassler, at the time of the crime, Gallegos's brain "would still have been in the process of achieving a full level of adult development, with the frontal lobes, which control judgment and reasoning, developing last." (*Id.* ¶ 60.) In addition, Gallegos has a history of drug and alcohol use and head injuries, which can "interfere with the process of normal brain development." (*Id.* ¶¶ 61, 64.)

Dr. Fassler concluded that: "A more detailed explanation of Mr. Gallegos' family history and genetic predisposition to abuse alcohol might have influenced the re-sentencing proceedings on October 24, 1994." (*Id.*, ¶ 58.)

The new evidence also includes lay declarations from Gallegos's family members and friends. Among other things, they attest that they were aware Gallegos had been involved in ATV accidents that may have resulted in head injuries; several declarants state that they reported this information to members of Gallegos's defense team. (Doc. 153, Ex's 98, 99, 101, 102, 103, 105, 108, 109, 119.) Gallegos also provided his own declaration describing three ATV accidents and another incident involving a head injury. (*Id.*, Ex. 110.)

**C.** **Analysis**

    1.    _Martinez_

Applying *Martinez*, the Court must determine whether cause and prejudice exist to excuse the procedural default of the claim that resentencing counsel failed to investigate and present mitigating evidence of Gallegos's organic brain damage. This requires the Court to determine whether the underlying claim is "substantial," establishing prejudice, and whether PCR counsel performed ineffectively, establishing cause. *Martinez*, 566 U.S. at 14; *Ramirez*, 937 F.3d at 1242.

    a.    Prejudice

The Court in *Martinez* "provided no further definition of substantial, but cited the standard for issuing a certificate of appealability as analogous support for whether a claim is substantial." *Ramirez*, 937 F.3d at 1242 (citing *Martinez*, 566 U.S. at 14). Under the standard for issuing a certificate of appealability, a claim is substantial when a petitioner has shown "that reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was 'adequate to deserve encouragement.'" *Apelt v. Ryan*, 878 F.3d 800, 828 (9th Cir. 2017) (quoting *Miller-El v. Cockerell*, 537 U.S. 322, 336 (2003)). In determining whether a claim meets this standard, a court should conduct a "general assessment" of the claim's merits, but should not decline to issue a certificate "merely because it believes the applicant will not demonstrate an entitlement to relief." *Miller El*, 537 U.S. at 336–37; *see Ramirez*, 937 F.3d at 1242 (citing *Cook*, 688 F.3d at 610 n.13).

The Court finds that the underlying claim of ineffective assistance of trial counsel is substantial under this standard. Having performed a general assessment of the claim, the Court "cannot conclude that [Gallegos's] ineffective assistance of trial counsel claim overall 'is insubstantial, *i.e.*, it does not have any merit or [ ] it is wholly without factual support.'" *Ramirez*, 937 F.3d at 1247 (quoting *Martinez*, 566 U.S. at 16).

First, there is substantial evidence that Antieau's performance at resentencing was deficient in that he did not pursue or present evidence of brain damage. Gallegos contends

that Antieau "was on notice that Mr. Gallegos 'may be mentally impaired' because he received information that Mr. Gallegos suffered from head injuries, which can result in brain damage." (Doc. 152 at 48–49.) Gallegos cites "[t]he interview memoranda provided by [mitigation specialist] Nowatzki from the Project in August of 1994," which included "information from six witnesses that Mr. Gallegos was in two ATC accidents after which he was 'in shock,' 'pale,' or 'dazed,' indications of potential concussions or more serious brain damage." (*Id.*) (citing Doc. 152-8, Ex. 76 at 2, 7, 12–13, 17, 21–22, 38.)

Because this information was available to him, there is a colorable claim that Antieau performed deficiently by not pursuing evidence that Gallegos suffered head injuries and possible brain trauma as a result of the accidents. Where "counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995). The record reveals no supporting reason for Antieau's failure to investigate the issue of Gallegos's possible head injuries. *See Stankewitz v. Woodford*, 365 F.3d 706, 719–20 (9th Cir. 2004) (explaining that when "tantalizing indications in the record" suggest that certain mitigating evidence may be available, those leads must be pursued).

