Jon M. Sands
Federal Public Defender
District of Arizona
Nicole List (HI No. 10077)
Kush Govani FP022 (AZ No. 032425)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
nicole_list@fd.org
kush_govani@fd.org
602.382.2816 Telephone
602.889.3960 Facsimile

Mark Brnovich
Attorney General
Elizabeth Bingert (AZ No. 030277)
Assistant Attorneys General
Capital Litigation Section
2005 N. Central Avenue
Phoenix, Arizona 85004
602-542-4686 Telephone
CLDocket@azag.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Gallegos,<br><br>    Petitioner,<br><br>  vs.<br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation & Reentry, et al.,<br><br>    Respondents. | No. CV-01-01909-PHX-NVW<br><br>**DEATH-PENALTY CASE**<br><br>**Joint Proposed Prehearing Order** |

The following are prehearing proceedings in this case as agreed to by the parties and approved by the Court:

I.   **BRIEF DESCRIPTION OF THE CLAIM**

Petitioner Michael Gallegos has alleged that he was deprived of his Sixth Amendment Right to effective assistance of counsel during his capital resentencing hearing and post-conviction proceedings. The claim of ineffective assistance of counsel substantially derives from the failure of both the resentencing counsel and the post-conviction counsel to investigate and present mitigating evidence of Gallegos's brain damage and/or brain impairment. Petitioner contends that the scope of this hearing also encompasses any adverse developmental consequences, as well as its explanatory role in the offense. This Court has already determined that there is cause and prejudice to excuse procedural default of the ineffective-assistance claim against resentencing counsel. (ECF No. 160 at 17.) The Court found that an evidentiary hearing is necessary to determine whether Gallegos is entitled to relief on the merits of his claim of ineffective assistance of resentencing counsel. (ECF No. 160 at 21.) In order to obtain relief, Petitioner must demonstrate in accord with *Strickland v. Washington*, that counsel failed to act "reasonabl[y] under prevailing professional norms," 466 U.S. 668, 688 (1984) and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of [Petitioner's capital sentencing] proceeding would have been different." *Id*. at 694.

II.   **STIPULATIONS**

The parties stipulate to the following:

- The parties stipulate that the issue for this Court to determine is whether resentencing counsel performed in a constitutionally deficient manner and whether Petitioner was prejudiced thereby.

- The parties stipulate that no additional foundation will be required for the admission of any exhibits.

- The parties stipulate that the transcripts of the witness interviews and depositions will be marked as exhibits, but will be used solely for the purposes of impeachment.

- The parties stipulate to the admission of the 2020 declarations of Ms. Statia Peakheart and Mr. Aaron Barrett.
- The parties stipulate that the following individuals are experts in the areas specified:
  - o Dr. Corwin Boake – neuropsychology
  - o Dr. David Fassler – child and adolescent psychiatry
  - o Dr. Robert Heilbronner – neuropsychology
  - o Dr. Daniel Reschly – psychologist with specialization in learning disabilities and special education
- The parties stipulate that Gallegos suffered from learning disabilities.
- The parties stipulate that Gallegos had substance abuse issues.
- The parties stipulate that the ATC/ATV accidents did in fact occur.

## III.   UNCONTESTED FACTS

The following material facts are uncontested:

- The 8-year-old victim, K.W., lived with her mother, Cynthia Wishon, and Petitioner's brother Jerry Gallegos, Jr. (Gallegos Jr.) in Phoenix. In November 1989, the victim's half-brother, George Smallwood, moved to Flagstaff to live with Petitioner and Petitioner's family. Petitioner's parents became Smallwood's legal guardians. Petitioner and Smallwood were friends and attended high school together. (ECF No. 111 at 2.)
- On March 15, 1990, Petitioner and Smallwood drank throughout the day. (ECF No. 111 at 2–3.)
- Petitioner suggested that they go into the victim's room to fondle her; Smallwood agreed. Once they were inside the victim's room, Petitioner lifted her nightgown and rubbed baby oil on the small of her back. (ECF No.111 at 3.)

- According to Petitioner, when K.W began to awaken, Smallwood put his hand over her mouth and Petitioner put his hand over Smallwood's hand and over the victim's nose. She gasped for air, struggled, and made sounds "like a little pig" before eventually going limp. (ECF No. 111 at 3.)

- Petitioner then had anal intercourse with her for 15 to 20 minutes. Smallwood likewise performed sex acts on K.W.'s dead body. (ECF No. 111 at 3.)

- The two carried the victim's naked body out of the house and down the street where they dropped it under a tree. They returned to the house and went to bed. (ECF No. 111 at 3.)

- After speaking with Petitioner, Smallwood reported the victim missing to the victim's mother and to the police. (ECF No. 111 at 3.)

- Petitioner and Smallwood participated in the search for the victim but deliberately avoided the area where they had dropped the victim's body.

- At around 1:00 p.m., an unidentified boy alerted the police as to the body's location. The police found the victim's naked body under the tree where it had been left the night before.

- Physical evidence and forensic analyses corroborated Petitioner's account of events. (ECF No. 111 at 4–5.)

- Petitioner testified at trial that he participated in the victim's death; he maintained he was drunk and did not intend to kill her. (ECF No. 111 at 5.)

- Gallegos was convicted in the Maricopa County Superior Court of first-degree murder and sexual conduct with a minor on March 14, 1991. (ROA 118 at 2.)[1] He was sentenced to consecutive sentences of

---

[1] When counsel is referring to the state court record, reporter's transcripts are

death and twenty years, respectively. (ROA 135 at 2–3.) The trial court found in aggravation that the murder was committed in a heinous, cruel or depraved manner, and that the victim was under 15 years old. The trial court found the statutory mitigating circumstance that Petitioner was 18 years old when he committed the offenses, and the non-statutory mitigating circumstances that he was remorseful and the case detectives recommended leniency. (ECF No. 111 at 6.)

- On March 15, 1994, the Arizona Supreme Court affirmed Gallegos's convictions and twenty-year sentence, but remanded the case for resentencing on the first-degree murder conviction. *State v. Gallegos* (*Gallegos I*), 870 P.2d 1097, 1117–19 (Ariz. 1994).

- After the completion of the resentencing hearing, the trial court once again imposed death on October 24, 1994. (ROA 164 at 5.) The trial court found Petitioner's impairment and history of alcohol and drug abuse constituted additional non-statutory mitigating circumstances. (ECF. No. 111 at 6.)

- On May 3, 1996, the Arizona Supreme Court affirmed Gallegos's sentence. *State v. Gallegos* (*Gallegos II*), 916 P.2d 1056 (Ariz. 1996).

- On March 29, 1999, Gallegos filed his petition for post-conviction relief (ROA 188), and filed a supplemental petition for post-conviction relief (ROA 204) on October 8, 1999.

- After conducting an evidentiary hearing (ROA 225), on January 4, 2001, the post-conviction court denied Gallegos's petition (ROA 227).

designated "Tr." followed by the relevant date and page number. Indexed documents from the record on appeal are designated "ROA" followed by the docket number and relevant page number. Documents from the petition for review proceedings are designated "PFR" followed by the docket number and relevant page number. Documents from the District Court docket are designated as "ECF No." followed by the docket number and page number. Documents from the Ninth Circuit Court of Appeals are designated "9th Cir. ECF No." followed by the docket number and page number.

- Gallegos filed a petition for review (PFR 1), which the Arizona Supreme Court denied on October 5, 2001 (PFR 12).

- On December 4, 2002, Gallegos filed in this Court an amended habeas petition. (ECF No. 74.) In his petition, Gallegos argued that his counsel was ineffective for not sufficiently developing evidence of his history of drug and alcohol abuse, his tendency to be a follower, and his learning disability. (ECF No. 74 at 68–77.)

- On September 29, 2008, this Court denied Gallegos's amended habeas petition, finding that his claim of ineffective assistance of counsel had been exhausted but failed on the merits. (ECF No. 111 at 35–47.) This Court also denied Gallegos's request for evidentiary development. (ECF No. 106.)

- Gallegos appealed this Court's denial of his habeas petition to the Ninth Circuit Court of Appeals and following the Supreme Court opinion in *Martinez v. Ryan*, 566 U.S. 1 (2012), Gallegos moved for a stay and partial remand in light of this decision. (9th Cir. ECF No. 46-1.) In his motion, Gallegos presented a report from Dr. Robert L. Heilbronner, who evaluated Gallegos and concluded that there is "objective evidence of cognitive dysfunction reflecting brain-based disturbances in functioning." (9th Cir. ECF No. 46-2 at 7 (emphasis omitted).) Dr. Heilbronner determined that Gallegos's "brain damage was present at the time he committed the crimes" and "compromised his capacity to inhibit and/or control his behavior at the time of the offense and also made him susceptible to the influence of others." (9th Cir. ECF No. 46-2 at 7.)