There is likewise a substantial claim that Gallegos was prejudiced by counsel's failure to present such evidence in mitigation. Courts have noted that evidence of "organic brain damage is the very sort of mitigating evidence that 'might well have influenced the jury's appraisal of [a petitioner's] moral culpability.'" *Earp v. Ornoski*, 431 F.3d 1158, 1179 (9th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 398 (2000)); *see Caro v. Woodford*, 280 F.3d 1247, 1257 (9th Cir. 2002) (explaining that omission of evidence of brain damage from exposure to neuro-toxins "renders Caro's death sentence unreliable").

The underlying claim of ineffective assistance of counsel at resentencing is therefore "substantial" for purposes of *Martinez*, and prejudice has been established.

/ / /

- 15 -

b.    Cause

The Court next considers whether PCR counsel's performance was ineffective under *Strickland*.

The Court finds that PCR counsel performed deficiently.  Gierloff presented no evidence in support of his claim that counsel performed ineffectively at resentencing.  As the Ninth Circuit noted, PCR counsel "adduced no additional mitigating evidence, nor did he offer evidence to undermine the aggravating circumstances found by the state court.  The sentencing profile presented to the state post-conviction court—in fact, to the very judge who had previously sentenced Gallegos to death—was identical to the profile at the time of resentencing."  *Gallegos*, 820 F.3d at 1037.

The Court also finds there was a reasonable probability of a different outcome if PCR counsel had presented the underlying claim.  As discussed above, there was a substantial claim that resentencing counsel performed ineffectively by failing to present evidence of Gallegos's brain damage.  *See Ramirez*, 937 F.3d at 1247 ("The underlying ineffective assistance of counsel claim is strong enough to support a conclusion that, had post-conviction counsel performed effectively and raised the claim, 'there [is] a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different.'") (quoting *Clabourne*, 745 F.3d at 377).

Gallegos argues that "evidence of organic brain damage is particularly compelling in mitigation because it offers an explanation for a defendant's behavior that is physiological and reduces moral culpability."  (Doc. 155 at 5.)  The Court agrees.  As the Ninth Circuit has explained:

> Evidence of organic brain injury, of a kind that may physically compel behavior or prevent emotional regulation of certain conduct, is the kind of evidence that suggests a defendant's "moral culpability would have been reduced. . . ."  Under our case law, such evidence, if it is credible, is considered weightier than evidence of non-organic, purely psychiatric or personality disorders, such as intermittent explosive disorder, that involve "a lack of emotional control."

*Leavitt v. Arave*, 646 F.3d 605, 623 (9th Cir. 2011) (quoting *Caro*, 280 F.3d at 1257–58); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 241 (2007) (explaining that the

- 16 -

"strength [of petitioner's mitigating evidence] was its tendency to prove that his violent propensities were caused by factors beyond his control—namely, neurological damage and childhood neglect and abandonment"); *Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013) ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available.").

The totality of the weight in mitigation therefore would have been substantially greater with evidence that Gallegos suffered from brain damage, *see Wiggins*, 539 U.S. at 534, and the resentencing court would have been presented with a "stronger and more sympathetic mitigation profile." *Leavitt*, 646 F.3d at 625.

Because evidence of organic brain damage is particularly compelling, counsel's failure to produce such evidence in mitigation results in a greater likelihood of prejudice.

Gallegos has satisfied both the deficient performance and prejudice prongs of his claim that PCR counsel performed ineffectively under *Strickland*. Accordingly, pursuant to *Martinez*, he has established cause for his default of the underlying claim that resentencing counsel performed ineffectively.

c.      Conclusion

Gallegos has established both cause and prejudice under *Martinez* to excuse the default of his claim that resentencing counsel performed ineffectively by failing to present evidence that Gallegos suffers from organic brain damage.