- The Ninth Circuit affirmed this Court's denial of Gallegos's habeas petition, but granted in part Gallegos's motion seeking a remand for consideration of a newly discovered *Brady* claim. *Gallegos v. Ryan*,

820 F.3d 1013 (9th Cir. 2016). The court initially denied Gallegos's *Martinez* motion. *Id*. at 1015–16.

- After Gallegos sought reconsideration of the court's decision to deny his request to pursue his unexhausted claim of ineffective assistance of counsel for failing to investigate and present evidence of brain damage (9th Cir. ECF No. 75-1), the Ninth Circuit granted Gallegos's Petition for Panel Rehearing and granted in part Gallegos's *Martinez* motion. *Gallegos v. Ryan*, 842 F.3d 1123 (9th Cir. 2016). The court ordered:

> On remand, the District Court shall consider Gallegos's timely *Martinez* claim and, accordingly, determine whether he can show cause and prejudice to excuse the procedural default with respect to his claim that counsel failed to investigate and present mitigating evidence of Gallegos's alleged organic brain damage. *See Dickens v. Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (en banc).

*Id*. at 1123.

- This Court subsequently set a briefing schedule, ordering Gallegos to file a supplemental brief on whether cause and prejudice exist to excuse the procedural default of his "claim that counsel failed to investigate and present mitigating evidence of Gallegos's alleged organic brain damage." (ECF No. 147 at 8–9.)

- After briefing was complete, the Court issued an order granting an evidentiary hearing to determine whether resentencing counsel performed ineffectively under *Strickland* by failing to present evidence that Gallegos suffered from organic brain damage. (ECF No. 160.)

## IV. UNCONTESTED ISSUES OF LAW

The parties agree that this case is not governed by AEDPA and that this

Court's review of the issues of ineffective assistance of resentencing counsel is *de novo*.

## V.   CONTESTED ISSUES OF FACTS AND LAW

The following are material issues to be tried and decided:

**A.   Did resentencing counsel have knowledge, information, or evidence that Gallegos, who committed the crime at age eighteen, might suffer from organic brain damage and/or brain impairment?**

Petitioner contends: Yes. John Antieau, Gallegos's resentencing counsel, possessed substantial and specific evidence indicating that Gallegos suffered from organic brain damage and brain impairment. By the time of resentencing, there were red flags indicating that Gallegos had suffered serious head injuries and had accompanying cognitive impairments.

In regards to head injuries, Antieau had notes indicating that Gallegos had suffered a "serious accident" as a passenger in an All Terrain Cycle ("ATC"), after which he was "dazed" all night. (ECF No. 152-8 at 35; ECF No. 152-8 at 41.) The crash paralyzed the driver. (ECF No. 152-8 at 41.) Another witness corroborated Gallegos's presence in the accident and that afterwards he was in shock and pale. (ECF No. 152-8 at 50.) Antieau had information that three more friends likely knew about the ATC accident. (ECF No. 152-8 at 56–57.) He also had information from both of Gallegos's parents confirming his involvement in an ATC accident, with his mother stating Gallegos had chipped his tooth in the accident. (ECF No. 152-8 at 30; ECF No. 152-8 at 66.)

In addition to the head injuries, Antieau possessed information that Gallegos suffered from cognitive impairments. He was learning disabled in all subjects starting in second grade. (ECF No. 152-8 at 65; ROA 127 at 169; ROA 131 at 7, 8.) Multiple witnesses commented on Gallegos's lack of maturity, with Phoenix police detective Michael Chambers testifying, "His age is still a question in mind. . . . I'm not certain of his—his actual maturity. My impressions in my brief contact with this

young man was of him, one, being unsophisticated, and, two, being at some point less than his chronological age[]" of 18 years old. (Tr. 5/24/1991 at 39–40; ROA 131 at 10.) Gallegos's juvenile probation officer, Noah Stalvey, testified that he "has apparently not developed the ability to think before he acts. . . .[he] tends to act impulsively and allow[s] himself to become involved in a situation without considering the consequences. . . . [his] actions do not appear to be vicious, just thoughtless." (Tr. 5/24/1991 at 15.) He added that when Gallegos "got into trouble, it was due to his impulsivity and the fact that he did not consider the consequences for his actions." (ROA 131 at 6.) Gallegos also "did not seem to have the cognitive ability to grasp the limits [of probation]." (ROA 131 at 5.)

Antieau possessed ample, concrete evidence suggesting that Gallegos suffered head injuries and attendant cognitive deficits, which should have indicated to Antieau that Gallegos might suffer from organic brain damage or brain impairment. *See* Sections V.B.–V.C., *infra*.

Respondents contends:

No. Resentencing counsel presented all of the information he had at his disposal regarding Petitioner's brain *impairment*. Antieau was aware, and it was well-established in the record, that Petitioner suffered from lifelong learning disabilities. That is not disputed. What is disputed is whether Antieau had knowledge, information, or evidence that Petitioner suffered from *brain damage*. Antieau had trial counsel Greg Clark's file to review. In that file was Dr. John DiBacco's report when the trial court appointed him to evaluate Petitioner in 1991. DiBacco's evaluation spanned two days and included a battery of psychological tests. Nothing in that testing prompted DiBacco to request additional medical testing or evaluation. DiBacco noted that at the time of the interview, Petitioner took Motrin for back pain as the result of an ATV accident, but that Petitioner otherwise denied any significant physical problems.

The evidence will show that based on prevailing professional norms, and the

1  what was accepted in the scientific community at the time of Petitioner's
2  resentencing, it was reasonable not to inquire further about brain damage
3  contributing to Petitioner's actions.

4    **B.    At the time of Gallegos's resentencing, what were the prevailing
5          professional norms in cases where counsel had evidence that the
6          client might suffer from cognitive deficits and/or impaired brain
          function?**

7      Petitioner contends: Under *Strickland v. Washington*, 466 U.S. 668 (1984)
8  whether defense counsel's performance satisfies the requirements of the Sixth
9  Amendment turns on an assessment of whether that performance was reasonable
10 under prevailing professional norms. It is undisputed that at the time of the
11 Petitioner's resentencing in 1994, under prevailing professional norms, capital
12 counsel was required to conduct a sufficient investigation and engage in sufficient
13 preparation to be able to present and explain the significance of all available
14 mitigating evidence. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Wiggins v.*
15 *Smith*, 539 U.S. 510, 524 (2003); *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per
16 curiam). Pointedly, the sentencing proceedings in *Williams*, *Wiggins*, and *Porter* all
17 took place prior to Petitioner's resentencing in 1994.[2]

18     Similarly, it was well established by 1994 that under prevailing professional
19 norms, when there are indications that a client might suffer from brain impairment
20 or other mental deficiency those leads must be investigated. *See Williams*, 529 U.S.
21 at 396; *Porter*, 558 U.S. at 39–40; *Wiggins*, 539 U.S. at 524. The cases in this Circuit
22 have long ago buttressed this point. *Evans v. Lewis*, 855 F.2d 631, 636–37 (9th
23 Cir.1988); *Caro v. Woodford*, 280 F.3d 1247, 1250, 1255 (9th Cir. 2002) (finding
24 deficient investigation into Caro's possible brain impairments, in a case tried in
25 1981). "We have repeatedly held that counsel may render ineffective assistance if
26 he 'is on notice that his client may be mentally impaired,' yet fails 'to investigate

27 _____
28 [2] Williams, Porter, and Wiggins were tried in 1986, 1987, and 1989, respectively.
   *Williams v. Commonwealth*, 360 S.E.2d 361 (Va. 1987); *Porter v. State*, 564 So. 2d
   1060 (Fla. 1990); *Wiggins v. State*, 597 A.2d 1359 (Md. 1991).

his client's mental condition as a mitigating factor in a penalty phase hearing...."' *Id.* at 1254 (quoting, *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995)).

Therefore, under prevailing professional norms in 1994, it is undisputed that, absent a reasonable strategic reason for not doing so, indications of possible mental disability or brain impairment had to be thoroughly explored.

Respondents contends:

The Supreme Court set forth the clearly established federal law governing ineffective assistance of counsel claims in *Strickland*. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). To obtain relief, a petitioner must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. He must satisfy both prongs of *Strickland*'s test by demonstrating that (1) counsel's performance was deficient under prevailing professional standards and (2) he suffered prejudice as a result. *Id.* at 687–88.

Here, Petitioner contends that because counsel for the sentencing phase did not hire an expert to determine whether Petitioner suffered from "organic brain damage" due to unsubstantiated traumatic brain injuries, his counsel was ineffective. Petitioner also contends that the evidence provided to resentencing counsel from the Arizona Capital Representation Project was so obvious that any attorney would see the need to have him evaluated for brain damage. However, as the evidence in this hearing will demonstrate, no one in Petitioner's family, circle of friends, juvenile probation team, teachers, attorneys, or counselors, thought enough of these ATV accidents to raise concerns. No one articulated that Petitioner's behavior changed after the accidents, that his drug use increased or subsided, or that he became less cognitively astute. Nothing in the materials from Ms. Nowatzki to Mr. Antieau indicated that these ATV incidents raised red flags for her. The issues that remained a constant concern for all of the people in

Petitioner's life were his heavy substance abuse and association with George Smallwood. Moreover, the hearing will demonstrate the lack of objective, credible evidence that Petitioner ever suffered from concussion or traumatic brain injury, thus undermining Petitioner's claim that he has brain damage. *Strickland* makes clear that "[t]hese standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case." 466 U.S. at 669.

Petitioner argues that Antieau failed to meet the prevailing professional norms when he did not call a mental health expert to testify in person. However, consultations with other counsel during the Arizona Capital Representation Project's work on the case revealed that other attorneys would only call a psychologist "presumably if he had anything positive to say." Therefore, it was not unreasonable for Antieau to have submitted expert reports in lieu of testimony.