2.      Evidentiary development

Gallegos seeks expansion of the record, discovery, and an evidentiary hearing. (Doc. 152 at 68–69.) Respondents oppose evidentiary development. (Doc. 154 at 29.) They contend that the existing record is sufficient to resolve Gallegos's claim. (*Id.*) They also assert that even if the procedural default is excused under *Martinez*, Gallegos must still satisfy 28 U.S.C. § 2254(e)(2) before the court may consider new evidence in its review of the underlying ineffective assistance of counsel claim.[6]   (*Id.* at 30.)   According to

---

[6] Pursuant to § 2254(e)(2), a federal court may not hold a hearing unless it first determines that the petitioner exercised diligence in trying to develop the factual basis of the claim in state court.

- 17 -

Respondents: "It is illogical to even allow consideration of new evidence to establish cause under *Martinez*, when that same evidence will be subsequently barred . . . from consideration in determining the merits of the substantive claim." (*Id.*) These arguments are unpersuasive.

First, contrary to Respondents' position, the evidentiary limitations described in *Cullen v. Pinholster*, 563 U.S. 170 (2011), do not apply to Gallegos's procedurally defaulted ineffective assistance of counsel claim because it was not previously adjudicated on the merits in state court.[7] *See Dickens v. Ryan*, 740 F.3d 1302, 1320–21 (9th Cir. 2014). Furthermore, the Court is not restricted by 28 U.S.C. § 2254(e)(2) from allowing evidentiary development for Gallegos to show cause and prejudice under *Martinez* because Gallegos is not asserting a constitutional "claim" for relief. *Id.*; *see also Detrich v. Ryan*, 740 F.3d 1237, 1246–47 (9th Cir. 2013) (plurality opinion) ("[W]ith respect to the underlying trial-counsel IAC 'claim,' given that the reason for the hearing is the alleged ineffectiveness of both trial and PCR counsel, it makes little sense to apply § 2254(e)(2).").

Finally, as the Ninth Circuit recently explained, "*Martinez*'s procedural-default exception applies to merits review, allowing federal habeas courts to consider evidence not previously presented to the state court." *Jones v. Shinn*, 943 F.3d 1211, 1221 (9th Cir. 2019). In *Jones*, the court "conclude[d] that 28 U.S.C. § 2254(e)(2) does not prevent a district court from considering new evidence, developed to overcome a procedural default under *Martinez v. Ryan*, when adjudicating the underlying claim on de novo review." *Id.* at 1222. Therefore, this Court is not prohibited from considering new evidence offered by Gallegos.

With respect to Gallegos's specific requests for evidentiary development, he first asks the Court to expand the record under Rule 7 of the Rules Governing Section 2254 Cases, to include all of the exhibits attached to his supplemental *Martinez* brief. (Doc. 152 at 71.) The Court will grant this request, with one exception. Gallegos has attached three

---

[7] In *Pinholster*, the Court held that a federal court's consideration of evidence in support of a habeas claim is confined to the evidence that was before the state court that adjudicated the claim on the merits. 563 U.S. at 180–81.

juror declarations.  (*See* Doc. 153, Ex's 111, 113, 116.)  In these declarations, the jurors from the guilt phase of Gallegos's trial state that they would have "voted for a life sentence."[8]  (*Id.*)  Respondents ask the Court to strike the declarations.  The Court grants the request.

Juror testimony cannot be used to impeach a verdict unless "extrinsic influence or relationships have tainted the deliberations."  *Tanner v. United States*, 483 U.S. 107, 120 (1987).  Rule 606(b)(1) prohibits juror testimony "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Evid. 606(b)(1).  "The court may not receive a juror's affidavit or evidence of a juror's statement on these matters."  *Id.*  There are limited exceptions to this Rule, Fed. R. Evid. 606(b)(2), but they do not apply here.

Gallegos contends that the Court may consider the declarations because they do not challenge the verdict within the meaning of Rule 606(b) but are offered in support of their ineffective assistance of counsel claim.  (Doc. 155 at 18–19.)

Courts have rejected this argument.  *See Brown v. United States*, 720 F.3d 1316, 1337 (11th Cir. 2013) (finding that juror's affidavit, swearing that additional mitigation evidence gathered during the postconviction process might have had an impact on the jury's penalty phase deliberations, was not competent evidence); *Hoffner v. Bradshaw*, 622 F.3d 487, 501 (6th Cir. 2010); *Garza v. Ryan*, No. CV-14-01901-PHX-SRB, 2017 WL 1152814, at *15 (D. Ariz. Mar. 28, 2017) ("Juror affidavits may not be considered under Rule 606(b) in support of ineffective assistance of counsel claims.").