Petitioner also cites to the ABA guidelines as the prevailing professional norm. The guidelines do not constitute bright line standards for reasonable performance: "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89; *see also Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) ("*Strickland* stressed . . . that [ABA] standards and the like are only guides to what reasonableness means, not its definition. We have since regarded them as such"); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms").

Likewise, Petitioner criticizes Mary Durand's work on his case. However, defendants do not have a constitutional right to a mitigation specialist and counsel is not required to employ such individuals. *Jells v. Mitchell*, 538 F.3d 478, 495 (6th Cir. 2008); *see also Phillips v. Bradshaw*, 607 F.3d 199, 207–08 (6th Cir. 2010)

(stating, "hiring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel"); *People v. Burt*, 658 N.E.2d 375, 389 (Ill. 1995) (mitigation specialists, called "mitigation experts" in the opinion, not constitutionally required). As a result, defendants have no right to a competent mitigation specialist. *See State v. Herring*, 28 N.E.3d 1217, 1239, ¶ 113 (Ohio 2014) ("It is true that [Defendant] did not have a constitutional right to a mitigation specialist or a right to an effective one.").

Further, counsel retained expert Dr. Charles Shaw, who was employed at St. Luke's Behavior Health Center at the time of Petitioner's evaluation. The Court had also appointed John Dibacco in 1991 to conduct a psychological evaluation as to whether at the time of the offense, "the defendant's capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Clearly, these experts were trained to screen for the presence of psychological disorders and would have alerted the court and counsel if they made findings that were out of the ordinary or required additional testing.

**C.   Was counsel's pre-resentencing investigation objectively unreasonable under prevailing professional norms?**

Petitioner contends:  Yes. As explained above in Section V.B, it is indisputable, that under professional norms prevailing in 1994, indications of possible mental disability or brain impairment had to be thoroughly explored. Resentencing counsel failed in this essential task.

Antieau's failure to discharge his duties in this case occurred within a larger context of inexperience and questionable professional conduct. First, Antieau was an appellate attorney; he did not have adequate experience in capital sentencing litigation. (ECF No. 152-8 at 25.) Before Gallegos's resentencing, he had only represented one client during a capital sentencing. *See* Min. Entry Order, *State v. Romanosky*, No. CR158333 (Maricopa Cty. Super. Ct. Dec. 13, 1989) (appointing

Antieau to represent defendant during retrial). Gallegos's trial counsel, Greg Clark, communicated to Antieau his concerns about Antieau remaining on the case and told him that he should withdraw from the case because of his inexperience with capital trials and sentencing. (ECF No. 153-1 at 75.) Antieau seemed to share Clark's concerns but failed to act on them. (ECF No. 153-1 at 75.)

Antieau's severe alcoholism also interfered with his representation. (ECF No. 153-1 at 90.) On his death certificate issued in 2000, one listed cause of death is alcoholism that lasted for thirty years. (ECF No. 152-10 at 111.) This coincides with his representation in Gallegos's case. That his alcoholism undermined his professional duties was apparent to both former trial counsel and his investigator for the resentencing. (ECF No. 153-1 at 90.) Clark stated that when Antieau came to discuss Gallegos's case, he appeared hungover or still intoxicated. (ECF No. 153-1 at 75.) He would ask questions after they had already been answered. (ECF No. 153-1 at 75.)

Antieau also had a non-existent relationship with Gallegos. After Gallegos's death sentence was initially overturned, Antieau only visited him one time. (ECF No. 153-1 at 138.) Antieau was never available to answer Gallegos's phone calls. (Tr. 12/1/2000 at 83.)[3] At one point, Gallegos—recognizing he had been abandoned—wrote a letter to the judge, voicing his concerns about Antieau's representation. (Tr. 12/1/2000 at 83–84.) He wrote about how Antieau failed to communicate with him and that Gallegos did not know what Antieau's mitigation strategy at resentencing would be.[4] Antieau's inexperience, his alcoholism, and his

---

[3] Antieau's insufficient communication with clients was not limited to his interactions with Gallegos. Antieau was informally reprimanded and placed on probation by the Arizona State Bar for "fail[ing] to respond to a client's repeated request for information necessary for the client to proceed[.]" (ECF No. 152-10 at 47.) In response to another complaint, Antieau was informally reprimanded and placed on probation for "failure to appear at a scheduled hearing, combined with his failure to thereafter communicate with the client in a timely manner as requested by the client[.]" (ECF No. 152-10 at 58.)

[4] While the letter is not contained in the record, Gallegos testified about its contents

1  refusal to communicate with Gallegos all contributed to an otherwise
2  constitutionally unreasonable and ineffective representation.

3      Ultimately, Antieau was in possession of unequivocal evidence that would
4  have prompted reasonable counsel to conduct an investigation. The investigation
5  would have led to the discovery that Gallegos suffers from significant brain and
6  associated cognitive impairments, which, along with the additional mitigating
7  evidence, would have engendered a reasonable probability for a life sentence. *See*
8  Section V.D, *infra*.

9      The records provided to Antieau by the Arizona Capital Representation
10 Project ("AZCAP") put him on notice that Gallegos had suffered repeated head
11 injuries, making it *plausible* that he may have sustained damage to his brain. *See*
12 Section V.A, *supra*. As an obvious first step, Antieau should have consulted and
13 communicated with Gallegos about the accidents and injuries to his head and brain.
14 *See Strickland*, 466 U.S. at 688, 691 (recognizing importance of communicating
15 with client). Had he taken the simple step of communicating with Gallegos, he
16 would have learned that Gallegos lost consciousness on several occasions after
17 sustaining injuries to his head. (ECF No. 152-6 at 26; ECF No. 153-1 at 136–37.)
18 This evidence would have rendered it even more plausible that Gallegos may have
19 sustained a brain injury, and "'the known evidence would [have] le[d] a reasonable
20 attorney to investigate further.'" *Andrus v. Texas*, 140 S. Ct. 1875, 1883 (2020)
21 (quoting *Wiggins*, 539 U.S. at 527). The trial court record also contained numerous
22 red flags reinforcing the plausibility of his cognitive impairments. *See* Section V.A,
23 *supra*. Competent counsel is expected to undertake a "thorough investigation of law
24 and facts relevant to *plausible* options . . . ." *Strickland*, 466 U.S. at 690 (emphasis
25 added). Yet Antieau did nothing.

26      Thus, this was not a case where that "reasonable professional judgments
27 support[ed] limitations on investigation." *Id*. at 691; *see Andrus*, 140 S. Ct. at 1883.
28 _____
   in an evidentiary hearing during post-conviction proceedings.

15

Antieau himself confirmed with the court that the scope of the resentencing was not limited to substance abuse and that he could have included whatever evidence he wanted to present. (Tr. 10/24/1994 at 32–33.) Yet, despite that admission, he limited his investigation into Gallegos's mental state to intoxication at the time of the offense. He defaulted on a basic duty to investigate potential brain impairments and consequent serious deficits in Gallegos's cognitive functioning. His performance was constitutionally deficient. *Caro*, 280 F.3d at 1255; *Hendricks*, 70 F.3d at 1043; *Bemore v. Chappell*, 788 F.3d 1151, 1171, 1174 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 1173 (2016); *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005).

        Respondents contends:

No. John Antieau performed a diligent mitigation investigation and presented a reasonable resentencing under prevailing professional norms. He accepted assistance from the Arizona Capital Representation Project, and had at his disposal interviews from everyone who knew Petitioner before the offense, documentation of his learning disabilities and special education, his performance on juvenile probation, and Petitioner's lengthy history of serious substance abuse. Even if this Court accepts as true that ATV accidents resulted in a head injury to the Petitioner, it is impossible to determine what role that played coupled with his excessive drug and alcohol use.

*Strickland* holds that "[j]udicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that *every effort be made to eliminate the distorting effects of hindsight*, *to reconstruct the circumstances of counsel's challenged conduct,* and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 669 (emphasis added). In this case, the Court will see a claim that is molded entirely out of hindsight. Subsequent interviews with witnesses and their declarations reveal increased emphasis on the ATV accidents that were of seemingly little significance to them during the time leading up to Petitioner's trial and resentencing. This Court will also hear evidence

that the tests, technology, and theories surrounding adolescent organic brain damage that exist today, were not widely accepted in the scientific community when John Antieau was handling Petitioner's case. Therefore, counsel was not ineffective.

### D. Did the deficient performance of resentencing counsel undermine confidence in the outcome of the resentencing proceeding and therefore prejudice under *Strickland*?

Petitioner contends: Yes. In order to establish prejudice, Petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. When a Petitioner challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Id.* at 695. When making this determination, this Court must consider the totality of the mitigating evidence; i.e., the evidence introduced at the original sentencing and the new mitigation evidence. *Williams*, 529 U.S. at 397–98 (2000). "[T]he district court's role [is] not to evaluate the evidence in order to reach a conclusive opinion as to [] brain injury (or lack thereof);" instead, this Court should assess "only whether there existed a 'reasonable probability' that 'an objective fact-finder' in a state sentencing hearing would have concluded, based on the evidence presented, that" a life sentence was appropriate. *Correll v. Ryan*, 539 F.3d 938, 952 n.6 (9th Cir. 2008) (third alteration in original) (quoting *Summerlin*, 427 F.3d at 643).