The proffered declarations concern the jurors' deliberative process and the effect of the evidence on their votes.  Therefore, they may not be considered under Rule 606(b).  *See Jones v. Ryan*, No. CV-01-00384-PHX-SRB, 2016 WL 3269714, at *2 (D. Ariz. June 15, 2016); *Smith v. Schriro*, No. CV-03-1810-PHX-SRB, 2006 WL 726913, at *22–23 (D. Ariz. Mar. 21, 2006).  The juror declarations are stricken.

---

[8] Gallegos was sentenced by the trial judge in this pre-*Ring v. Arizona*, 536 U.S. 584 (2002), case.

Gallegos also seeks discovery. (Doc. 152 at 73–77.) That request will be denied.

A habeas petitioner is not entitled to discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery is authorized upon a showing of good cause, but the "party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents." Rule 6(a) and (b), Rules Governing § 2254 Cases.

"[A] district court abuse[s] its discretion in not ordering Rule 6(a) discovery when discovery [i]s 'essential' for the habeas petitioner to 'develop fully' his underlying claim." *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (quoting *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997)). However, courts should not allow a petitioner to "use federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. United States Dist. Ct. for the N. Dist. of Cal.* (*Nicolaus*), 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (explaining that habeas corpus is not a fishing expedition for petitioners to "explore their case in search of its existence") (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

Whether a petitioner has established "good cause" for discovery under Rule 6(a) requires a habeas court to determine the essential elements of the substantive claim and evaluate whether "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

Gallegos asserts that good cause exists because "discovery is crucial to ensure the additional level of due process required in capital cases." (Doc. 152 at 75.) He specifically asks to depose a number of witnesses, in the event the Court does not order an evidentiary hearing, including trial and PCR counsel and the various experts discussed above. (*Id.* at 76.) He "relies on the briefing of his ineffective-assistance claim to illustrate the relevance of these witnesses." (*Id.* at 77.)

Gallegos fails to show good cause for the requested discovery. He does not allege specific, relevant facts that might be found in the requested depositions. Thus, his

discovery request constitutes the type of "fishing expedition" Rule 6 does not sanction. *See Kemp v. Ryan*, 638 F.3d 1245, 1260 (9th Cir. 2011) ("[T]he desire to engage in [an improper fishing] expedition cannot supply 'good cause' sufficient to justify discovery."); *see also Teti v. Bender*, 507 F.3d 50, 60 (1st Cir. 2007) (denying a discovery request because the petitioner "did not comply with the specific requirements of Rule (6)(b); his request for discovery is generalized and does not indicate exactly what information he seeks to obtain"). Gallegos's generalized statements regarding the potential existence of discoverable material does not constitute "good cause."

Finally, Gallegos requests an evidentiary hearing. (Doc. 152 at 77–80.) Having determined that cause and prejudice exist to excuse the default of the underlying ineffective assistance of counsel claim, the Court finds that an evidentiary hearing is necessary to determine the claim's merits. *See Detrich*, 740 F.3d at 1246 (explaining that the district court should hold an evidentiary hearing "to determine, if the default is excused, whether there has been trial-counsel IAC"); *see also Ramirez*, 937 F.3d at 1251 (remanding for an evidentiary hearing after finding default excused under *Martinez*).

## IV. CONCLUSION

Pursuant to the Ninth Circuit's directive on remand, the Court has reconsidered, in the light of *Martinez*, Gallegos's claim that counsel at resentencing performed ineffectively by failing to present evidence of brain damage. The Court finds that an evidentiary hearing is necessary to determine whether Gallegos is entitled to relief on that claim.

Accordingly,

/ / /

/ / /

/ / /

**IT IS ORDERED** that an evidentiary hearing will be held to determine whether resentencing counsel performed ineffectively under *Strickland* by failing to present evidence that Gallegos suffered from brain damage. The Court will issue a separate order setting this matter for a scheduling conference.

Dated this 19th day of February, 2020.

Neil V. Wake
Senior United States District Judge