The Supreme Court has never limited *Strickland*'s prejudice inquiry "to cases in which there was only 'little or no mitigation evidence presented.'" *Sears v. Upton*, 561 U.S. 945, 954–55 (2010) (per curiam) ("We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have

prejudiced the defendant."). To the contrary, prejudice will be found when a "more complete presentation . . . could have made a difference." *Stankewitz v. Woodford*, 365 F.3d 706, 724 (9th Cir. 2004) ("We have held, however, that a defendant was prejudiced when, '[a]lthough [counsel] introduced some of [the defendant's] social history, he did so in a cursory manner that was not particularly useful or compelling.'" (alterations in original) (quoting *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003))); *Bemore*, 788 F.3d at 1172. ("[I]t is not enough just to present 'extensive mitigating evidence' where particularly persuasive evidence— especially evidence in the form of expert [mental health] testimony—was omitted."); *Jones v. Ryan*, 583 F.3d 626, 641–43 (9th Cir. 2009), *judgment vacated on other grounds*, 563 U.S. 932 (2011) ("We have consistently held that merely skimming the surface on important issues does not make in-depth discussion cumulative.").

Gallegos's case is an unusual one because in so many words, in *Gallegos I*, the Arizona Supreme Court explicitly recognized that a life sentence was reasonably plausible. It refused to affirm Gallegos's death sentence because it was unable to "ascertain whether the trial judge would have sentenced defendant to death had he considered defendant's impairment[,]" including his learning disability and long history of substance abuse. *Gallegos I*, 870 P2d at 1114–15; *see also id.*, at 1118. Thus, from the very beginning, Gallegos's case was emblematic of one where a "complete presentation . . . could have made a difference." *Stankewitz*, 365 F.3d at 724. It is therefore unsurprising that the Arizona Supreme Court took the unusual step of remanding Gallegos's case for a resentencing, where this Court previously noted, "the trial court [could] assess [Petitioner's] impairment . . . ." (ECF No. 160 at 6.)

Yet on remand, even though the trial court allowed Gallegos to "present any mitigation evidence that he desired[,]" *Gallegos II*, 916 P.2d at 1059, a constitutionally flawed investigation—already described above—left the record

barren of readily available evidence that Gallegos suffered moderate to severe brain impairments, that by their very nature would have made a difference to the outcome. Some lay witnesses did testify about Petitioner's learning disabilities and substance abuse, but the evidence did not even scratch the surface in terms of accurately portraying Gallegos's serious cognitive impairments. And no testimony was offered from school teachers, who could have shed real light on the serious extent of Gallegos's disabilities on his cognitive functioning and behavior. (*See* ECF No. 211-2; ECF No. 211-3.)[5] This presented evidence came nowhere near close to accurately presenting the scope of Gallegos's impairments to the sentencing judge. *Cf. Correll*, 539 F.3d at 953 n.8 ("While the bare facts of Correll's troubled past were indeed presented to the court, without further investigation and presentation of contextual evidence and argument, such facts served only to demonize Correll rather than to mitigate the appropriateness of imposing the death penalty for his actions.").

Instead, resentencing counsel offered only one expert report, from substance-abuse expert Dr. Charles Shaw, who was not called to testify. (Tr. 10/24/1994 at 142.) Dr. Shaw's report was focused on advancing the theory that Gallegos was significantly intoxicated at the time of the offense. (ECF No. 152-7 at 35–36.) The evidence was determined to be unpersuasive. *Gallegos II*, 916 P.2d at 1060–61. Counsel's ineffectiveness had deadly consequences. Relying on Dr. John DiBacco's report submitted at the first sentencing, the resentencing court found—opposite to the evidence that counsel *should* have presented—that Gallegos suffered from no mental deficiencies. (Tr. 10/24/1994 at 185; *see also* ECF No. 152-7 at 27–33.) Of course, Dr. DiBacco had not been tasked with investigating brain impairment, nor did he do so, and in the end the resentencing

---

[5] *See* American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases at §§ 11.4.1(2)(C); 11.8 (B)(2) (emphasizing mitigation relevant to cognitive limitations and related behaviors, as may be revealed in educational history, should be investigated and presented.

court was left with an unreliable and inaccurate portrayal of Gallegos's deficits and limitations.

The investigation conducted by Antieau stands in stark contrast to the investigation that reasonable counsel would have conducted. First, as explained above, he would have met with Gallegos to discuss his head injuries; Gallegos would have told the attorney that he suffered a number of head injuries and that, on multiple occasions, these injuries caused him to lose consciousness. (ECF No. 152-6 at 26; ECF No. 153-1 at 136–37.) A reasonable attorney would then have spoken to his family members and friends, whose names AZCAP provided to Antieau, to develop this information. (ECF No. 152-8 at 35; ECF No. 152-8 at 41; ECF No. 152-8 at 50; ECF No. 152-8 at 66.) Four witnesses, Michelle Emig (Gallegos's niece), Todd Emig (his niece's husband), Tony Duran (Gallegos's friend), and Hortensia Gallegos (Gallegos's mother) would have corroborated Gallegos's statements and explained his symptoms after the head injuries. (ECF No. 153-1 at 85; ECF No. 153-1 at 93; ECF No. 152-8 at 35; ECF No. 152-8 at 66.) Additional discussions with Gallegos's family members and friends would have led to Antieau confirming that, in another accident in which Gallegos struck a tree while riding an ATC, his helmet broke into pieces. (ECF No. 153-1 at 85; ECF No. 153-1 at 114.)

Antieau knew about Gallegos's substance abuse as a teenager, but a reasonable attorney would have discussed this with Gallegos himself. Gallegos would have explained, among other things, that his paternal grandfather was an alcoholic and died from liver problems. (ECF No. 152-8 at 13.) A reasonable attorney would have provided this information to an expert in child psychiatry, like Dr. Fassler, because research in 1994 indicated that the adolescent brain was still developing at 12 years old, when Gallegos started using alcohol. (ECF No. 152-6 at 75.) Additionally, that expert would have explained that Gallegos likely had a genetic predisposition to alcohol abuse due to his paternal grandfather being an alcoholic. (ECF No. 152-6 at 67.) The expert would have further opined that alcohol

and substance abuse may impair adolescent brain development. (ECF No. 152-6 at 65–66, 75.)

A reasonable attorney would have also investigated the effects of Gallegos's learning disability diagnosis. AZCAP gathered some school records in 1994 and provided the names of Gallegos's schools to Antieau. (ECF No. 152-8 at 58.) If Antieau had obtained all of Gallegos's school records, he would have learned that, in 1985, Gallegos had disorders in "psychological processes" including those affecting visual-motor integration, sequencing, and auditory memory. (ECF No. 153 at 64.) His school records further state that, in his final year of high school, Gallegos was totally "self-contained." (ECF No. 152-10 at 123.) A reasonable investigation would have led to Russell Randall, Gallegos's special education teacher in his senior year of high school. AZCAP supplied Antieau with his name and the name of the school where he worked. (ECF No. 152-8 at 44; ECF No. 152-8 at 57; ECF No. 152-8 at 59.) Randall would have told Antieau that Gallegos was in self-contained classrooms because "he was not cognitively or socially equipped to be in general education classes." (ECF No. 211-3 at 3.) Randall would have added that Gallegos "was lower functioning than many of his learning-disabled peers in [his] special education classes." (ECF No. 211-3 at 3.) According to Randall, Gallegos's learning disability caused his age to not be representative of his actual maturity level. (ECF No. 211-3 at 3.) Gallegos's disability made him more like a 13-year-old in a 17- or 18-year-old's body. (ECF No. 211-3 at 3.)

Sally Ake, another of Gallegos's special education teachers in high school, would have corroborated Randall's assessment. (ECF No. 211-2 at 4.) Antieau had her name and address. (ECF No. 152-8 at 59.) By speaking to Ake, Antieau would have also learned that Gallegos suffered "auditory and visual processing disabilities throughout his academic career." (ECF No. 211-2 at 3.) Gallegos was at a loss in making appropriate decisions, had difficulty controlling his impulses, had difficulty understanding and processing information, and was easily manipulated by others.

(ECF No. 211-2 at 3.) Ake would have explained that his disabilities impeded his ability to acquire the social skills needed to interrelate with children inside and outside the special education program. (ECF No. 211-2 at 2.) Armed with the evidence from Gallegos's educational records, a reasonable attorney would have retained an expert in learning disabilities and special education, like Dr. Nancy Cowardin or Dr. Daniel Reschly, to further investigate the disabling effects of Gallegos's visual and auditory processing disorders, and how those disabilities undermined his adolescent development and maturity. *See Rompilla v. Beard*, 545 U.S. 374, 391 (2005) (if trial counsel had conducted a reasonable investigation, and obtained new evidence, they would "unquestionably have gone further to build a mitigation case[]"); *Washington v. Ryan*, 922 F.3d 419, 429–30 (9th Cir. 2019) (counsel's unreasonable failure to investigate education and other records in the first instance prevented counsel from gaining information that would have led him to request further psychological evaluation) (citing *Rompilla*, 545 U.S. at 390–93).

Educational experts would have explained that a learning disorder is a brain-based, neurodevelopmental disorder and Gallegos's neurodevelopmental disorder result in significant deficits and abnormalities in brain function, with associated deficits in social, emotional, and adaptive functioning. (ECF No. 209-1 at 5, 8, 22.) In addition, a learning disability affects a person beyond the classroom. (ECF No. 152-6 at 155.) A person with an accompanying psychological deficit in auditory processing has difficulty in understanding information to modulate his behavior. (ECF No. 209-1 at 20; ECF No. 152-6 at 155.) The behavioral ramifications of these disorders extends to domestic life and social interactions. (ECF No. 152-6 at 155.) Further, such an expert would have explained that people with neurodevelopmental disorders, like Gallegos, suffer delays in development of executive functioning, meaning they are less capable of controlling impulsive behavior, anticipating consequences, and avoiding dangerous situations. (ECF No. 209-1 at 21.) And children and adolescents with neurodevelopmental disorders, as Gallegos did,

suffer delays in adult development and maturity. (ECF No. 209-1 at 31.) Thus, Gallegos functioned at a much younger age than his chronological age of eighteen at the time of the offense in 1989. In turn, this evidence would have supported the statutory mitigation factor respecting the defendant's maturity and age; a factor the Arizona Supreme Court gave little weight due to the absence of supporting evidence. *Gallegos II*, 916 P.2d at 1062.

After communicating with his client and following the leads in his file, Antieau would have had evidence that (1) Gallegos's learning disability was a brain-based disorder that caused significant cognitive deficits and affected his behavior, (2) his substance abuse as an adolescent may have impaired his brain development, and (3) multiple accidents with head injuries possibly resulted in further impairments to his already impaired brain. Therefore, in light of all these discoveries, "'the known evidence would [have] le[d] a reasonable attorney to investigate further.'" *Andrus*, 140 S. Ct. at 1883 (quoting *Wiggins*, 539 U.S. at 527). Habeas counsel did so, by retaining neuropsychologist Dr. Robert Heilbronner, to conduct testing to further assess the extent of Gallegos's brain impairments. Testing would have demonstrated "*objective evidence of cognitive dysfunction reflecting brain-based disturbances in functioning.*" (ECF No. 152-6 at 29.) The neuropsychologist, would have further determined that Gallegos's lifelong history of cognitive impairments, first evidenced in pronounced learning disabilities, and later compounded by head injuries, impaired his capacity to conform his conduct to the requirements of law and that he was significantly impaired at the time of the offense. (ECF No. 152-6 at 23-29; ECF No. 152-6 at 31-35.)

Without the above investigation, the resentencing judge had been misled about nearly every facet of Gallegos's impairments. A thorough investigation would have shown that Gallegos exhibited symptoms of brain damage and cognitive dysfunction beginning in early childhood. These brain-based disabilities had wide-ranging adverse effects on his emotional and psychosocial development,

ultimately contributing to self-medication with drugs and alcohol, engagement in risky behaviors resulting in multiple head injuries that caused further damage to his brain, and further reduced his capacity to regulate his behavior at the time of the offense. Gallegos was also functioning as a child younger than his chronological age when he was susceptible to the influence of the co-defendant and a combination of alcohol and drugs.

The failure to produce this evidence prejudiced Gallegos. It would have demonstrated that he was significantly impaired in his capacity to conform his conduct to the law at the time of the offense, thereby satisfying the statutory mitigator in Arizona Revised Statutes ("A.R.S.") § 13-703(G)(1) (1988) (current version at A.R.S. § 13-751(G)(1) (2019)). And, as the Arizona Supreme Court recognized, these types of impairments can also serve as powerful non-statutory mitigation. *See Gallegos I*, 870 P.2d at 1114.

Indeed, courts have long recognized that evidence of organic brain damage is particularly compelling in mitigation as it offers an explanation for a defendant's behavior at the time of the offense and reduces moral culpability. *See, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 241 (2007) ("In sum, the strength of Cole's mitigating evidence . . . was its tendency to prove that his violent propensities were caused by factors beyond his control—namely, neurological damage and childhood neglect and abandonment."); *Caro*, 280 F.3d at 1258 ("The jury was not afforded the benefit of expert testimony explaining the effects that Caro's *physiological* defects would have on his behavior, such as causing him to have 'impulse discontrol' and irrational aggressiveness. By explaining that his behavior was physically compelled, not premeditated, or even due to a lack of emotional control, his moral culpability would have been reduced."); *Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013) ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."); *Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012) ("Evidence of organic brain damage is something

that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect. . . . And for good reason—the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action."). This evidence is particularly probative not only because it provides standalone weight as mitigation, but also because it rebuts the prosecution's showing of aggravation. *See*, *Summerlin*, 427 F.3d at 641–42 ("The strong psychiatric evidence of Summerlin's lack of impulse and emotional control and organic brain dysfunction could have provided significant mitigating evidence countering the State's circumstantial evidence that the crime was committed in an especially heinous manner.").

Nor does it make any difference that resentencing counsel "skimmed the surface" of Petitioner's learning disabilities or drinking problems. *Jones*, 583 F.3d at 641–43 (collecting cases). Minimal evidence of impairment does not render the newfound expert evidence of Petitioner's brain impairments redundant or cumulative. Instead, prejudice must still be found because a "more complete presentation . . . could have made a difference." *Stankewitz*, 365 F.3d at 724 ("We have held, however, that a defendant was prejudiced when, '[a]lthough [counsel] introduced some of [the defendant's] social history, he did so in a cursory manner that was not particularly useful or compelling.'" *Id*. (alteration in original) (quoting *Douglas*, 316 F.3d at 1090); *see also Bean v. Calderon*, 163 F.3d 1073, 1081 (9th Cir. 1998) (finding prejudice when "numerous" mitigating factors "were reported to the jury" but "only in the vaguest of terms.").

The omission of expert testimony about cognitive or brain impairment is particularly prejudicial. "[I]t is not enough just to present 'extensive mitigating evidence' where particularly persuasive evidence—especially evidence in the form of expert testimony—was omitted." *Bemore*, 788 F.3d at 1172. And it also is "not enough that some of the defense witnesses informed the jury of the facts that

might *underlie* a mental health mitigation defense; 'expert testimony to explain the ramifications of those experiences on [petitioner's] behavior . . . is necessary.'" *Id.* (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)). Thus, even if trial counsel offered some expert evidence on mental impairment, prejudice must still be found when the "only expert testimony presented relating to [] mental health did not shed light on his brain damage." *Caro*, 280 F.3d at 1257 (finding prejudice even though sentencing counsel presented expert testimony from a psychologist and social worker); *see also, e.g.*, *Bemore*, 788 F.3d at 1172 (finding prejudice even though clinical psychologist "testified [] about the impact on Bemore of growing up in a family with chemical dependency[]" and other "witnesses did mention Bemore's drug problems and tumultuous upbringing."); *Littlejohn*, 704 F.3d at 862 ("In this case, while counsel presented *some* mitigation evidence—relating to Mr. Littlejohn's socioeconomic and psychological development—there were numerous indicators suggesting that a *neurological* evaluation could have uncovered evidence of organic brain damage.").

It is unsurprising that the Arizona Supreme Court ultimately affirmed Gallegos's sentence without testimony from experts like Drs. Reschly, Heilbronner, or Fassler. But these experts filled nearly all of the gaps the Arizona Supreme Court highlighted when finding resentencing counsel's presentation unpersuasive.

For example, that court discounted Gallegos's problems with substance abuse because of his "failure to seek treatment." *Gallegos II*, 916 P.2d at 1061. We now know that both genetic and environmental circumstances beyond his control predisposed Gallegos to substance abuse, explaining this failure. (ECF No. 152-6 at 67, 74.) *See Jones*, 583 F.3d at 643 ("It is much easier to discount the effects of substance abuse when the facts which led to the abuse are unknown, but much less so when we gain insight into the particular circumstances an individual was facing when he began abusing drugs.") The Arizona Supreme Court also discounted the mitigating weight of Gallegos's age, citing his apparent maturity and an expert

report finding Gallegos to be of "at least average fluid intelligence" and "not mentally deficient." *Gallegos II*, 916 P.2d at 1062. We now know that Gallegos is of below average intelligence, and suffers from neurological developmental deficiencies that rendered his brain development and maturity level far below age appropriate. (ECF No. 152-6 at 27; ECF No. 209-1 at 16, 19, 32.) The Arizona Supreme Court also found that Gallegos's conduct "reveal[ed] decisiveness and intent[,]" *Gallegos II*, 916 P.2d at 1063, but we now know that he may not have had the capacity to form such an intent, and was particularly susceptible to the influence of others. (ECF No. 152-6 at 28–29; ECF No. 152-6 at 32; ECF 209-1 at 34.) Moreover, the Arizona Supreme Court's reliance on the "heinous or depraved" aggravator, *Gallegos II*, 916 P.2d at 1063, would have been undermined by expert testimony of Gallegos's organic brain damage. *See Summerlin*, 427 F.3d at 641–42 (finding evidence of "organic brain dysfunction could have . . . counter[ed] the State's circumstantial evidence that the crime was committed in an especially heinous manner.").

Finally, the failure to add this information to the record prevented the Arizona Supreme Court from considering the full scope of his brain impairments on independent review. *See Correll*, 539 F.3d at 951 ("[T]here is no strategic excuse for failing to put on evidence in support of statutory mitigating factors that the Arizona Supreme Court could have considered in its independent re-weighing of aggravating and mitigating factors."). The omitted expert evidence is just the sort that the Arizona Supreme Court was relying on to impose life sentences on independent review in the years before Gallegos's resentencing. *See, e.g.*, *State v. Stuard*, 863 P.2d 881, 902 (Ariz. 1993) (sentence reduced to life based on expert evidence of severe organic brain damage, dementia, and low IQ); *State v. Jimenez*, 799 P.2d 785, 800 (Ariz. 1990) (sentence reduced to life based on expert evidence of major mental illness); *State v. Rockwell*, 775 P.2d 1069, 1079–80 (Ariz. 1989) (sentence reduced to life based on defendant's age, and impact of motorcycle

accident on his behavior and substance abuse); *State v. Mauro*, 766 P.2d 59, 81 (Ariz. 1988) (sentence reduced to life based on expert evidence of "chemical disorder in the brain"); *State v. Stevens*, 764 P.2d 724, 728–29 (Ariz. 1988) (sentence reduced to life based on expert testimony about diminished capacity caused by substance abuse); *State v. Graham*, 660 P.2d 460, 463–64 (Ariz. 1983) (sentence reduced to life based on expert evidence that defendant was immature for his age; suffered from drug addiction "not . . . of his own making"; and from neurological problems and brain damage); *State v. Brookover*, 601 P.2d 1322, 1325–26 (Ariz. 1979) (sentence reduced to life based on expert evidence that defendant suffered from brain damage inhibiting development).

This Court must additionally consider this new evidence of brain damage and impairment mitigating evidence along with the rest of the mitigating evidence that was presented at the resentencing. *Williams*, 529 U.S. at 397–98. The crime occurred four months after Gallegos's eighteenth birthday. By that point, Gallegos was an alcoholic; he had started drinking at 12 or 13 years old. (Tr. 10/24/1994 at 184.) Additionally, George Smallwood brought up the idea to fondle the victim. (Tr. 10/24/1994 at 25–26.) According to multiple witnesses, Gallegos tended to follow Smallwood's lead. (Tr. 10/24/1994 at 58, 67, 89, 98.)[6] Gallegos did not enter the victim's room with the intent to kill her. (ECF No. 152-3 at 46.) Detective Chambers indicated that the crime was accidental. (Tr. 10/24/1994 at 45.) Since the crime, Gallegos has repeatedly expressed his remorse. (Tr. 5/24/1991 at 42–43; Tr. 10/24/1994 at 175–76.) In addition, two Phoenix police detectives recommended that he receive a life sentence. (Tr. 10/24/1994 at 33, 41.)

As this Court has already recognized, the "totality of the weight in mitigation . . . would have been substantially greater with evidence that Gallegos suffered from brain damage, . . . and the resentencing court would have been

---

[6] Although the prosecution dismissed charges against Smallwood, a Phoenix police detective believed that Smallwood was also responsible for the victim's death. (Tr. 10/24/1991 at 41.)

presented with a stronger and more sympathetic mitigation profile. . . . Because evidence of organic brain damage is particularly compelling, counsel's failure to produce such evidence in mitigation results in a greater likelihood of prejudice." (ECF No. 160 at 17 (citations and quotation marks omitted).) The failure by Gallegos's resentencing counsel to present this evidence undermines the reliability of the outcome of Gallegos's case. Had this evidence been presented, there is a reasonable probability the outcome would have been different.

Respondents contends:

No. Petitioner offers speculative and tenuous theories about brain damage without credible, objective evidence to support this claim.  When balanced against the aggravating circumstances, Petitioner cannot establish a reasonable probability that Judge Hotham would have returned a life sentence if counsel had presented all of the mitigation evidence now available to Petitioner after more than a decade of available research. *See Strickland*, 466 U.S. at 694. Petitioner offers speculative and tenuous theories about brain damage, but these circumstances are not conclusive, and do not overcome Petitioner's burden to establish a reasonable probability that the sentencing judge would have returned a life sentence.

## VI.   LIST OF WITNESSES

Each party understands that it is responsible for ensuring that the witnesses it wishes to call to testify are subpoenaed. Each party further understands that any witness a party wishes to call shall be listed on that party's list of witnesses; the party cannot rely on the witness having been listed or subpoenaed by another party.

Petitioner's Witnesses:

1.   Ms. Sally Ake

Sally Ake was one of Mr. Gallegos's special education teachers in high school. She did not testify during the state court proceedings. During federal habeas proceedings, Ms. Ake signed a declaration in 2002, which is part of the record (ECF. No. 153-1 at 69; ECF No. 160

at 18). The 2002 declaration, however, contains little information about Mr. Gallegos's academic struggles due to his learning disability. In contrast, her 2020 declaration catalogs how Mr. Gallegos's learning disability affected his social, emotional, and adaptive functioning, as well as his immaturity, which left him functioning well below his age. She has firsthand knowledge of Mr. Gallegos's serious deficits in psychological processing including deficits in visual and auditory processing and sequencing; serious disabilities, which impaired his functioning inside and outside the classroom. Further, Ms. Ake's testimony contextualizes her experiences with him within her more than twenty-years of experience as a special education teacher. Petitioner's expert, Dr. Daniel Reschly, is relying on Ms. Ake's first-hand observations in support of his finding that Mr. Gallegos's learning disability is an expression of an underlying brain-based neurodevelopmental disorder. Because Respondents are contesting Ms. Ake's declaration, if the Court elects not to admit her declaration, it is imperative she be permitted to testify.

2.    Mr. Anthony Duran*[7]

Tony Duran was Mr. Gallegos's friend from elementary to high school. Mr. Duran testified at the 1994 resentencing hearing and signed a declaration in 2017, which is part of the record (ECF No. 153-1 at 85; ECF No. 160 at 18). Mr. Duran has knowledge material to several different issues. First, he can testify regarding his observations of Mr. Gallegos's learning disability and the effects it had on his

---

[7] Petitioner has added an asterisk to indicate that Petitioner is willing to proceed without the witness's live testimony, provided the Court is willing to consider their 2017 declaration in evaluating the merits of Gallegos's claim. The relevant portions of their proffered testimony is contained in their prior declarations or prior testimony or other information in the record. This is in accordance with the Court's prior order regarding live testimony. (*See* ECF No. 173 at 3.)

behavior outside the classroom. Second, with regard to the effects of Mr. Gallegos's head injuries, Mr. Duran can testify as to Mr. Gallegos's demeanor, appearance, and behavior after his ATV/ATC accidents. Third, Mr. Duran can testify regarding his disappointing encounters with the inattentive resentencing counsel, Mr. Antieau, before and during the resentencing proceeding, supporting the claim of ineffective assistance. These areas of testimony were neither provided in his 1994 testimony nor in his 2017 declaration. Because Respondents are contesting Mr. Duran's declaration, if the Court elects not to admit his declaration, it is imperative he be permitted to testify.

3.      Ms. Mary Durand*

Mary Durand was the mitigation specialist for both the 1991 sentencing hearing and the 1994 resentencing hearing. She did not testify during state court proceedings. Ms. Durand was in possession of critical information, substantiating that claim that resentencing counsel, Mr. Antieau, had evidence that Mr. Gallegos likely suffered from cognitive deficits and possible brain damage, and that he failed to investigate this evidence. In 2017, she signed a declaration affirming this evidence, which is part of the record (ECF No. 153-1 at 89). Her 2020 declaration elaborates on the declaration she submitted in 2017, adding that on multiple occasions she encouraged Mr. Antieau to investigate Mr. Gallegos's cognitive impairments, but he never did so. Her testimony at the evidentiary hearing will recount the same evidence presented in the 2017/2020 declarations. Respondents challenge the admission of her 2020 declaration.

Petitioner is willing to proceed without live testimony from Ms. Durand if the Court will consider the contents of her 2017 declaration, which is already part of the record, in evaluating the merits of

Petitioner's claim. (ECF No. 153-1 at 85; ECF No. 160 at 8) Because Respondents are contesting Ms. Durand's declaration, if the Court elects not to admit her 2020 or 2017 declarations, it is imperative she be permitted to testify.

4.  Ms. Michelle Emig*

Michele Emig is Mr. Gallegos's niece, who is near in age to him and lived with him when he was growing up in Flagstaff. Ms. Emig testified at the 1994 resentencing and provided signed declarations in 2002 and 2017, which are part of the record (ECF No. 153-1 at 93; ECF No. 153-1 at 96). Among other testimony, she will testify that in at least one of the ATC/ATV accidents, Mr. Gallegos was not wearing a helmet and chipped his front tooth, testimony that has never been provided before. Respondents do not stipulate to the admission of Ms. Emig's 2020 declaration and contest the fact above.

Petitioner is willing to proceed without live testimony from Ms. Emig, if the Court will consider the contents of Emig's 2017 declaration in evaluating the merits of Petitioner's claim. (ECF No. 153-1 at 93; ECF No. 160 at 8.) Because Respondents are contesting Ms. Emig's declaration, if the Court elects not to admit her 2020 or 2017 declarations, it is imperative she be permitted to testify

5.  Dr. David Fassler

Dr. Fassler is expected to testify consistent with the affidavit he authored on October 6, 2017. (ECF No. 152-6 at 63, Ex. 54.) Petitioner expects to elicit testimony that children, even those at age 18, like Mr. Gallegos was at the time of the offense, have not achieved adult development of their brain, particularly, the frontal lobes which control judgment, regulation of impulses, abstract thinking and moral reasoning. Even apart from other factors, discussed next below, Dr.

Fassler's testimony concerning the nature of the undeveloped teenage brain would have offered the sentencer a reason to consider a less severe punishment. Dr. Fassler will also explain how Mr. Gallegos's pronounced neurocognitively-based learning disorder, his genetically rooted abuse of alcohol and drugs, and traumatic brain injuries undermined the functioning of his already fragile juvenile-like brain.

Dr. Fassler's testimony will further demonstrate the prejudice resulting from resentencing counsel's systematic failure to investigate and present evidence bearing on Mr. Gallegos's diminished cognitive abilities, particularly those associated with an undeveloped 18-year-old brain.

6.    Ms. Hortensia Gallegos*

Hortensia Gallegos is Mr. Gallegos's mother. Ms. Gallegos testified at the 1991 sentencing and 1994 resentencing. In addition, she provided signed declarations in 2002 and 2017, which are part of the record (ECF No. 153-1 at 102; ECF No. 153-1 at 105). In her 2020 declaration, Ms. Gallegos supplies more information regarding the effects of his learning disability outside the classroom. She also explains how, compared to her other children, he was more immature and had a pronounced difficulty in understanding verbal instructions.

Petitioner is willing to proceed without live testimony from Ms. Gallegos if the Court will consider the contents of her 2017 declaration, which is already a part of the record, in evaluating the merits of Petitioner's claim. (ECF No. 153-1 at 102; ECF No. 160 at 8.)

7.    Mr. Jerry Gallegos, Jr.*

Jerry Gallegos, Jr. is Mr. Gallegos's older brother. Jerry Jr. testified at the 1991 sentencing and signed declarations in 2002 and

2017, which are part of the record (ECF No. 153-1 at 113; ECF No. 153-1 at 117). His testimony at the hearing will recount additional accidents and injuries that Mr. Gallegos suffered when he was a child, injuries that left him "dazed." Additionally, he will explain the effects of Mr. Gallegos's learning disability on his daily life, rendering him unable to learn from mistakes. Jerry Jr.'s personal experience with Mr. Gallegos makes him a critical witness.

Petitioner is willing to proceed without live testimony from Jerry Gallegos, Jr., if the Court will consider the contents of his 2017 declaration, which is already a part of the record, in evaluating the merits of Petitioner's claim. (ECF No. 153-1 at 113; ECF No. 160 at 8.)

8.  Ms. Margaret Gallegos*

Margaret Gallegos is Mr. Gallegos's older sister. She testified at both the 1991 sentencing and 1994 resentencing. She also provided signed declarations in 2002 and 2017, which are part of the record (ECF No. 153-1 at 128; ECF No. 153-1 at 131). Her testimony at the hearing will further detail the effects of Mr. Gallegos's learning disability, explaining how he could not easily process information. She will also provide significant details concerning his head injuries such as the fact that he was not wearing a helmet when he was thrown from an ATV.

Petitioner is willing to proceed without live testimony from Margaret Gallegos if the Court will consider the contents of her 2017 declaration in evaluating the merits of Petitioner's claim.

9.  Dr. Robert Heilbronner

Dr. Heilbronner is a licensed neuropsychologist who conducted a complete neuropsychological evaluation of Mr. Gallegos and

34

prepared a report dated December 12, 2011, and an addendum report authored October 3, 2017. (ECF No. 152-6 at 23, 31, Exs. 51 & 52.) He is expected to testify consistent with his two earlier reports, that neuropsychological testing demonstrated that Mr. Gallegos suffers from significant impairments in cognitive functions. He will testify that as a result of Mr. Gallegos's lifelong history of cognitive impairments, first evidenced in pronounced neurocognitively based learning disabilities, and later compounded by traumatic brain injury, Mr. Gallegos's capacity to conform his conduct to the requirements of law was significantly impaired at the time of the offense, thereby satisfying the statutory mitigator in A.R.S. § 13-703(G)(1) (1988) (current version at A.R.S. § 13-751(G)(1) (2019)).

Respondents plan to have Dr. Corwin Boake, also a licensed neuropsychologist, testify at the evidentiary hearing. He contests Dr. Heilbronner's methodology, but he did not test Mr. Gallegos and has not produced contrary testing results.

Dr. Heilbronner's testimony is critical to demonstrate prejudice from resentencing counsel's failure to investigate and present evidence of Mr. Gallegos's brain-based disabilities and how those disabilities resulted in a diminished mental capacity at the time of the offense. Secondarily, Dr. Heilbronner needs to testify in order to defend his findings against Dr. Boake's criticism.

10.   Ms. Melodee Nowatzki

Melodee Nowatzki was the mitigation investigator for the Arizona Capital Representation Project, which assisted Mr. Antieau in representing Mr. Gallegos. Ms. Nowatzki provided a signed declaration in 2017, which is part of the record (ECF No. 153-1 at 147). While her 2017 declaration was focused on her reception of

evidence concerning Mr. Gallegos's head injuries, her testimony and/or recently signed 2020 declaration will explain how she also received evidence that he was in special education classes and that she gathered his school records. She will also testify that she provided all of this information to Mr. Antieau for the resentencing hearing

11.   Dr. Daniel Reschly

Dr. Reschly will explain the lifelong and often disabling consequences of Mr. Gallegos's Specific Learning Disability ("SLD"); a brain-based neurodevelopmental disorder manifested in significant deficits in learning as well as associated deficits in social, emotional, and adaptive functioning. Mr. Gallegos's deficits were expressed in a diminished capacity to understand and process information, to communicate, to abstract from mistakes, learn from experience, engage in logical reasoning, to control impulses, and understand others. Despite evidence of his normal intelligence (a diagnostic element of most specific learning disabilities), Mr. Gallegos's neurodevelopmentally rooted SLD disorder substantially limited his ability to achieve both inside and outside the classroom. During his adolescence, Mr. Gallegos's disabilities also left him vulnerable to manipulation by others, it considerably undermined his maturation, and left him functioning at a level much younger than his chronological age. Mr. Gallegos's neurodevelopmental disabilities, as expressed in his SLD also contextualize Mr. Gallegos's abuse of alcohol and drugs. First, his SLD placed him at increased risk for developing addiction problems and difficulty overcoming those problems. Unfortunately, Mr. Gallegos's strong genetic risks for addiction and his older brother's role in furnishing him with alcohol and drugs, magnified the risk that he would develop addiction issues

and would face challenging obstacles in overcoming those problems. Dr. Reschly is expected to testify consistent with his report dated September 11, 2020.

Dr. Reschly's testimony will further demonstrate the prejudice resulting from resentencing counsel's systematic failure to investigate and present evidence bearing on Mr. Gallegos's brain function abnormalities and cognitive deficits. Although Mr. Gallegos's sentencer and the Arizona Supreme Court knew that he had been diagnosed with a learning disability, they did not know that his disability was rooted in a brain-based neurodevelopmental disorder, associated with life-long deficits and neurobehavioral consequences. Dr. Reschly's testimony is critical to demonstrate that Mr. Gallegos's brain abnormalities did not begin with later head trauma; he was born with significant permanent deficits, which significantly undermined his maturity, judgment and reasoning. These disabilities were additive to his already underdeveloped 18-year-old brain, described by Dr. Fassler.

12.    Mr. Russell Randall

Russell Randall was Mr. Gallegos's special education teacher in twelfth grade. Mr. Randall did not testify during the state court proceedings. Mr. Randall signed a declaration in 2002, which is part of the record (ECF. No. 153-1 at 160). His 2002 declaration also has little information about the serious effects of his learning disability compared to his 2020 declaration. He will testify that Mr. Gallegos would act without thinking about consequences and that he had deficits in reflective reasoning. Mr. Randall has firsthand knowledge of Mr. Gallegos's learning and emotional disabilities and their effects on him. As his teacher in twelfth grade, Mr. Randall is also uniquely positioned

to testify about the emotional and psychological struggles that Mr. Gallegos had near in time to the offense. Dr. Reschly is relying on Mr. Randall's first-hand observations in support of his finding that Mr. Gallegos's learning disability is an expression of an underlying brain-based neurodevelopmental disorder. Thus, Mr. Randall's testimony is highly relevant to the proceedings. Because Respondents are contesting Mr. Randall's declaration, if the Court elects not to admit his declaration, it is imperative he be permitted to testify.

13.     Mr. Noah Stalvey*

Noah Stalvey was Mr. Gallegos's juvenile probation officer. He testified in 1991. His testimony at the evidentiary hearing will mirror the testimony he provided in 1991 and he will state that, despite discussing Mr. Gallegos's learning disability in a presentence report, he was not contacted by Mr. Antieau. Further Mr. Stalvey will offer testimony that he had special training and experience working with juvenile sexual offenders, and that Mr. Gallegos did not present the typical signs or symptoms of those offenders. This supports the conclusion that Mr. Gallegos's participation in the instant sexual offense was a consequence of cognitive deficits and not habitually sexually aberrational behavior. Respondents will not stipulate to the admission of his declaration and contest the facts missing from his 1991 testimony.

Respondents' Witnesses

1.     Dr. Corwin Boake

Dr. Corwin Boake is a neuropsychologist who interviewed Petitioner and evaluated the expert reports in this case. He is expected to testify consistent with his report dated September 11, 2020.

2.     Any witness listed in above under "Petitioner's Witnesses."

Respondent contends:

Petitioner includes a footnote that indicates he is willing to forgo certain witnesses' live testimony because their declarations and statements in the record are sufficient. Respondents believe that it is necessary to have live testimony because these witnesses' statements (some giving multiple statements since 1991) differ or are contradictory and it is necessary to conduct a complete cross-examination. While experts may have considered previous statements these witnesses made, they are not *admissible* under the Federal Rules of Evidence and are considered hearsay.

Petitioner appears to adopt contradictory positions as to the testimony of their witnesses. Respondents only noticed Petitioner's witnesses (above) in the event that this Court grants Petitioner's Motion for Live Testimony, Petitioner elects not to call them, and seeks to rely solely upon their declarations. Respondents do not intend to elicit new factual information from these witnesses, but want to ensure their appearance at the hearing. Respondents maintain that cross-examination of these witnesses is crucial to this Court's fact finding.

Petitioner contends:

By listing "[a]ny witness listed in above under 'Petitioner's Witnesses'" in the Respondents' witnesses, Respondents have violated this Court's order requiring motions be filed for each witness that testifies at the evidentiary hearing. (ECF No. 173 at 4.)  Respondents filed a motion for live testimony for only their expert witness; their motion contains no mention of any other witness. (ECF No. 212.) In accordance with this Court's order, Petitioner listed each witness in his Motion for Live Testimony and explained in detail the substance of each witness's proposed testimony. (ECF No. 211 at 2–8.) In contrast, Respondents have included a brief paragraph containing a generic explanation as to why ten witnesses must testify in person. Respondents' inclusion of "[a]ny witness listed in above under 'Petitioner's Witnesses'" constitutes a late Motion to Present Live Witness Testimony and

1  unfairly prejudices Petitioner because he does not know what role each of the
2  witnesses plays in Respondents' position.  Respondents, however, are on notice of
3  how each of these witnesses fit into Petitioner's case and can prepare accordingly.

4  **VII.  LIST OF EXHIBITS**

5      **Petitioner's Exhibits**

6      1.     Greg Clark's Trial Counsel File

7      2.     John Antieau's Appellate/Resentencing Counsel File

8      3.     Mary     Durand's     Trial     Investigation/Sentencing/Resentencing
9             Mitigation File

10     4.     Arizona Capital Representation Project's Investigation/Consultation
11            File

12     5.     Declaration of Sally Ake, 9/8/2020

13     6.     Declaration of Aaron Barrett, 9/3/2020

14     7.     Declaration of Anthony Duran, 9/4/2020

15     8.     Declaration of Mary Durand, 9/4/2020

16     9.     Declaration of Michelle Emig, 9/7/2020

17     10.    Declaration of Hortensia Gallegos, 9/4/2020

18     11.    Declaration of Jerry Gallegos, Jr., 9/5/2020

19     12.    Declaration of Jerry Gallegos, Sr., 10/9/2002

20     13.    Declaration of Margaret Gallegos, 9/5/2020

21     14.    Declaration of Melodee Nowatzki, 9/3/2020

22     15.    Declaration of Statia Peakheart, 9/4/2020

23     16.    Declaration of Russell Randall, 9/3/2020

24     17.    Declaration of Noah Stalvey, 9/4/2020

25     18.    AZCAP faxes from Melodee Nowatzki to John Antieau

26     19.    School Records of Michael Gallegos

27     20.    Juvenile Records of Michael Gallegos (obtained by prior counsel)

28

21. Juvenile Supplemental Pre-Dispositional Reports, 1989 (obtained by prior counsel)

22. Juvenile Records from Coconino County Juvenile Court (obtained by FPD)

23. Flagstaff Catholic Social Services Records, 1989-1990

24. Arizona Department of Correctional Educational Record

25. Arizona Department of Corrections Department Order regarding Inmate Education Programs, 1/26/1990

26. Medical Records of Michael Gallegos from Dr. Charles Swetnam

27. Curriculum Vitae of Dr. Robert Heilbronner, 2020

28. Report of Neuropsychological by Dr. Robert Heilbronner, 12/12/2011

29. Addendum to Report of Neuropsychological by Dr. Robert Heilbronner, 10/3/2017

30. Curriculum Vitae of Dr. David Fassler, 2020

31. Affidavit of Dr. David Fassler, 10/6/2017

32. Curriculum Vitae of Dr. Nancy Cowardin, 2002

33. Individual Assessment Report by Dr. Nancy Cowardin, 5/28/2002

34. Sentencing Transcript, 5/24/1991

35. Resentencing Transcript, 10/24/1994

36. Curriculum Vitae of Dr. Daniel Reschly, 2020

37. Declaration of Dr. Daniel Reschly, 9/11/2020

38. Interview Transcript of Dr. Corwin Boake

**Respondents' Exhibits**

58. Curriculum Vitae of Dr. Corwin Boake

59. Report of psychological evaluation by Dr. Boake, dated 9/9/2020

60. Interview Transcript of Dr. Robert Heilbronner

61. Interview Transcript of Dr. Daniel Reschly

62. Interview Transcript of Dr. David Fassler

63. Interview Transcript of Mr. Garrett Simpson

64. Interview Transcript of Sally Ake

65. Interview Transcript of Anthony Duran

66. Interview Transcript of Mary Durand

67. Interview Transcript of Michelle Emig

68. Interview Transcript of Hortensia Gallegos

69. Interview Transcript of Jerry Gallegos, Jr.

70. Interview Transcript of Margaret Gallegos

71. Interview Transcript of Melodee Nowatzki

72. Interview Transcript of Russell Randall

73. Interview Transcript of Noah Stalvey

74. Declaration of Sally Ake, 10/28/02

75. Declaration of Aaron Barrett, 10/22/02

76. Declaration of Maria Victoria "Vicki" Covarrubiaz, 10/09/02

77. Declaration of Bruce Diffenderfer, 10/16/17

78. Declaration of Anthony Duran, 10/13/17

79. Declaration of Mary Durand, 10/12/17

80. Declaration of Michelle Emig, 10/22/02

81. Declaration of Michelle Emig, 10/16/17

82. Declaration of Hortensia Gallegos, 10/09/02

83. Declaration of Hortencia Gallegos, 10/16/17

84. Declaration of Jerry Gallegos, Jr., 10/09/02

85. Declaration of Jerry Gallegos, Jr., 10/16/17

86. Declaration of Jerry Gallegos, Sr., 10/09/02

87. Declaration of Margaret Gallegos, 10/22/02

88. Declaration of Margaret Gallegos, 10/16/17

89. Declaration of Melodee Nowatzki, 10/13/17

90. Declaration of Statia Peakheart, 10/15/17

91.     Declaration of Russell Randal, 10/22/02

92.     Declaration of John Rivas, 10/16/17

Petitioner's Objections to Exhibits:

Petitioner objects to Respondents exhibits numbered 19, 20, and 35 because they are not listed as witnesses for either party and they have not previously been included on any motion for live testimony.

Respondents' Objections to Exhibits:

Respondents note Petitioner's objection to Exhibits 19, 20, and 35. Petitioner's experts reviewed these declarations and Respondents may discuss what the experts have reviewed in forming their opinions. An objection to an exhibit's *admission* may be made at a salient time during the hearing. (*See* Section VIII.)

## VIII.  DEPOSITIONS

The parties have stipulated that portions of depositions will be offered only for impeachment. The parties recognize that many exhibits listed by both are hearsay. However, to the extent these records were reasonably relied upon by the experts in forming their opinions, they are admissible for that purpose. *See* Fed. R. Evid. 703.

## IX.   PROCEDURES FOR EXPEDITING THE EVIDENTIARY HEARING

The parties have discussed procedures for expediting the hearing. The parties have stipulated to foundation for the exhibits and will use courtroom technology to expedite presentation of the evidence.

## X.    PROBABLE LENGTH OF HEARING

The parties agree that the hearing can be completed within the scheduled timeframe of November 9-12.

## XI.   CERTIFICATION

Undersigned counsel for each of the parties in this action do hereby approve and certify as follows:

1.     All discovery will be completed before the commencement of the evidentiary hearing.

2.     The identity of each witness has been disclosed to opposing counsel.

3.     Each exhibit listed herein: (a) is in existence, (b) is numbered, and (c) has been disclosed and shown to opposing counsel.

## XII.   ADOPTION

The Court may adopt this Joint Proposed Prehearing Order at the Final Prehearing Conference or subsequent hearing.

Respectfully submitted this 15th day of October, 2020.

| | |
|---|---|
| Mark Brnovich | Jon M. Sands |
| Attorney General | Federal Public Defender |
| Elizabeth Bingert | Nicole List |
| Gregory Hazard | Kush Govani |
| Assistant Attorneys General | Assistant Federal Public Defenders |
| | |
| s/ *Elizabeth Bingert* | s/ *Nicole List* |
| Elizabeth Bingert | Nicole List |
| Counsel for Respondents | Counsel for Petitioner |

1

**Certificate of Service**

2

3            I hereby certify that on October 15, 2020, I electronically filed the foregoing

4      Joint Proposed Prehearing Order with the Clerk's Office by using the CM/ECF

5      system. I certify that all participants in the case are registered CM/ECF users and

6      that service will be accomplished by the CM/ECF system.

7

8      s/ Kat Esparza
       Assistant Paralegal
9      Capital Habeas Unit

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28