**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Michael Gallegos,

          Petitioner,

v.

David Shinn, et al.,

          Respondents.

No. CV-01-01909-PHX-NVW

<u>DEATH PENALTY CASE</u>

**ORDER**

In 2016, the Court of Appeals for the Ninth Circuit granted Petitioner Michael Gallegos's motion for a partial remand of this case pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), and directed the Court to determine whether cause and prejudice existed to excuse the procedural default of his claim that "counsel failed to investigate and present mitigating evidence of Gallegos's alleged organic brain damage."[1]  *Gallegos v. Ryan*, 842 F.3d 1123 (9th Cir. 2016).  The Court found that the default was excused and Gallegos was entitled to an evidentiary hearing on the merits of the claim.  (*See* Doc. 160.)  The hearing was held on November 9–10, 2020.  Gallegos submitted a post-hearing brief.  (Doc. 244.)

## I.    BACKGROUND

In 1990, Gallegos, age eighteen, raped and killed an eight-year-old girl.  He was convicted of first-degree murder and sexual conduct with a minor and sentenced to death.[2]

---

[1] *Martinez* held that the ineffective assistance of post-conviction counsel can excuse the procedural default of a claim of ineffective assistance of trial counsel.  566 U.S. at 17.

[2] The Court has discussed the facts of the crime elsewhere. (*See* Doc. 111 at 2–5.)

1

2

On direct appeal, the Arizona Supreme Court affirmed the convictions but remanded for

3

re-sentencing on the murder conviction. *State v. Gallegos* (*Gallegos I*), 178 Ariz. 1, 870

4

P.2d 1097 (1994). On remand, the trial judge re-sentenced Gallegos to death. The Arizona

5

Supreme Court affirmed. *State v. Gallegos* (*Gallegos II*), 185 Ariz. 340, 916 P.2d 1056

6

(1996).

7

After unsuccessfully pursuing post-conviction relief in state court, Gallegos filed a

8

habeas petition in this Court in 2001 and an amended petition in December 2002. (Docs.

9

1, 74.) The Court denied relief. (Doc. 111.)

10

On appeal to the Ninth Circuit, Gallegos raised claims of ineffective assistance of

11

counsel at the guilt and sentencing phases of trial. In his 2009 opening brief, Gallegos

12

argued that counsel failed to provide scientific evidence about his learning disability. (Case

13

No. 08-99029, Dkt. 12.) Gallegos relied on a 2002 report by Dr. Nancy Cowardin, a

14

psychologist with expertise in learning disabilities. (*Id.* at 41–42.) The Supreme Court

15

issued its opinion in *Martinez* in March 2012. 566 U.S. 1. In June 2012, Gallegos moved

16

for a stay and remand pursuant to *Martinez*. (Dkt. 46.) Citing the 2011 report of

17

neuropsychologist Dr. Robert Heilbronner, Gallegos argued that there was new evidence

18

supporting his claim of ineffective assistance of counsel at sentencing; i.e., evidence that

19

he "suffered from brain damage," including damage caused by head injuries sustained in a

20

series of ATV accidents.[3] (*Id.* at 15.) In April 2016, the court denied Gallegos's ineffective

21

assistance of counsel claims and rejected his motion for a stay and remand with respect to

22

those claims.[4] *Gallegos v. Ryan*, 820 F.3d 1013 (9th Cir. 2016).

23

In May 2016, Gallegos filed a petition for rehearing and rehearing en banc. (Dkt.

24

75.) He argued that the new "evidence of organic brain damage" fundamentally altered his

25

26

[3] All-Terrain Vehicle. The record also refers to ATCs (All-Terrain Cycles). For consistency's sake the Court will use ATV to refer to this category of vehicles except when quoting the record.

27

28

[4] The court granted Gallegos's motion to remand for consideration of a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). This Court denied Gallegos's request for a stay so that he could pursue his *Brady* claim in state court. (Doc. 130.)

claim of ineffective assistance of counsel at sentencing, which had previously alleged only that counsel erred by failing to present additional evidence of Gallegos's history of substance abuse, tendency to be a follower, and learning disability.  (*Id.* at 5–6.)

On November 30, 2016, the Ninth Circuit amended its opinion, granted Gallegos's petition for rehearing, and ordered a partial remand to this Court.  *Gallegos*, 842 F.3d 1123.

## II.   APPLICABLE LAW

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense.  *Id.* at 687–88.  The inquiry is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.

Under *Strickland*, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  *Id.* at 691.  A "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

Prejudice is proved by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  It is enough to show "a reasonable probability that at least one juror" would have recommended a sentence of life instead of death.  *Wiggins*, 539 U.S. at 537; *see Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005) (explaining, in the context of judge sentencing, that prejudice exists where, "[h]ad an adequate mitigation defense been presented, there is 'a reasonable probability' that an objective sentencing factfinder 'would have struck a different balance'") (quoting *Wiggins*, 539 U.S. at 537).

## III.   OVERVIEW

At issue is Gallegos's claim that resentencing counsel performed ineffectively by failing "to investigate and present mitigating evidence of Gallegos's alleged organic brain damage." *Gallegos*, 842 F.3d 1123.  Review of the claim is *de novo*.

Gallegos asserts that he suffers from three types of brain damage or dysfunction: specific learning disability ("SLD"); damage from alcohol and substance abuse; and damage resulting from traumatic brain injuries ("TBI"), including injuries sustained in ATV accidents.  (*See* Doc. 227 at 8.)  He alleges that resentencing counsel performed ineffectively by failing to investigate and present such evidence despite "red flags" in the record.  (*Id.*)  He contends that the following information would have been revealed through a proper mitigation investigation: "(1) Gallegos's learning disability was a brain-based disorder that caused significant cognitive deficits and affected his behavior, (2) his substance abuse as an adolescent may have impaired his brain development, and (3) multiple accidents with head injuries possibly resulted in further impairments to his already impaired brain."  (*Id.* at 21.)

Respondents argue that there is no objective evidence Gallegos ever suffered TBI and no way to distinguish the effects of possible head injuries from the effects of Gallegos's substance abuse.  (*Id.* at 12.)  They also assert that "the tests, technology, and theories surrounding adolescent organic brain damage that exist today, were not widely accepted in the scientific community" at the time of Gallegos's resentencing.  (*Id.* at 16–17.)

The parties have stipulated that Gallegos has a learning disability, that he had substance abuse issues, and that he was involved in ATV accidents.  (*Id.* at 3–4.)

The parties disagree about the scope of the remand.  Gallegos argues that the phrase "organic brain damage" as used by the Ninth Circuit refers to damage beyond that purportedly caused by TBI.  (*See* Doc. 244 at 5–9.)  The Court agrees.  As explained below, the testimony at the evidentiary hearing indicated that "organic brain damage" encompasses the damage reflected in Gallegos's learning disability and the damage potentially caused by his substance abuse and TBI.

## IV.   BACKGROUND

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.   Initial sentencing

At the guilt phase of trial, Gallegos's mother testified about his learning disability and alcohol consumption.  (RT 3/13/91 at 23–32.)  Gallegos himself testified that he suffered from a learning disability.  He also detailed his alcohol consumption on the day of the crimes.  (*Id.* at 34–35, 37–41, 42–58, 84–90, 112–16.)

Following Gallegos's conviction, counsel moved for a "diagnostic evaluation." (ROA 119.)  The court granted the motion and appointed Dr. John DiBacco to evaluate Gallegos and determine whether, at the time of the crime, his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to requirements of the law was significantly impaired, but not so impaired as to constitute a defense to the prosecution." (ROA 122; *see* Pet's Ex. 39.) [5]  Dr. DiBacco found that Gallegos was competent and did appreciate the wrongfulness of his conduct but also detailed Gallegos's learning disability, substance abuse problems, poor judgment and insight, and impulsivity.  (Pet's Ex. 39 at 4– 6.) He also noted that during the exam Gallegos was experiencing back pain from an ATV accident.  (*Id.* at 2.) Dr. DiBacco diagnosed Gallegos with adjustment disorder with mixed emotional features; alcohol dependence; rule-out alcohol abuse; cannabis dependence; rule-out cannabis abuse; rule-out psychoactive substance abuse, NOS; and personality disorder, NOS.  (*Id.* at 6.)

Counsel prepared a sentencing memorandum and attached reports written by Gallegos's juvenile probation officer, Noah Stalvey.  (ROA 127.)  The reports noted that Gallegos was a learning-disabled student with poor attendance and poor grades.  They also stated that "Gallegos is a young man who apparently has not developed the ability to think before he acts" and "tends to behave impulsively and allows himself to become involved in a situation without considering the consequences."

At the sentencing hearing, the State rested on the record with respect to the aggravating factors—that the murder was especially cruel, heinous, or depraved and the victim was under fifteen.  (RT 5/24/91 at 6.)  In mitigation, defense counsel called

---

[5] "Pet's Ex." refers to the exhibits prepared for the evidentiary hearing.  (*See* Doc. 235.)

Gallegos's father, mother, brother, and sister, all of whom testified that Gallegos was a good person from a good family and was remorseful for his actions. (RT 5/24/91 at 21–30.) Stalvey also testified, sharing his opinion that Gallegos was the least likely of his clients to commit this type of crime. (*Id.* at 16.) He also testified that Gallegos tended to act impulsively and was a follower rather than a leader. (*Id.* at 15, 19–20.)

Detectives Michael Chambers and Armando Saldate Jr., the lead investigators in the case, testified that they did not believe the death penalty was appropriate for Gallegos. (*Id.* at 30–41.) Detective Chambers testified that in his view Gallegos was "unsophisticated" and "less than his chronological age." (*Id.* at 39–40.)

Finally, Gallegos took the stand, reading a statement that expressed his remorse for the victim's death and attributing his actions to drug and alcohol impairment. (*Id.* at 42–43.)

Counsel submitted Dr. DiBacco's report (*id.* at 57–58, 65) and letters advocating a life sentence. Also before the court was the presentence investigation report, which included information about Gallegos's substance abuse history and mental health, and the comments of a counselor who described Gallegos as "definitely a follower and not a leader." (ROA 131 at 6.)

In its order, the trial court found that the two aggravating factors had been proved.[6] (*Id.* at 65–68.) With respect to statutory mitigating circumstances, the court found that Gallegos failed to prove, pursuant to A.R.S. § 13–703(G)(1), that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired.[7] (*Id.* at 68.) In doing so, the court considered Gallegos's "documented" history of drinking and substance abuse and his "documented learning disability." (*Id.* at 70–71.) The court found that Gallegos's learning disability affected his "math and spelling but not his reading or understanding." (*Id.* at 71.) The court cited Dr.

---

[6] Gallegos was sentenced prior to the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 609 (2002), which held that a jury, not a judge, must make the findings that render a defendant eligible for death.

[7] Since renumbered as A.R.S. § 13–751.

DiBacco's conclusion that Gallegos had "normal language skills, at least average fluid intelligence and was not mentally deficient" and that while Gallegos "may have been intoxicated at the time of the crime, he did appreciate the wrongfulness of his act." (*Id.*) The court found that Gallegos's age was a statutory mitigating circumstance. (*Id.* at 73.)

The court found that Gallegos had established as nonstatutory mitigating circumstances his remorse and the recommendations of leniency from the detectives. (*Id.* at 74.)

The court concluded that the mitigating evidence was not sufficiently substantial to outweigh the two aggravating factors and that "each aggravating circumstance . . . standing alone outweighs the total mitigation." (*Id.* at 75.)

On direct appeal, the Arizona Supreme Court remanded the case for resentencing, finding that the trial court had failed to consider Gallegos's impairment at the time of the crimes as a potential nonstatutory mitigating circumstance. *Gallegos I*, 178 Ariz. at 21–23, 870 P.2d at 1117–19.

### 2.  Resentencing

John Antieau represented Gallegos on appeal and during his 1994 resentencing proceedings.[8]  Prior to the resentencing hearing, he sought and the court authorized the appointment of investigator Mary Durand and Dr. C.J. Shaw, an addiction specialist. (ROA 154.)  Dr. Shaw prepared a report opining that Gallegos's blood alcohol level at the time of the crimes was 0.2 or higher. (ROA 161; *see* RT 10/24/94 at 142.)

Although the case was remanded with directions to consider impairment as a mitigating circumstance, the trial court agreed with defense counsel that the resentencing hearing would not be limited to that issue. (RT 10/24/94 at 32.)  Counsel presented testimony from Gallegos and his family and friends regarding his drug and alcohol use, learning disability, tendency to be a follower, and passive, nonviolent personality.

Gallegos testified that he suffered from a learning disability, was a "slow learner," and was placed in special education classes starting in the fourth grade. (*Id.* at 6.)  He

---

[8] Antieau passed away in 2000.

testified that he began drinking alcohol at age twelve or thirteen and began using marijuana in sixth or seventh grade and methamphetamine in tenth or eleventh grade.  (*Id.* at 6–7.)  His conduct deteriorated when George Smallwood arrived at his home.[9]  (*Id.* at 8–9.)  On the day of the murder he and Smallwood drank scotch, schnapps, and beer in the morning, smoked two joints, and then drank beer throughout the afternoon and night.  (*Id.* at 11–12.)  Gallegos testified that the crimes would not have happened if he had not been impaired and Smallwood had not been present. (*Id.* at 13.)

Gallegos's mother, Hortensia, testified that from second grade on he had attended special education classes due to his learning disability.  (*Id.* at 54.)  He was tested at the beginning of every school year and remained in special education through twelfth grade.  (*Id.*)  Mrs. Gallegos testified that Gallegos had a tendency to take the blame for things other people did.  (*Id.* at 55.)

Mrs. Gallegos testified that she became aware of Gallegos's drug use when he was in junior high.  (*Id.* at 56.)  She testified that Smallwood was violent and a bad influence; he exerted control over Gallegos and Gallegos followed his lead.  (*Id.* at 58.)

Gallegos's sister Margaret testified that she was aware of his drug and alcohol use in the years before the murder.  (*Id.* at 63–64.)  She stated that Gallegos was nonviolent and mellow when intoxicated.  (*Id.* at 64–65.)  She testified that after Smallwood arrived Gallegos's behavior changed; he became sullen and withdrawn and abandoned his old friends.  (*Id.* at 66.)

Another sister, Maria, became aware of Gallegos's drug and alcohol use when he was in seventh grade.  (*Id.* at 71.)  She too indicated that Gallegos became mellow when drinking, and described him as following Smallwood's lead.  (*Id.* at 72–74.)  She testified that Smallwood was a bad influence on Gallegos, who began to drink more and became rebellious.  (*Id.* at 76.)

Gallegos's brother-in-law testified that Gallegos began drinking at age 13 or 14.

---

[9] Smallwood, a friend of Gallegos and the victim's half-brother, was present with Gallegos during the crimes but charges against him were dropped.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(*Id.* at 83.)  He too had observed that Gallegos became mellow under the influence of drugs.  (*Id.*)

Gallegos's niece Michell Emig testified that he started drinking in junior high.  (*Id.* at 96.)  He began to drink every day and used marijuana and crystal meth.  (*Id.*)  Gallegos was mellow when drunk.  (*Id.* at 97.)  Emig testified that Smallwood was the leader and Gallegos the follower.  (*Id.* at 98.)

Several other friends and acquaintances testified that Gallegos was mellow and non-combative when under the influence and that he was a passive follower in his relationship with Smallwood.  (*Id.* 87, 89, 117–19, 128–30, 136, 138–39.)

Counsel again presented the testimony of Detectives Saldate and Chambers.  Detective Chambers testified in support of a life sentence based on his opinion that the killing was accidental and that Gallegos had been drinking at the time of the crimes.  (*Id.* at 43–45.)

At the close of the hearing, the court indicated that in making its decision it would consider mitigating evidence from the first sentencing hearing, including the testimony of Jerry Gallegos Jr., Gallegos's older brother, and Noah Stalvey.  (*Id.* at 112.)  Counsel did not offer Dr. DiBacco's report.  (*Id.* at 112–13.)

The State again did not present any evidence in support of the aggravating factors, relying on the evidence presented at trial.

In sentencing Gallegos, the court again rejected impairment as a statutory mitigating factor.  (*Id.* at 182.)  The court repeated its finding that Gallegos "has a documented learning disability" . . . that "affects his math and spelling but not his reading or understanding.  There is no evidence that the defendant is mentally deficient."  (*Id.* at 185.)  The court found that Gallegos's impairment and substance abuse history constituted nonstatutory mitigating circumstances but that they, together with the other mitigation evidence, did not outweigh the aggravating factors.  (*Id.* at 189–90.)  The court stated that: "Even if the Arizona Supreme Court told this court to weigh the alcohol and drug history and impairment ten times, this court would still find that each aggravating circumstance

standing alone would outweigh all collective mitigation." (*Id.* at 189–90.)

The Arizona Supreme Court affirmed. *Gallegos II*, 185 Ariz. at 347–48, 916 P.2d at 1063–64.

### 3.   ACRP Investigation

During the resentencing proceedings, the Arizona Capital Representation Project ("ACRP") offered Antieau assistance, which he accepted. (Pet's Ex. 4 at 4.) ACRP staff discussed with Antieau the need to present a different mitigation case from the one offered at the original sentencing. (*Id.* at 5.) In August 1994, Melodee Nowatzki, a mitigation specialist for the ACRP, faxed Antieau memoranda from witness interviews she had conducted. (*See id.* at 38.) These documents, which contained information that Gallegos had been injured in ATV accidents, are found in Antieau's file. (Pet's Ex. 2.)

In an interview with Nowatzki dated April 15, 1995, Gallegos described an accident that happened when he was about 16. (Pet's Ex. 2 at 411.) He was drunk and drove an ATV into a tree. He "chipped both front teeth . . . but didn't wreck the ATV too badly." (*Id.*)

He described another accident that happened in the summer before tenth grade. Gallegos went to a birthday party. (*Id.*) He was drunk and rode as a passenger on an ATV. The driver, also drunk, crashed into a tree going about 50 mph. (*Id.* at 411.) The driver broke his neck and was air-evacuated to the hospital. (*Id.*) Gallegos, who was not wearing a helmet, was "thrown into a bunch of rocks and landed face first." (*Id.*) He broke his nose and his glasses flew off. (*Id.*) Gallegos flagged down a car, and they called for an ambulance. (*Id.*) Although Gallegos had "hurt his leg and his head," he left when the ambulance arrived because he had been drinking under age. (*Id.*)

Another account of that accident was offered by Gallegos's niece Michelle Emig, who provided the following information to Nowatzki:

MICHAEL'S ATC ACCIDENT:

Someone had a police scanner and heard there was an accident and that the police were coming. Everyone was leaving in their cars, but Michelle

couldn't find Michael.  Ten minutes later some older kids brought Michael back in a truck. Michael just sat there, looking dazed from the accident. . .

Michael just sat there going "Whoa! That was a trip—I think that guy really got hurt."

Michael seemed dazed and spent the night at Margaret's house because he had been out too late.  Michael was not overly drunk at the time because they had only been at the party for about 10 minutes.  Michael seemed dazed all night and was sore afterward. Michael said he jumped off before the cycle hit the tree.  The driver was paralyzed from the neck down and was taken away by ambulance.

(*Id.* at 669–70.)

Todd Emig, Michelle's husband, told Nowatzki that: "At the cedars, in cinder hills near cinder lake, Michael rode ATC's. There was a big party there and Michael had a serious accident there."  (*Id.* at 664.)

Richard Wilson, a friend of Gallegos, reported that: "One time, a guy was driving his brother's 4-wheel; Mike jumped off, the guy hit a tree; Mike had some scratches." (*Id.* at 628.)

Another friend, Anthony Duran, told Nowatzki that "[e]veryone heard that the guy is paralyzed from the waist down from hitting the tree on the ATC.  The marks are still visible on the tree."  He continued: "Michael's ATC accident happened by Timberline, before Cinderlake [sic].  You can see the marks on the tree where it happened.  Michael was in shock after the accident.  He was pale, and looked that way for 1 hour." (*Id.* at 705–06.)

Duran also noted a prior accident: "At Richard's party, Michael wrecked Richard's ATC, lost his glasses until the next day. Tony remembers Michel being out on [sic] street looking for his glasses."  (*Id.* at 705.)

Finally, Nowatzki reported that Hortensia Gallegos, Gallegos's mother, once "noticed that Michel had a chipped tooth and asked Michael what happened to his front tooth.  He said that he had been ATC riding and hit a tree."  (*Id.* at 688.)

Antieau did not investigate this evidence or present it at resentencing, nor did he

offer any expert testimony with respect to learning disabilities or the effects of substance abuse on the brain.

## V.    HABEAS PROCEEDINGS & EVIDENTIARY HEARING

During the course of these habeas proceedings, Gallegos's counsel have retained a number of experts.  They include Drs. Cowardin and Heilbronner; Dr. David Fassler, a child and adolescent psychiatrist; and Dr. David Reschly, a psychologist with expertise in learning disabilities and special education.  Drs. Heilbronner, Fassler, and Reschly testified at the evidentiary hearing on remand.  Respondents retained one expert, Dr. Corwin Boake, a neuropsychologist.  He also testified at the evidentiary hearing on remand.

At the hearing Gallegos presented evidence from twelve lay witnesses: Aaron Barrett, a friend of Gallegos; Statia Peakheart, an attorney with the ACRP; Russell Randall, one of Gallegos's special education teachers; Jerry Gallegos Jr.; Hortensia Gallegos; Margaret Gallegos; Michelle Emig; Anthony Duran; Mary Durand, the defense investigator; Melodee Nowatzki; Sally Ake, one of Gallegos's special education teachers; and Noah Stalvey.  The Court accepted the declarations of Barrett, Peakheart, and Randall in lieu of live testimony.  (*See* Doc. 218; RT 11/09/20 at 109.)  The Court admitted the 2020 declarations of the remaining lay witnesses in lieu of direct testimony but allowed live cross-examination.  (*Id.*)

### 1.    Lay witnesses

#### a.    *Aaron Barrett*

Barrett was a friend of Gallegos.  In his 2020 declaration (Pet's Ex. 6), he writes that Gallegos had "difficulty learning anything beyond simple mechanical concepts."  (*Id.*, ¶ 4.)  Gallegos "struggled socially with the fact that he was in special education classes." (*Id.*, ¶ 5.)  Barrett and Gallegos experimented with drugs together but drifted apart in their senior year.  (*Id.*, ¶ 6.)

#### b.    *Statia Peakheart*

In her 2020 declaration (Pet's Ex. 15), Peakheart writes that Gallegos's case was assigned to her when she was with the ACRP and she provided assistance to Antieau.  (*Id.*,

¶ 6.)  She learned that Antieau was not meeting with Gallegos.  (*Id.*)  When she met with Gallegos, she got the impression he was intellectually impaired.  (*Id.*)  She spoke with mitigation specialist Nowatzki about evidence Nowatzki had discovered concerning Gallegos's mental health, cognitive deficits, and ATV accidents.  (*Id.*, ¶ 8.)  The evidence was forwarded to Antieau on the assumption that he would investigate further, but he failed to continue the mitigation investigation.  (*Id.*, ¶¶ 8, 9.)

### c.    Russell Randall

Randall was Gallegos's special education teacher in eleventh and twelfth grade.  He did not testify during the state court proceedings, but he wrote a letter in 1991 on Gallegos's behalf.  In his 2020 declaration, Randall quotes from the letter in which he stated that Gallegos was "friendly" and "cooperative" and "generally worked up to his academic ability" but was "hindered by his learning disability."  (Pet's Ex. 16, ¶ 4.)  Randall was not contacted by resentencing counsel.  (*Id.*, ¶ 5.)

In his declaration Randall describes Gallegos as lower functioning than his special education peers.  (*Id.*, ¶6.)  Gallegos was a follower, not a leader; he was "gullible and immature" and would gravitate toward peer groups that got into trouble.  (*Id.*, ¶¶ 4, 7.)  Gallegos acted without thinking about consequences and had deficits in reflective reasoning; "once he found himself in a troubling situation, he could not figure his way out."  (*Id.*, ¶ 8.)  His "disability left him more like a 13-year-old in a 17 or 18-year old body."  (*Id.*)  Gallegos could not cope with his emotions and was "easily frustrated."  (*Id.*, ¶9.)  He had low self-esteem and was "severely depressed"; Randall regarded him as a suicide risk.  (*Id.*, ¶ 10.)  Randall believed Gallegos used alcohol to "cover his emotional pain."  (*Id.*, ¶ 11.)

### d.    Jerry Gallegos Jr.

Gallegos Jr., Gallegos's older brother, testified at the 1991 sentencing and provided declarations in 2002, 2017, and 2020.  In his 2020 declaration (Pet's Ex. 11), Gallegos Jr. states that Gallegos was involved in 40–50 ATV wrecks.  (*Id.*, ¶ 4.)  Gallegos Jr. describes several of the accidents.  In one, Gallegos lost control of his ATV and rolled down a hill;

the ATV "smashed into him the entire way down." (*Id.*, ¶ 5.) In another, Gallegos crashed his ATV into the side of Gallegos Jr.'s truck; he "flew off" the vehicle and crashed into the side door. (*Id.*, ¶ 6.) "His face and body were bleeding heavily but he just got up and licked off the blood." (*Id.*) At age 16, Gallegos crashed after hitting a tree root while going 40 mph. (*Id.*, ¶ 7.) "He must have suffered a tremendous blow to the head," because his helmet broke into pieces when he removed it. (*Id.*) "He appeared dazed and as if he was trying to figure out what happened to him." (*Id.*) Gallegos was not taken to the hospital because he said he was fine. (*Id.*)

Gallegos Jr. states that Gallegos "didn't always think things through." (*Id.*, ¶ 10.) He was a "slow learner" and had "difficulty reading." (*Id.*, ¶ 11.)

Finally, Gallegos Jr. states that neither trial counsel, Antieau, nor Durand asked him about Gallegos's possible head injuries or learning disability. (*Id.*, ¶ 23, 24.)

In his testimony at the evidentiary hearing, Gallegos Jr. acknowledged that he did not disclose information about Gallegos's ATV accidents and possible head injuries at sentencing or during the 1994 resentencing proceedings when he was interviewed by Nowatzki. (RT 11/9/20 at 34–35.) He did not mention the accidents in his 2002 declaration. (*Id.* at 36.) In his 2017 declaration he discussed the incident where Gallegos crashed into his truck, but did not note concerns about a head injury. (*Id.* at 37.) He testified that he would have sought medical attention for Gallegos after the accidents if he were concerned about his condition, but "he seemed fine." (*Id.* at 38.) Gallegos Jr. would have shared the information about the accidents if he had been asked. (*Id.* at 39.)

### e.    Hortensia Gallegos

Hortensia is Gallegos's mother. She testified at the 1991 sentencing and 1994 resentencing and provided declarations in 2002, 2017, and 2020. In her 2020 declaration (Pet's Ex. 10), she states that Gallegos had difficulty understanding and following instructions. (*Id.*, ¶ 3.) He was more immature than her other children, which "caused him to be more reckless and exhibit poor judgment." (*Id.*, ¶ 5.) He had trouble learning and was placed in special education classes. (*Id.*, ¶ 6.) Once when Gallegos was in high school,

1  Mrs. Gallegos noticed that he had a chipped tooth; he later told her that had hit a tree in an

2  ATV accident.  (*Id.*, ¶ 8.)  Neither sentencing counsel, resentencing counsel, nor Durand

3  asked her about Gallegos's "learning disabilities, mental health, or history of accidents or

4  head injuries."  (*Id.*, ¶ 12.)  Instead, they were focused on Gallegos's drug and alcohol

5  abuse.  (*Id.*, ¶ 12.)  Mrs. Gallegos did inform Nowatzki about the accident where Gallegos

6  chipped his tooth.  (*Id.*, ¶ 13.)

7       At the evidentiary hearing, Mrs. Gallegos acknowledged that in her testimony at

8  sentencing and resentencing she discussed Gallegos's learning disability, substance abuse,

9  and the influence of George Smallwood, but did not provide information about Gallegos's

10 ATV accident or express concerns about possible head injuries; nor did she provide such

11 information in her 2002 declaration.  (RT 11/9/20 at 43–45.)

12      *f.*    **Margaret Gallegos**

13      Margaret, Gallegos's older sister, testified at both sentencing and resentencing and

14 provided declarations in 2002, 2017, and 2020.  In her 2020 declaration (Pet's Ex. 13), she

15 notes that one of the effects of Gallegos's learning disability was his difficulty in

16 processing information.  (*Id.*, ¶ 3.)  She states that Gallegos was "embarrassed and

17 ashamed" to be in special education.  (*Id.*, ¶ 4.)  She describes hearing about an accident

18 where Gallegos was the passenger on an ATV and the driver lost control, hit a tree, and

19 was left paralyzed.  (*Id.*, ¶ 5.)  Gallegos flew off the ATV after rolling several times.  (*Id.*)

20 He was not wearing a helmet.  (*Id.*)  He had scrapes on his arm, scratches on his face, and

21 a broken tooth.  (*Id.*)  Margaret was worried about him because he had "visible injuries and

22 likely a head injury, as he was complaining his head hurt."  (*Id.*, ¶ 6.)  She wanted to take

23 him to the hospital but he refused to go.  (*Id.*)  She states that she called Antieau to complain

24 about his lack of effort during the resentencing proceedings, but he did not return her calls.

25 (*Id.*, ¶ 7.)  At resentencing, Antieau focused on Gallegos's drinking and did not seem

26 interested in his learning disability or ATV accidents.  (*Id.*, ¶ 8.)

27      At the evidentiary hearing, Margaret acknowledged that she did not mention

28 Gallegos's ATV accidents in her testimony at the 1991 sentencing, in a letter she wrote to

- 15 -

counsel in 1991, when interviewed by Nowatzki in 1994, or in her testimony at resentencing. (RT 11/9/20 at 47–49.) She reported the ATV accident in her 2002 declaration, stating that Gallegos had a chipped tooth and scrapes on his arms but not mentioning a head injury or describing Gallegos's demeanor. (*Id.* at 50.) She provided more information about the accident in her 2017 declaration. (*Id.*)

### g.   *Michelle Emig*

Emig, Gallegos's niece, testified at the 1994 resentencing and provided declarations in 2002, 2017, and 2020. In her 2020 declaration (Pet's Ex. 9), she states that she was interviewed in 1994 by a defense investigator. (*Id.*, ¶ 3.) She told the investigator that Gallegos was involved in an ATV accident which left the driver paralyzed. (*Id.*) She provided the identities and contact information of people who were present at the time of the accident. (*Id.*, ¶ 4.) She states that she and Gallegos went to his sister Margaret's house after the accident. (*Id.*, ¶ 5.) He seemed "dazed, confused, and in pain." (*Id.*) He had lost his glasses and chipped a tooth. (*Id.*) Emig also discusses a second accident in which Gallegos crashed his ATV into the side of a truck. (*Id.* at ¶ 6.) She was not asked to testify about the ATV accidents or head injuries at the resentencing hearing. (*Id.*, ¶ 8.)

In her testimony at the evidentiary hearing, Emig acknowledged that she did not mention Gallegos's ATV accidents and possible head injuries in a letter she wrote to counsel in 1991 or during her testimony at resentencing. (RT 11/9/20 at 54.) She testified that when interviewed in 1994 she told Nowatzki about the ATV accident in which the driver was paralyzed. (*Id.* at 55.) She did not witness the crash, but saw Gallegos afterwards and he looked "dazed" and was "sore." (*Id.* at 56.) He said that he had jumped off the ATV before it hit the tree. (*Id.*) In her 2002 declaration, Emig stated that after the accident Gallegos held his hand to his head but she did not include that information in her later declarations. (*Id.*)

Emig testified that she did not notice any changes in Gallegos's behavior after the accident. (*Id.* at 57.) She also testified that in high school Gallegos drank to excess every day and most days used some kind of drug. (*Id.* at 58.) She testified that she could not be

sure Gallegos sustained any head injuries from the accident. (*Id.* at 59.)

### h.   Anthony Duran

Duran was Gallegos's friend from elementary to high school. He testified at the 1994 resentencing hearing and provided declarations in 2017 and 2020.  In his 2020 declaration (Pet's Ex. 7), he states that Gallegos had trouble understanding the consequences of his actions and was gullible and easy to manipulate. (*Id.*, ¶¶ 3, 4.)  Duran states that in 1994 he disclosed two ATV accidents to a defense investigator, including the one in which Gallegos was a passenger and the driver crashed into a tree.  (*Id.*, ¶6, 7.)  When Duran saw Gallegos after the accident, he looked "dazed, confused, and disoriented." (*Id.*, ¶ 8.)  The ATV was "completely destroyed." (*Id.*, ¶ 9.)  In the second accident Gallegos had been riding by himself; when he returned to camp after walking a mile from the site of the accident he was "pale and in shock"; he "must have suffered a very powerful blow to the head." (*Id.*,¶ 10.)

When Duran met with Antieau before the 1994 resentencing, Antieau did not ask any questions about the ATV accidents or about Gallegos's mental difficulties, gullibility, and impulsivity. (*Id.*, ¶ 11, 13.)  Duran states that Antieau "always looked tired and seemed like he was falling asleep" and "behaved strangely" in court. (*Id.*,¶ 12.)

At the evidentiary hearing, Duran testified that Gallegos drank often in high school, started smoking marijuana at age 14, and took acid and mushrooms.  (11/9/20 at 61–62.)  He testified that he did not witness the ATV accident where Gallegos was a passenger and the driver was paralyzed.  (*Id.* at 62.)  He described Gallegos after that accident as disoriented or having a hard time realizing where he was.  (*Id.* at 63.)  He asked Gallegos if he wanted to go to the hospital but Gallegos refused; today, as an adult, Duran "think[s] we send somebody to the hospital like that." (*Id.*)  He testified that he believed Gallegos did suffer a head injury but could not say for sure. (*Id.* at 65.)

### i.   Mary Durand

Durand was the defense team's investigator.  She did not testify during the state court proceedings.  She provided declarations in 2017 and 2020.  In her 2020 declaration

(Pet's Ex. 8), she opines that "Mr. Antieau ignored the prevailing professional norms which dictated the need to conduct a thorough mitigation investigation."  (*Id.*, ¶ 4.)  She states that Antieau was provided with Nowatzki's notes which contained evidence that Gallegos "suffered from learning disabilities and . . . had sustained prior head injuries."  (*Id.*, ¶ 6.)  According to Durand: "This evidence raised an obvious red flag that Mr. Gallegos might suffer from serious brain abnormalities."  (*Id.*)  Durand urged Antieau to investigate Gallegos's cognitive deficits and brain impairments, but he failed to do so.  (*Id.*, ¶¶ 10, 11.)  Durand states that she was aware Antieau had "a very serious problem with drugs and alcohol," which interfered with his performance and caused him to miss meetings with her and with Gallegos's family.  (*Id.*, ¶ 13.)

In her testimony at the evidentiary hearing, Durand acknowledged that the interview notes provided to Antieau by the ACRP discussed Gallegos's medical history, learning disability, education, and substance abuse history but did not specifically mention brain injury.  (RT 11/9/20 at 68–69.)  While the notes detailed Gallegos's ATV accidents, they also show that he was never taken to the hospital for medical treatment.  (*Id.* at 70.)  Durand testified that although the notes documenting her conversations with Antieau are missing from her file, she did discuss with him her concerns about the scope of his mitigation investigation.  (*Id.* at 71–73.)  The notes that are present do not mention concerns Durand might have had about the issues of brain damage or cognitive impairment.  (*Id.* at 73.)  She testified, however, that she did raise those topics in her conversations with Antieau.  (*Id.*)  Durand "felt very strongly that Antieau did not do a good job in this case."  (*Id.* at 75.)

### j.    Melodee Nowatzki

Nowatzki was a mitigation investigator for the ARCP.  She provided declarations in 2017 and 2020.  In her 2020 declaration (Pet's Ex. 14), she states that she received evidence about Gallegos's head injuries, gathered his school records, and provided all of the information to Antieau with the expectation that he would use the evidence to investigate whether Gallegos had brain impairments resulting from his learning disability and head injuries.  (*Id.*, ¶¶ 8, 9.)

- 18 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

At the evidentiary hearing, Nowatzki testified that she worked under the auspices of attorney Karen Fischer.  (RT 11/9/20 at 84.)  She testified that she met with Gallegos and talked about his ATV accidents.  (*Id.*)  He reported injuring his knee and his head, but did not indicate that he experienced any symptomology from the head injury.  (*Id.* at 84– 85.)  Gallegos's family did not tell Nowatzki that he suffered head injuries from the ATV accidents, but she believed there was a possibility he did have traumatic brain injury.  (*Id.* at 87.)  She faxed the information she had gathered to Antieau in August 1994.  (*Id.* at 85.) She did not include any recommendations or directions to Antieau as to what he should do with the witnesses, as that was not her role.  (*Id.* at 86.)  Attorney Fisher, however, did discuss with Antieau the possibility of having Gallegos evaluated for brain injury.  (*Id.*)

### k.    *Sally Ake*

Ake was one of Gallegos's special education teachers in high school.  She did not testify during the state court proceedings.  She provided declarations in 2002 and 2020.  In her 2020 declaration (Pet's Ex. 5), she states that Gallegos "suffered from significant cognitive limitations and learning disabilities" but "was not a behavioral problem" in her classes.  (*Id.*, ¶ 6.)  Gallegos was ashamed of his cognitive disabilities, which impeded his ability to relate socially with other students.  (*Id.*, ¶ 7.)  He showed signs of depression and began to self-medicate with alcohol and drugs.  (*Id.*)  Ake states that learning disabilities like Gallegos's have "pervasive and life-long effects both inside and outside the classroom."  (*Id.*, ¶ 8.)  Teenagers with learning disabilities have difficulty with decision-making, impulse control, and processing information; they are often followers rather than leaders.  (*Id.*, ¶ 9.)  Gallegos's "most serious impairments were caused by deficits in the ability of his brain to process auditory and visual information"; these deficits "impact[] both academic and social learning."  (*Id.*, ¶ 11.)  Due to his cognitive deficits and lack of adaptive skills, when Gallegos left school he "he did not possess the cognitive, social or the practical judgment of an 18-year-old."  (*Id.*, ¶ 18.)  Ake wrote a short letter to trial counsel prior to Gallegos's 1991 sentencing in which she described Gallegos as a follower. (*Id.*, ¶ 20.)  She was not contacted by resentencing counsel.  (*Id.*)

At the evidentiary hearing, Ake testified that she taught Gallegos in tenth and eleventh grade.  (RT 11/9/20 at 98.)  He progressed in some areas and regressed in others.  (*Id.*)  While his cognitive abilities were always an issue, she did not notice a significant decline in that area.  (*Id.* at 99.)

### l.  Noah Stalvey

Stalvey was Gallegos's juvenile probation officer. He testified at the 1991 sentencing and provided a declaration in 2020.  In his declaration (Pet's Ex. 17), Stalvey states that Gallegos was "very likeable," "personable and agreeable."  (*Id.*, ¶ 3.)  He explains that in his job he "encountered many evil kids," but "never consider[ed] Michael to be one of them."  (*Id.*, ¶ 4.)  He believed Gallegos did not have the cognitive ability to succeed on probation.  (*Id.*, ¶ 5.)  Gallegos did not "have the ability to think before he acted"; he behaved impulsively and became "involved in a situation without considering the consequences."  (*Id.*)  Stalvey states that he had special training and experience working with juvenile sexual offenders and found that Gallegos did not fit that profile.  (*Id.*, ¶ 6.)  Before testifying at the 1991 sentencing, Stalvey spoke with defense counsel, who did not ask him any questions about Gallegos's learning disability.  (*Id.*, ¶ 9.)  Stalvey was not contacted by resentencing counsel.  (*Id.*, ¶ 7.)

At the evidentiary hearing on remand, Stalvey testified that Gallegos continued to have substance abuse issues throughout his probation, and that five years of intervention did not make much of a difference.  (RT 11/9/20 at 105.)  He testified that he received no information from Gallegos or his family members about Gallegos being involved in ATV accidents or suffering head injuries.  (*Id.* at 106.)  During his supervision of Gallegos, Stalvey noticed no appreciable decline in his cognitive abilities.  (*Id.* at 107.)

### 2.  Gallegos's experts

### a.  Dr. Cowardin

Habeas counsel retained Dr. Nancy Cowardin to conduct psycho-educational testing.  In her report, dated May 28, 2002, Dr. Cowardin found that Gallegos's "academic age equivalent falls at approximately the 10½ year level, his language fundamentals at age

8, and overall information processing is estimated just below age 10 years, with lapses to the 6 year level in specific auditory tasks." (Pet's Ex. 33 at 19.)  She opined that "it is reasonable to conclude that at the time this crime was committed, Michael operated cognitively in much the same manner as a far younger child. . . .  At 18, the youth did not function in the least like a competent adult defendant." (*Id.* at 6, 20.)  Dr. Cowardin measured Gallegos's IQ as 98. (*Id.* at 9.)

Dr. Cowardin discussed the impact of learning and attentional disorders, explaining that "when a child like Michael has additional difficulties involving emotional, attention, and language processing issues, LD (learning disability) can present an insurmountable hurdle with lifelong effects." (*Id.* at 4.)

Dr. Cowardin opined that individuals with such deficits "are often at a loss in making appropriate adaptive decisions on confrontation, and can be easily manipulated. . . . It was therefore not a surprise to learn that [Gallegos] neither preplanned nor initiated the crime on his own, but followed the direction of another who he perceived as more competent." (*Id.* at 20–21.)

Dr. Cowardin, who has since retired, did not testify at the evidentiary hearing.

### b.  Dr. Heilbronner

Dr. Heilbronner, a neuropsychologist, conducted a complete neuropsychological evaluation of Gallegos and prepared a report dated December 12, 2011. (Pet's Ex. 28.)  He reviewed evaluations by other experts, interviewed Gallegos, and administered a battery of neuropsychological tests. (*Id.* at 3–4.)

In his report and in an addendum dated October 3, 2017, Dr. Heilbronner recounted three ATV accidents Gallegos reportedly was involved in between the ages of 15 and 17. (Pet's Ex. 29 at 1.)  In the first incident, Gallegos had been drinking when he tried to jump over a flower bed but fell backwards and hit his head on a concrete block. (*Id.*)  He reported that he had no memory of the rest of the night, but later learned that he had been driving an ATV; when he woke up on the living room floor the next day the back of his shirt was bloody. (*Id.*)  In the second incident, he hit a tree while driving an ATV. (*Id.*)  Afterwards

he was "out for a while." (*Id.*)  The helmet he was wearing broke apart in six pieces.  (*Id.*)  In the third incident Gallegos was drinking at a party when he got on the back of a stranger's ATV.  (*Id.*)  The vehicle hit a tree.  (*Id.*)  Gallegos "reportedly hit his head on the back of the driver's helmet before falling off the [ATV] and landing on rocks."  (*Id.*)

In his report Dr. Heilbronner focused on the reported periods of unconsciousness following each incident and Gallegos's "post-traumatic amnesia" following two of the incidents.  (*Id.*)  Dr. Heilbronner opined that in each accident Gallegos suffered "not mere concussions," but "moderate to severe trauma to the brain."  (*Id.*)  According to Dr. Heilbronner, traumatic brain injuries affect adolescents' brains more severely than the brains of adults, and "the greatest challenges many adolescents with brain damage face are changes in their abilities to think and learn and to develop socially appropriate behaviors."  (*Id.* at 2.)

Dr. Heilbronner measured Gallegos's IQ as 79, or borderline to low average.  (Pet's Ex. 28 at 5.)  His neuropsychological testing detected impaired cognitive functions in several areas, including attention, concentration, working memory, mental flexibility, and response inhibition.  The tests thus revealed "objective evidence of cognitive dysfunction reflecting brain-based disturbances in functioning."  (*Id.* at 5, 7.)  Dr. Heilbronner diagnosed Gallegos with Cognitive Disorder, NOS, which is a disorder "characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders. . . ."  (*Id.* at 7.)  He explained that "the cognitive deficits cannot be explained by other factors such as normal aging, psychological/emotional issues (e.g., depression, anxiety), or any other type of current environmental stressors."  (*Id.*)

Dr. Heilbronner opined that Gallegos's "brain damage played a role in the commission of the offense through a lack of planning and organization (e.g., premeditation) and an impaired ability to consider the consequences of his actions."  (*Id.*)  Combined with "the cognitive and psychosocial effects of a learning disability, this compromised his capacity to inhibit and/or control his behavior at the time of the offense and also made him

susceptible to the influence of others." (*Id.*)

According to Dr. Heilbronner, Gallegos may have been even more impaired in 1990 when the crimes were committed because his "brain was even less developed, given his age and the associated lack of neural maturation that is evident in the brains of adolescents, especially those with learning disabilities and in those who have sustained brain damage as a result of multiple head injuries." (Pet's Ex. 29 at 3.)

Dr. Heilbronner opined that with proper testing Gallegos's "widespread brain dysfunction" could have been detected at the time of resentencing in 1994. (*Id*. at 4.)

At the evidentiary hearing, Dr. Heilbronner testified that the battery of neuropsychological tests he administered included measures to detect malingering. (RT 11/9/20 at 123.) Gallegos's efforts were within normal limits, so the results of the tests were valid. (*Id.* at 124.)

Dr. Heilbronner did not include all of the test scores in his 2011 report. (*Id.* at 127.) He also destroyed the raw data, pursuant to a policy which allows the destruction of such data after seven years. (*Id.* at 127–28.)

Dr. Heilbronner testified that Gallegos's low IQ score in comparison with previous scores was attributable to the new, more complete, test he administered. (*Id.* at 126–27.) The lower score also could have resulted from Gallegos's substance abuse or head injuries. (*Id.* at 127.)

Dr. Heilbronner testified that he found "objective evidence of cognitive dysfunction reflecting brain-based disturbances in functioning" and that he diagnosed Gallegos with Cognitive Disorder NOS, an "acquired physiological condition," pursuant to the DSM-IV.[10]   (*Id.* at 134–35.)   According to Dr. Heilbronner, Gallegos's brain dysfunction exceeded what could be attributed to his learning disability alone. (*Id.* at 137–38.) Dr. Heilbronner could not specify the cause of the dysfunction; there were multiple causes.

---

[10] Diagnostic and Statistical Manual IV, which was replaced by DSM-V in 2013. (RT 11/9/20 at 135–36.) In DSM-V, the diagnosis Cognitive Disorder NOS was replaced by Mild Neurocognitive Disorder. (*Id.* at 136.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(*Id.* at 138.)  He explained that "the neuropsychologist . . . needs to come up with a reason why the results were like they were, and the reason I gave NOS is because I couldn't say specifically it's due just to the head trauma or due just to the alcohol."  (*Id.*)  Gallegos's "disturbances and abnormalities in brain function exist without regard to the specific cause or causes of his impaired brain."  (*Id.*)

According to Dr. Heilbronner, none of the previous testing done on Gallegos, including the evaluations of Drs. DiBacco and Cowardin, would have revealed the extent of Gallegos's brain injury or impairment.  (*Id.*)  He discussed Dr. Cowardin's diagnosis of specific learning disability, explaining that SLD is "a neurodevelopmental disorder," which means that "something is wrong with the central nervous system."  (*Id.* at 141.)  Dr. Heilbronner testified that "the information processing disorder and the related deficits" associated with SLD are "the result[] of an organic damage or impairment to the normal functioning of the brain."  (*Id.*)

Dr. Heilbronner testified that Gallegos's head injuries worsened the damage to his brain attributable to SLD.  (*Id.* at 142.)  He opined that the reported facts surrounding the accidents, including loss of consciousness and amnesia, made it plausible that Gallegos suffered TBI.  (*Id.* at 143–45.)  According to Dr. Heilbronner, contemporaneous medical records are not required to render a diagnosis of TBI.  (*Id.* at 149.)

Dr. Heilbronner stated that even if Gallegos did not suffer any head or brain injury from the ATV accidents, "he still suffer[s] from organic brain abnormalities evident in school testing, Dr. Cowardin's testing and [Dr. Heilbronner's] testing."  (*Id.* at 150.)  Even in the absence of TBI, the deficits identified in Dr. Heilbronner's testing are "the result of organic brain damage or impairment."  (*Id.*)

Dr. Heilbronner testified that the repeated head traumas had an "exponential effect" on Gallegos's brain.  (*Id.* at 146.)  Gallegos's youth and pre-existing learning disability also made him more vulnerable to TBI.  (*Id.* at 148–49.)

Dr. Heilbronner testified that depression and personality change often follow TBI, and that Gallegos's teachers described him as being depressed around the time the

accidents occurred.  (*Id.* at 147–48.)

According to Dr. Heilbronner, at the time of the crime, Gallegos's brain injuries significantly impaired his capacity to conform his conduct to the requirements of law and compromised his ability to control his impulses.  (*Id.* at 151.)  The injuries affected his ability to plan, reason, and think through the consequences of his actions; they also left him gullible, easily manipulated, and impulsive.  (*Id.* at 151–53.)

On cross-examination, Dr. Heilbronner acknowledged that all of his testimony in capital cases has been on the side of the defendant, and he has given approximately 20 presentations to criminal defense organizations.  (*Id.* at 155–58.)

Dr. Heilbronner agreed that neuropsychology is an evolving field and the state of the field today is much different than it was in 1994.  (*Id.* at 159.)

Dr. Heilbronner acknowledged that Gallegos's reported memory gaps could be the result of alcohol abuse.  (*Id.* at 176–77.)  He agreed that a layperson's description of Gallegos as "pale" or "dazed' is not dispositive of head injury and the described symptoms could be the result of other causes.  (*Id.* at 177–78.)

Dr. Heilbronner testified that he did not order follow-up brain scans, and in fact no scans were ever performed.  (*Id.* at 183–84.)  He stated that neuropsychological testing can be more sensitive to brain damage than scans, but admitted it was possible that a scan could show damage.  (*Id.* at 184; *see id.* at 199.)

Dr. Heilbronner acknowledged that some of the tests he performed were not available at the time of Gallegos's resentencing.  (*Id.* at 184.)  However, neuro-cognitive deficits, such as attention, memory, and executive functions, could have been "reliably assessed" in 1994.  (*Id.*)

Dr. Heilbronner testified that Gallegos's depression might have been a sequela of his head trauma, but acknowledged that it could also have been situational.  (*Id.* at 185.) He conceded that some of the effects he attributed to Gallegos's brain injury are also consistent with both intoxication and the long-term effects of drug or alcohol abuse.  (*Id.* at 188.)

1
2
3

Finally, Dr. Heilbronner agreed it was plausible that Gallegos's conduct in carrying out the crime could be explained even in the absence of TBI by Gallegos's pre-existing learning disability and emotional problems.  (*Id.* at 198.)

4

### c.    Dr. David Fassler

5
6
7
8
9
10
11
12
13

Gallegos has presented an affidavit from Dr. David Fassler, a child and adolescent psychiatrist.  (Pet's Ex. 31.)  In the affidavit, dated October 6, 2017, Dr. Fassler explained that the region of the brain "responsible for instinctual behavior, such as aggression, anger, pleasure and fear," develops first, while the frontal cortex, the region "responsible for planning, strategizing, and judgment," develops last and continues to mature into the mid-20s.  (*Id.*, ¶¶ 12, 13.)  Before the frontal cortex is fully developed, "young adults [are] more likely to act on instinct or impulse," and it is "harder for them to modulate emotional responses, regulate behavior, control impulses, assess risks or fully consider the consequences of their actions."  (*Id.*, ¶ 15.)

14
15
16
17
18

Brain development can be impaired by substance abuse.  (*Id.*, ¶¶ 17–21.)  Adolescents are more susceptible to long-lasting impacts of alcohol than adults, and alcohol use in adolescents "may result in alterations in normal brain development leading to permanent brain damage."  (*Id.*, ¶¶ 19, 21.)  Dr. Fassler also noted that "Gallegos has a genetic disposition to substance abuse."  (*Id.*, ¶ 55.)

19
20
21
22
23

According to Dr. Fassler, at the time of the crime, Gallegos's brain "would still have been in the process of achieving a full level of adult development, with the frontal lobes, which control judgment and reasoning, developing last."  (*Id.*, ¶ 60.)  Gallegos also had a history of drug and alcohol use and head injuries, which can "interfere with the process of normal brain development."  (*Id.*, ¶¶ 61, 64.)

24
25
26

At the evidentiary hearing, Dr. Fassler first testified that learning disability is indicative of "some level of brain dysfunction," a fact that was "well understood" in 1994.  (RT 11/9/20 at 207.)

27
28

Dr. Fassler then testified that he had reviewed Gallegos's records to determine whether he had a genetic predisposition for substance abuse.  (*Id.*)  He concluded that

Gallegos did have such a predisposition based on his family history of alcohol abuse, with his father, brother, paternal grandfather, and paternal aunt all having problems with alcohol.  (*Id.* at 209.)  Dr. Fassler testified that individuals with such a predisposition are three to four times more likely to have a substance abuse problem.  (*Id.* at 208.)  Other factors contributing to a predisposition to alcohol abuse were present in Gallegos's case, including environmental factors, such as being provided alcohol by his older brother, and the young age, 13, at which Gallegos began drinking.  (*Id.* at 209–10.)  The factors have a "compounding" effect.  (*Id.* at 210.)  With these factors in place, Gallegos's use of alcohol before the crime was not "purely voluntary."  (*Id.* at 211.)

Dr. Fassler next testified about the effects of alcohol abuse on brain development. He explained that alcohol, if abused, is a neurotoxin that can cause "organic damage" or "physical damage" by "interfer[ing] with the connections between brain cells."  (*Id.* at 212.)  Such damage can be permanent.  (*Id.* at 212–13.)  The damage can appear in neuropsychological testing.  (*Id.* at 212.)

Alcohol abuse in adolescents affects the still-developing frontal lobe, which is responsible for executive functioning.  (*Id.* at 213–14.)  This information was available in 1994.  (*Id.* at 212, 215.)

The results of such damage include difficulties in reasoning, impulse control, stopping an action once started, and susceptibility to the influence of others.  (*Id.* at 214–15.)  Gallegos's behavior exhibited these characteristics.  (*Id.* at 215.)

Dr. Fassler acknowledged that some of the effects of brain impairment, such as difficulty with impulse control, judgment, and reasoning, could also be caused by being under the influence of alcohol or drugs.  (RT 11/10/20 at 225.)

Dr. Fassler testified that taken together, learning disability, substance abuse, and head injuries have a cumulative effect on the brain.  (*Id.* at 226.)  When all three are present it is not possible to assign a percentage to each cause.  (*Id.*)

**d.    *Dr. Daniel Reschly***

Habeas counsel retained Dr. Daniel Reschly to replace the retired Dr. Cowardin. Dr. Reschly, a psychologist with expertise in learning disabilities and special education, prepared a declaration dated September 11, 2020. (Pet's Ex. 37.) Dr. Reschly diagnosed Gallegos with Specific Learning Disability (SLD) and Attention-Deficit Hyperactivity Disorder (ADHD).

Dr. Reschly also opined that Gallegos has "brain-based neurodevelopmental disabilities that result in diminished capacities" in areas of reasoning, judgment, understanding and processing information, communicating, learning from experience, and controlling impulses. (*Id.*, ¶ 117.) According to Dr. Reschly, "Gallegos's neurocognitive deficits and diminished capacities are inseparable from his conduct at the time of the offense." (*Id.*)

Dr. Reschly explained that "SLD is a developmental challenge that has effects on academic learning *and* social development" and "life-long effects on individual adjustment and performance." (*Id.*, ¶ 121.)

Dr. Reschly stated that "ADHD is a developmental challenge that has significant effects on social and academic development." (*Id.*) Impulsivity and inattention are frequently associated with SLD and ADHD, and individuals with ADHD often have inadequate control over their emotions. (*Id.*, ¶ 122.) Dr. Reschly opined that: "The combined effects of SLD and ADHD likely were significant contributors to Mr. Gallegos [sic] poor judgment and inadequate impulse control apparent in the crimes." (*Id.*, ¶ 123.)

According to Dr. Reschly, the effects of TBI on Gallegos's behavior include "poor judgment, impulsivity, failure to consider consequences, failure to inhibit inappropriate impulses, poor decision making, inability to delay gratification, and poor reasoning and judgment." (*Id.*, ¶ 124.) These effects, exacerbated by alcohol abuse, likely influenced Gallegos's behavior at the time of the crimes. (*Id.*)

At the evidentiary hearing, Dr. Reschly testified that SLD is a "brain-based neurobiological disorder." (RT 11/10/09 at 239.) It is caused by brain dysfunction "related to largely unknown factors," although there is a genetic component. (*Id.*) SLD is a life-

long condition that affects not only the learning of academic information but also "emotional regulation in social learning." (*Id.*)

Dr. Reschly testified that ADHD is also the result of "brain dysfunction." (*Id.* at 241.) It is associated with "identifiable structural differences" in the brain. (*Id.*) Both SLD and ADHD were well understood as far back as the 1980s. (*Id.* at 242.)

A person with both SLD and ADHD will suffer from learning difficulties as well as problems with attention, motivation, and impulse control. (*Id.*)

Dr. Reschly explained that Gallegos's low score on the IQ test administered by Dr. Heilbronner was the result of poor performance on subscales not included in prior versions of the test. (*Id.* at 253.)

Dr. Reschly testified that SLD affects frontal lobe development and therefore impairs the ability to reason and control impulses. (*Id.* at 256.) It is the brain's "brake pedal," meaning that it "assist[s] people in considering the consequence and interactions of not simply impulsively doing something." (*Id.* at 257.) The frontal lobe does not reach maturity until a person is in his late teens or early twenties. (*Id.*) A person with underdeveloped executive functioning has deficits in "inhibition and impulse control" and the "ability to delay gratification." (*Id.* at 258.) The relationship between the frontal lobe and SLD was understood in 1994. (*Id.*)

Dr. Reschly testified that the deficits associated with Gallegos's underdeveloped executive functioning were apparent during his school years and around the time of the murder. (*Id.*) In committing the crime, Gallegos exhibited deficits in judgment, reasoning, ability to delay gratification, impulse control, and decision-making. (*Id.* at 259.)

Dr. Reschly testified that SLD affects social and adaptive behaviors. (*Id.* at 259–60.) He testified that Gallegos's deficits in auditory processing impact his ability to follow directions, stay on task, and learn from mistakes. (*Id.* at 260.) A person with such deficits is susceptible to manipulation by others. (*Id.* at 261.)

**2.**     **Respondents' expert witness**

***Dr. Corwin Boake***

Respondents retained one expert, Dr. Corwin Boake, a neuropsychologist. Dr. Boake interviewed Gallegos by video-teleconference but, due to restrictions on visitation caused by the COVID-19 pandemic, was unable to administer any testing.  (Resp's Ex. 59.)  Dr. Boake also reviewed previous evaluations, including the testing performed by Dr. Heilbronner.

In his report, Dr. Boake opined that there is no objective evidence that Gallegos experienced concussions or TBI.  (*Id.* at 7.)  He explained that the criteria for neurocognitive disorder due to TBI requires that altered mental status and other neurologic signs must be observed immediately following the injury.  (*Id.*)  Delayed, self-reported symptoms, as in Gallegos's case, do not meet those criteria.  (*Id.*)

Dr. Boake opined that, given Gallegos's history of alcohol abuse and binge drinking, it is most likely that his reported memory gaps were alcohol blackouts, not concussions or TBI.  According to Dr. Boake: "It is unclear how the reported memory gaps can be attributed to undiagnosed brain injuries instead of alcohol use." (*Id.* at *8.*)

Dr. Boake found that Dr. Heilbronner's diagnosis of neurocognitive impairment caused by TBI was unreliable based on "three methodological problems." (*Id.*)  First, there were no medical records so the history taken by Dr. Heilbronner relied on Gallegos's self-report, and "[r]elying on the history as reported by a person with no medical training, and who was probably intoxicated at the time of the relevant events, increases the risk of diagnostic errors."  (*Id.*)  According to Dr. Boake, there is no "validated procedure to diagnose traumatic brain injury using only neuropsychological assessment" and it is not possible to use "neuropsychological testing to detect remote concussions in a person with learning disability and substance abuse."  (*Id.*)  Second, Dr. Heilbronner failed to consider alcohol blackouts as a possible cause of Gallegos's reported memory gaps.  (*Id.*)  Third, Dr. Heilbronner failed to consider whether the decline in Gallegos's IQ scores from the mid-90s to 79 could be the result of invalid performance, given that "there is no medical reason" for the decline.  (*Id.*)  Dr. Boake concluded that he had "never seen a neuropsychological report offer a diagnosis of moderate to severe traumatic brain injury

based only on the neuropsychological evaluation results." (*Id.* at 9.)

The diagnoses most consistent with Dr. Boake's findings are specific learning disorder, adjustment disorder, and polysubstance use disorder. (*Id.*)

Dr. Boake noted that "Dr. Heilbronner's report does not list the majority of test scores." (*Id.*) If the data had been available, Dr. Boake "would have used them to check test scoring, to compare the test data to previous examinations, to compare the test data to relevant research, and to compare [his] interpretations of the test data to those of Dr. Heilbronner." (*Id.*)

At the evidentiary hearing on remand, Dr. Boake testified that most cases of TBI are diagnosed without a neuropsychologist. (RT 11/10/20 at 290.) A neuropsychological examination alone is not sufficient to diagnose TBI. (*Id.* at 289.) Instead, the diagnosis is made by a physician who performs a neurological examination, which includes imaging studies. (*Id.* at 290.)

Dr. Boake testified that evaluating the lower IQ score measured by Dr. Heilbronner would require access to validity data that are not available. (*Id.* at 298.) Therefore, there is no objective evidence that Gallegos put forth his best effort on the test. (*Id.* at 299.)

Dr. Boake testified to a reasonable degree of neuropsychological certainty there was no objective evidence of concussion or TBI. (*Id.* at 306.) Such evidence would include a scan or medical observation. (*Id.*) There were no medical records documenting Gallegos's reported head injuries. (*Id.*) Dr. Boake testified that under the DSM-V, a diagnosis of TBI requires medical observation of neurocognitive effects immediately following the injury; delayed, self-reported observations are not sufficient. (*Id.* at 308.)

Dr. Boake noted that Gallegos admitted to binge drinking and was intoxicated at the time of each of the ATV accidents he reported to Dr. Heilbronner. (*Id.* at 310.) Accordingly, Gallegos's reported gaps in memory are best explained as alcoholic blackouts. (*Id.*) A finding of TBI is unnecessary to diagnose Gallegos's condition. (*Id.*)

Dr. Boake reiterated that Dr. Heilbronner used non-standard methods in reaching his diagnosis of neurocognitive disorder due to brain damage and moderate to severe TBI.

(*Id.* at 312.)  He repeated that moderate to severe TBI is never diagnosed based solely on a neuropsychological evaluation without additional medical evidence.  (*Id.*)  Dr. Boake again challenged Dr. Heilbronner's failure to consider alcoholic blackouts in reaching his diagnoses and his failure to adequately explain the decline in Gallegos's IQ score.  (*Id.* at 313.)

Dr. Boake testified that he diagnosed Gallegos with SLD, substance abuse, and adjustment disorder.  (*Id.* at 320.)

**VI.    FINDINGS OF FACT**

1.    Gallegos has a specific learning disability.  (*See* Doc. 227 at 3.)

2.    SLD is a "brain-based neurobiological disorder."  (Reschly, RT 11/10/09 at 239.) It is caused by brain dysfunction related to largely unknown factors.  (*Id.*)  SLD is a life-long condition that affects both the learning of academic information and "emotional regulation in social learning." (*Id.*)

3.    A learning disability is indicative of "some level of brain dysfunction," a fact that was "well understood" in 1994. (Fassler, *id.* at 207.)  SLD is "a neurodevelopmental disorder," which means that "something is wrong with the central nervous system." (Heilbronner, *id.* at 141.)  "[T]he information processing disorder and the related deficits" associated with SLD are "the result[] of an organic damage or impairment to the normal functioning of the brain."  (*Id.*)

4.    SLD affects frontal lobe development and therefore the ability to reason and control impulses.  (Reschly, RT 11/10/20 at 256.)  The frontal lobe does not reach maturity until a person is in his late teens or early twenties.  (*Id.* at 257.)  SLD affects social and adaptive behaviors.  (*Id.* at 259.)  SLD impacts the ability to follow directions, stay on task, and learn from mistakes.  (*Id.* at 260.)   A person with such deficits is susceptible to manipulation.  (*Id* at 261.)

5.    Gallegos has Attention-Deficit Hyperactivity Disorder.  (*Id* at 240.)

6.    ADHD is the result of brain dysfunction.  (*Id* at 241.)  It is associated with "identifiable structural differences" in the brain.  (*Id.*)

7.      A person with both SLD and ADHD suffers from learning difficulties as well as problems with attention, motivation, impulse control, and the ability to delay gratification. (*Id* at 258.)

8.      Both SLD and ADHD were well understood as far back as the 1980s.  (*Id* at 242.)

9.      Gallegos had a history of substance abuse.  (*See* Doc. 227 at 3.)

10.     Gallegos was genetically predisposed to substance abuse.  (Fassler, RT 11/9/20 at 209.)  That predisposition was compounded by environmental factors and the young age at which he started drinking.  (*Id.* at 209–10.)

11.     Alcohol, when abused, is a neurotoxin that can cause "organic brain damage."  (*Id.* at 212.)  Such damage can be permanent.  (*Id.* at 212–13.)  The damage can appear in neuropsychological testing.  (*Id.* at 212.)  Alcohol abuse in adolescents affects the still-developing frontal lobe, which is responsible for executive functioning.  (*Id.* at 213–14.)

12.     The results of brain damage from alcohol abuse include difficulties in reasoning, impulse control, stopping an action once started, and susceptibility to the influence of others.  (*Id.* at 214–15.)  This information was available in 1994.  (*Id.* at 212, 215.)

13.     Resentencing counsel Antieau was aware that Gallegos suffered from a learning disability and had a history of substance abuse.

14.     Gallegos was involved in ATV accidents.  (*See* Doc. 217 at 3.)  In one accident he was the passenger on an ATV that crashed into a tree.  (*See* Pet's Ex. 2 at 411–12, 628, 669–70, 705–06.)  In another accident, Gallegos crashed an ATV into the side of a truck. (Pet's Ex. 9, ¶ 6; Pet's Ex. 11, ¶ 6.)  Gallegos, Jerry Gallegos Jr., and Tony Duran described additional ATV accidents.  (Pet's Ex. 2 at 410, 705; Pet's Ex. 11, ¶¶ 5, 7; Pet's Ex's. 28 at 4, 29 at 1.)

15.     It is probable that Gallegos suffered TBI in one or more of these accidents.  (*See* Pet's Ex's 28 at 4, 29 at 4; Heilbronner, RT 11/9/20 at 146–48.)

16.     Dr. Heilbronner performed a full battery of neuropsychological tests.  The test results were valid.  (RT 11/09/20 at 123–24.)

17.    It is probable, based on the results of that testing, that Gallegos suffers from Cognitive Disorder NOS (DSM-IV).  (Pet's Ex's. 28 at 7, 29 at 4; Heilbronner, RT 11/09/20 at 136–38.)

18.    The adolescent brain is more susceptible to the effects of TBI.  (Pet's Ex. 29 at 2; Heilbronner, RT 11/09/10 at 158–49.)   Pre-existing conditions such as SLD increase vulnerability to the effects of brain trauma.  (RT 11/09/20 at 149.)

19.    In individuals with brain injury, impulsivity is increased, judgment and reasoning are compromised, and "in many cases the person acts much younger than their chronological age."  (*Id.* at 151.)   A person with such injuries is also susceptible to manipulation.  (*Id.*)

20.    Gallegos's conduct in committing the offenses, including poor judgment, impulsivity, immaturity, inability to stop an action once started, and susceptibility to be being manipulated by others, was consistent with the effects caused by SLD and brain damage resulting from alcohol abuse or TBI.  (*See* Fassler, RT 11/09/20 at 215.)

21.    The etiology of Gallegos's brain dysfunction cannot be known for certain, but it is probable that the effects of substance abuse and TBI contributed to the condition.  (*Id.* at 138.)   Gallegos's brain dysfunction exists without respect to a specific cause or causes.  (*Id.*)  Even in the absence of TBI, Gallegos's deficits are "the result of organic brain damage or impairment."  (*Id.* at 150.)

22.    Neuropsychological testing available in 1994 could have identified Gallegos's cognitive deficits.  (*Id.* at 184.)

23.    Resentencing counsel Antieau possessed information that Gallegos was involved in at least one ATV accident.  Gallegos reported that the ATV was traveling at 50 mph when it crashed into a tree.  (Pet's Ex. 2 at 411.)  He was not wearing a helmet.  (*Id.*)  He landed face-first in a pile of rocks and "hurt his head."  (*Id.*)  According to witnesses who saw him after the accident, he appeared "dazed, "pale," and "in shock."  (*Id.* at 670, 706.)  The accident was serious enough to leave the driver paralyzed.  (*Id.* at 411, 670, 705.)

24.     Antieau did not pursue the information that Gallegos had been injured in ATV accidents and possibly suffered head injuries.  (Pet's Ex. 8, ¶¶ 10, 11.)

25.     At the resentencing hearing, Antieau did not present evidence of Gallegos's ATV accidents or possible head injuries.  He did not present expert testimony about the brain-based nature of SLD or the effects of substance abuse on the brain.

## II.     CONCLUSIONS OF LAW

### 1.     Resentencing counsel Antieau's performance was deficient

By failing to investigate and present evidence of organic brain damage at Gallegos's 1994 resentencing, Antieau's performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.

Under prevailing professional norms at the time of Gallegos resentencing, Antieau had an "obligation to conduct a thorough investigation of the defendant's background." *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).  "It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase."  *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).  "[C]ounsel's duty to investigate all potentially mitigating evidence . . . and to provide the sentencing court with a full presentation of the evidence that might lead the sentencer to spare his client's life is not discharged merely by conducting a limited investigation . . . or by providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors."  *Lambright v. Schriro*, 490 F.3d 1103, 1120–21 (9th Cir. 2007) (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004)); *see also Wiggins*, 539 U.S. at 524 (finding ineffective assistance where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources").

"Where counsel is aware of potentially mitigating evidence, he or she must investigate that evidence, absent a reasonable strategic reason not to do so."  *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015); *see Wiggins*, 539 U.S. at 521; *Andrus v. Texas*, 140 S. Ct. 1875, 1883 (2020) (finding deficient performance where "counsel

disregarded, rather than explored, the multiple red flags" concerning defendant's mental health).

The Ninth Circuit has "repeatedly held that counsel may render ineffective assistance if he 'is on notice that his client may be mentally impaired,' yet fails 'to investigate his client's mental condition as a mitigating factor in a penalty phase hearing.'" *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995)). "[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at 1117 (quoting *Stankewitz*, 365 F.3d at 719–20).

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527; *see Earp v. Ornoski*, 431 F.3d 1158, 1175–76 (9th Cir. 2005) ("[T]he presence of certain elements in a capital defendant's background, such as a family history of alcoholism, abuse, and emotional problems, triggers a duty to conduct further inquiry before choosing to cease investigating.")

Antieau was on notice that Gallegos suffered from a learning disability and had a history of substance abuse. Lay evidence to that effect was presented at the original sentencing; and although the trial court found the evidence insufficient to call for leniency, Antieau did not expand his investigation of those issues beyond what had already been presented. *Cf. Smith v. Stewart*, 189 F.3d 1004, 1007 (9th Cir. 1999) (finding ineffective assistance at resentencing where counsel did not present any new mitigating evidence). He did not, for example, contact Gallegos's special educations teachers, Ake and Randall, who could have provided further information about the nature of Gallegos's learning disability.

Antieau was also on notice, through information provided by Nowatzki of the ACRP, that Gallegos reported injuring his head in a serious ATV accident and that witnesses had described Gallegos in the aftermath of the accident as "pale," dazed," and "in shock." This information raised red flags that should have, but did not, prompt further

- 36 -

investigation into Gallegos's mental condition.   Failure to undertake these further investigations rendered Antieau's performance deficient.  *See Frierson v. Woodford*, 463 F.3d 982, 991 (9th Cir. 2006) (finding deficient performance where counsel "ignored the red flag of possible brain damage caused by multiple childhood head injuries by failing to consult a neurologist and instead relied on the lay opinion of Frierson's parents"); *Earp*, 431 F.3d at 1177–79 (finding petitioner was entitled to evidentiary hearing on his claim that counsel performed ineffectively by failing to present mitigating evidence, including evidence of organic brain damage resulting from a motorcycle accident); *Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991) (finding deficient performance where counsel was aware defendant had suffered a near-fatal head injury but failed to seek an expert assessment of the effects of the injury for purposes of mitigation).

The Supreme Court has found deficient performance in similar circumstances.  In *Andrus*, for example, counsel was on notice that his client had been diagnosed with affective psychosis and may have had schizophrenia but did not pursue the evidence or present it at sentencing.  140 S. Ct. at 1882–83.  The Supreme Court found counsel's performance deficient because "clearly, 'the known evidence would [have] le[d] a reasonable attorney to investigate further.'"  *Id.* at 1883 (quoting *Wiggins*, 539 U.S. at 527).  In *Porter*, counsel "ignored pertinent avenues for investigation of which he should have been aware," such as previous competency evaluations, and "thus failed to uncover and present any evidence of Porter's mental health or mental impairment," 558 U.S. at 40, including a possible brain abnormality, *id.* at 36.  Like counsel in *Porter*, Antieau ignored pertinent avenues of investigation, including the notes from the ACRP which reported that Gallegos was injured in ATV accidents.

Federal circuit court opinions also support a finding of deficient performance.  In *Williams v. Filson*, 908 F.3d 546 (9th Cir. 2018), the court found that "competent counsel" would have obtained records containing "conspicuous red flags" warranting a medical or mental health evaluation.  *Id.* at 563.  Those records would have shown a previous recommendation that the petitioner be evaluated for possible brain damage and records

showing that he had a history of substance abuse from the age of 14 and had suffered multiple head injuries, including from a car accident that left him unconscious for 15 minutes and for which he never received medical treatment. *Id.* at 563–64. The Ninth Circuit, on de novo review, concluded that counsel's "failure to have Williams evaluated by a competent medical or mental health professional" constituted deficient performance. *Id.* at 564. Antieau likewise failed to have Gallegos evaluated by appropriate medical or mental health experts despite being aware of his learning disability, history of substance abuse, and possible head injuries.

In *Caro*, 280 F.3d 1247, the Ninth Circuit held that counsel's failure to investigate potential brain damage constituted ineffective assistance. Although counsel was aware of Caro's "extraordinary history of exposure to pesticides and toxic chemicals," he failed to adequately investigate that history and did not inform the experts who examined Caro of the facts that were known to him. *Id.* at 1255. Counsel did not seek an expert to assess the effect of the poisoning on Caro's brain, and "[t]he only expert testimony presented relating to Caro's mental health did not shed light on his brain damage." *Id.* at 1255–57. Like Caro's counsel, Antieau failed to present expert evidence shedding light on Gallegos's mental status, including possible brain damage.

In *Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013), the Tenth Circuit remanded the case for an evidentiary hearing on a claim of ineffective assistance of counsel at sentencing. Counsel at sentencing had presented only socio-psychological testimony about Littlejohn's troubled childhood and its effect on his development. *Id.* at 861. In post-conviction proceedings, however, Littlejohn was examined by a psychiatrist, Dr. Saint Martin, who opined that he had a behavioral disorder resulting from neuro-developmental deficits caused by in utero exposure to his mother's drug abuse. *Id.* at 861. The deficits existed in the structure and neuro-chemical function of the brain. *Id.* at 862.

The court of appeals noted that "[t]here were numerous indicators suggesting that a neurological evaluation could have uncovered evidence of organic brain damage." *Id.* at 862. Specifically, the court referred to a prior competency examination in state court, in

which an expert testified that Littlejohn had "neurological injury [originating] from birth" and cognitive problems of the kind seen in "a lot in head injured patients who are normal individuals" and become aggressive when their cortex is injured.  *Id.*

In remanding the case, the court explained that:

> [T]here is a very real likelihood that the decision of Mr. Littlejohn's counsel to focus solely on mitigating evidence relating to the socioeconomic conditions of Mr. Littlejohn's upbringing and to his psychological makeup— without even investigating whether there was some physical, brain-related condition that would account for Mr. Littlejohn's behavior—amounted to constitutionally deficient performance.

*Id.* at 863.  The court concluded that "there were patent 'red flags' in this case, pointing to a possible physiological explanation for Mr. Littlejohn's violent and anti-social behavior. Dr. Saint Martin's declaration suggests that in fact Mr. Littlejohn suffered from physical brain damage."  *Id.*

Like Littlejohn's counsel, Antieau ignored red flags which, if pursued, could have revealed a "physical, brain-related" explanation for Gallegos's conduct.

Finally, in *Bemore*, 788 F.3d at 1171–72, the Ninth Circuit held that counsel performed ineffectively at sentencing by failing to present sufficient evidence of the defendant's mental condition.  The court explained that counsel was on notice "that Bemore had periodic manic-like episodes; was a heavy drug user; and was severely beaten as a child in a manner and to a degree that brain damage could have resulted," and was also aware, through the report of a psychologist, Dr. Fineman, that "Bemore suffered mild, diffuse organic impairment, and exhibited impaired reasoning skills, judgment, and ability to control his impulsivity."  *Id.* at 1171 (interior quotations omitted).

Despite this information, counsel "purposely truncated the inquiry into Bemore's mental health."  *Id.* at 1171–72.  She retained Dr. Fineman specifically to develop a theory explaining that Bemore's drug use was the product of cultural pressures, "*not* to develop evidence of mental impairment."  *Id.* at 1172 (emphasis in original).  "When Dr. Fineman reported that Bemore did suffer a number of mental impairments and possible disorders, and recommended further inquiry, she terminated his

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

involvement and put his report in the back of a drawer." *Id.* Another expert testified about the effects of growing up in a family with chemical dependency but was not asked to conduct any psychological testing or to give an opinion about Bemore's mental state at the time of the offense. *Id.* "The net result was that there was, except for Dr. Fineman's fairly vague "organic impairment" assessment, and despite Dr. Fineman's indications of possible, serious mental health issues, no definitive conclusion concerning either Bemore's mental state at the time of the crime or his overall mental health diagnosis." *Id.*

Antieau's performance was similarly deficient. His truncated investigation, which included no expert analysis of possible brain dysfunction, left the sentencer with no evidence about Gallegos's mental state at the time of the crime or his overall mental health.

Antieau did present lay evidence of Gallegos's learning disability and substance abuse, but more was required. In *Bemore*, the court observed that "it is not enough just to present 'extensive mitigating evidence' where particularly persuasive evidence— especially evidence in the form of expert testimony—was omitted." 788 F.3d at 1172 (quoting *Caro*, 165 F.3d at 1227). The court elaborated that "it is not enough that some of the defense witnesses informed the jury of the facts that might *underlie* a mental health mitigation defense; 'expert testimony to explain the ramifications of those experiences on [petitioner's] behavior . . . is necessary.'" *Id.* (quoting *Caro*, 165 F.3d at 1227).

Antieau presented only the facts that might underlie a mental health mitigation defense—that Gallegos was learning disabled and attended special education classes and that he had a history of substance abuse. He omitted, however, any "expert testimony to explain the ramifications of those experiences" on Gallegos's behavior. *Id.* Additional evidence about the brain-based nature of SLD and the effects on the brain of long-term substance abuse was available but Antieau did not pursue it. Likewise, Antieau was on notice of evidence that Gallegos suffered potential head injuries in ATV accidents, but he did not pursue that information either.

While Antieau's decision not to pursue such evidence must be assessed for reasonableness, applying a heavy measure of deference to his judgment, *Wiggins* 539 U.S.

- 40 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

at 521, no reasonable basis for limiting his investigation appears in the record.   No tactical reason suggests itself, as Antieau successfully argued for a "full resentencing hearing" not limited to evidence of impairment.  (RT 10/24/94 at 32.)  *Cf. Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008) ("[T]here is no strategic excuse for failing to put on evidence in support of statutory mitigating factors that the Arizona Supreme Court could have considered in its independent re-weighing of aggravating and mitigating factors.").

Respondents assert that "the tests, technology, and theories surrounding adolescent organic brain damage that exist today, were not widely accepted in the scientific community" in 1994.  (Doc. 227 at 16–17.)  This was not borne out by the testimony at the evidentiary hearing.  Dr. Heilbronner testified that Gallegos's neuro-cognitive deficits could have been "reliably assessed" in 1994 (RT 11/09/20 at 184); Dr. Fassler testified that the effects of alcohol abuse were known in 1994 (RT 11/09/20 at 212, 215); and Dr. Reschly testified that SLD and ADHD were both well understood as far back as the 1980s (11/10/20 at 242.)  Antieau simply ignored red flags that should have prompted additional investigation.  This constitutes deficient performance.

## 2. Gallegos was prejudiced by resentencing counsel's performance

To prove prejudice under *Strickland*, Gallegos must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

In assessing prejudice, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."  *Harrington v. Richter*, 562 U.S. 86, 111 (2011) (citing *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam)).  Rather, the question is whether it is "reasonably likely" the result would have been different.  *Id.* (quoting *Strickland*, 466 U.S. at 696.)  "This does not require a showing that counsel's actions 'more likely than not altered the outcome.'"  *Richter*, 562 U.S. at 111–12 (quoting *Strickland*, 466 U.S. at 693); *see Mann v. Ryan*, 828 F.3d 1143, 1157 (9th Cir. 2016) (en

- 41 -

banc) ("The Supreme Court considered and explicitly rejected the more-likely-than-not standard in *Strickland*."). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112 (citing *Strickland*, 466 U.S. at 693).

To determine whether prejudice has been shown, the Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The question here, therefore, is whether there is a reasonable probability that the new evidence of organic brain damage, added to the evidence that was presented at resentencing, would have resulted in a life sentence.

The Court first notes that in determining whether Gallegos suffers from organic brain damage, it is not this Court's role "to evaluate the evidence in order to reach a conclusive opinion." *Correll*, 539 F.3d at 952 n.6. In *Correll*, the district court, after holding a nine-day evidentiary hearing, denied relief on Correll's claim of ineffective assistance of counsel at sentencing. The Ninth Circuit reversed. The court faulted the district court for dismissing evidence of brain injury based on its "own evaluation of two conflicting experts." *Id.* The court explained that: "Because the competing neuropsychologists who testified at the evidentiary hearing agreed that the evidence of brain injury was at least strong enough to deserve presentation at a sentencing hearing, we conclude that Correll's evidence had at least a 'reasonable probability' of persuading an objective fact-finder." *Id.*

Dr. Heilbronner opines that Gallegos suffered TBI as a result of ATV accidents. Respondents argue, with support from Dr. Boake, that there is no objective evidence that those injuries occurred and no support for Heilbronner's diagnosis of cognitive disorder. The directive from *Correll*, however, suggests that it is not within this Court's ambit to make a final credibility assessment of these competing experts as to whether or not Gallegos experienced TBI and as a result suffers from a cognitive disorder. Given the conflicting evidence and opinions, and the fact that SLD and the effects of substance abuse are also forms of organic brain damage, the Court concludes that "there existed a 'reasonable probability' that 'an objective fact-finder' in a state sentencing hearing would

have concluded, based on the evidence presented, that [Gallegos] had a brain injury that impaired his judgment at the time of the crimes." *Id.* (quoting *Summerlin*, 427 F.3d 623 at 643).

Organic brain damage is particularly compelling mitigation evidence. In *Caro*, 280 F.3d at 1258, the Ninth Circuit emphasized the mitigating weight of evidence of "*physiological* defects" in the brain that affect behavior and cause "'impulse discontrol' and irrational aggressiveness." *Id.* The court found that "[b]y explaining that [Caro's] behavior was physically compelled, not premeditated, or even due to a loss of emotional control, his moral culpability would have been reduced." *Id.*; *see Abdul-Kabir v. Quarterman*, 550 U.S. 233, 241 (2007) (explaining that the "strength [of petitioner's mitigating evidence] was its tendency to prove that his violent propensities were caused by factors beyond his control—namely, neurological damage and childhood neglect and abandonment"); *Littlejohn*, 704 F.3d at 864 ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available.").

In *Sears v. Upton*, for example, the Supreme Court found prejudice where counsel failed to present evidence of severe learning and behavioral disabilities, frontal lobe injuries, and brain damage from drug and alcohol abuse. 561 U.S. 945, 948–49 (2010). In *Caro*, the court found that counsel's failure to present evidence of brain damage from exposure to neurotoxicants undermined confidence in the jury's selection of a death sentence. 280 F.3d at 1258. In *Correll*, the court found prejudice based on counsel's failure to present evidence of brain injury which "could have colored Correll as an organically diseased and injured person who, through no fault of his own, lacks the ability to comprehend the immorality of his conduct." 539 F.3d at 954. In *Summerlin*, the court found that the defendant was prejudiced by counsel's failure to present "strong psychiatric evidence . . . of lack of impulse and emotional control and organic brain dysfunction." 427 F.3d at 641.

The Arizona Supreme Court has likewise held that evidence of brain damage is entitled to greater weight than other types of psychological disorder. *See State v. Walton*,

159 Ariz. 571, 588, 769 P.2d 1017, 1034 (1989) ("Mental impairments have far greater mitigating effect because they may evidence an inability of the defendant to control his conduct."). In *State v. Stuard*, 176 Ariz. 589, 610, 863 P.2d 881, 902 (1993), the court reduced a death sentence based on mitigating evidence that the defendant suffered from organic brain damage that was a "major contributing cause of his conduct." In *State v. Rockwell*, 161 Ariz. 5, 15, 775 P.2d 1069, 1079 (1989), the court reduced a death sentence based on the defendant's youth and the effects of a motorcycle accident which resulted in a head injury that altered his behavior. *See also State v. Mauro*, 159 Ariz. 186, 208, 766 P.2d 59, 81 (1988) (reducing sentence based on evidence of bipolar disorder, a "chemical disorder in the brain"); *State v. Graham*, 135 Ariz. 209, 213, 660 P.2d 460, 464 (1983) (reducing sentence based on valium intoxication and "neurological problems and brain damage"); *State v. Brookover*, 124 Ariz. 38, 41, 601 P.2d 1322, 1325 (1979) (sentence reduced based on evidence of a "prenatal neurological lesion" that disrupted the integration and storage of information in the brain).

The likelihood of prejudice in Gallegos's case is magnified because the new information which Antieau failed to present would have supported a finding that Gallegos's ability to conform his conduct to the requirements of the law was impaired. *See Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (finding prejudice where counsel failed to present evidence of "organic brain damage" that impaired Rompilla's "capacity to appreciate the criminality of his conduct or conform his conduct to the law"); *Summerlin*, 427 F.3d at 643 (finding prejudice where omitted expert evidence suggested "a complete loss of impulse control that affected Summerlin's ability to conform his conduct to the requirements of the law").

Drs. Heilbronner, Fassler, and Reschly testified that Gallegos's ability to control his conduct was affected by his brain dysfunction, whether the cause of that dysfunction was SLD, the effects of substance abuse, or TBI. Dr. Fassler also testified about Gallegos's genetic and environmental predisposition to substance abuse. Because counsel failed to present expert testimony explaining the ramifications of Gallegos's conditions, *Bemore*,

788 F.3d at 1172, the sentencer was not made aware that there was a brain-based explanation for Gallegos's conduct in committing the offenses—that the brain dysfunction evident in his learning disability and resulting from his history of substance abuse and probable TBI impaired his judgment, impulse control, maturity, and ability to stop a behavior once started, and left him susceptible to manipulation by others. The sentencer was likewise not informed that an adolescent's immature brain is affected more profoundly by damage resulting from substance abuse or head injuries. Again, the presence of an organic explanation for Gallegos's conduct constitutes powerful mitigation because it reduces his moral culpability. *See Caro*, 280 F.3d at 1257–58.

In sentencing Gallegos to death, the trial court rejected the A.R.S. § 13–703(G)(1) mitigating circumstance, finding that Gallegos had not shown that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired. (RT 10/24/94 at 182.) There is a reasonable probability that this finding would have been different in light of the evidence of Gallegos's brain damage and its effects. The trial court considered but discounted Gallegos's learning disability because it affected his "math and spelling but not his reading or understanding" and did not show that he was "mentally deficient." (*Id.* at 185.) There is a reasonable probability that this finding would have been different with evidence about the brain-based nature of SLD and its behavioral effects. Finally, evidence that Gallegos was predisposed to alcohol abuse might have affected the trial court's consideration of Gallegos's "history of drinking." (RT 10/24/94 at 184–85.)

The fact that the crime here was particularly disturbing does not alter this analysis. The Ninth Circuit has "held consistently that even in cases involving particularly heinous murders, a defendant can be prejudiced by an attorney's failure to investigate and present mitigating evidence." *Lambright*, 490 F.3d at 1127 (collecting cases).

The Court concludes that there is a reasonable probability that the outcome of the resentencing would have been different if Antieau had presented evidence that Gallegos

- 45 -

suffered from organic brain damage, including expert testimony describing the brain-based nature of his SLD and the effects of long-term alcohol abuse and TBI.

This conclusion finds support in the Ninth Circuit's 2016 opinion. *Gallegos*, 820 F.3d 1013. There the court of appeals, applying AEDPA deference, denied Gallegos's claim of ineffective assistance of counsel at sentencing.[11] *Id.* The court found that additional evidence of Gallegos's history of substance abuse, tendency to be a follower, and learning disability would have been cumulative to the evidence presented at resentencing. *Id.* at 1038. The additional evidence the court considered was that presented in Gallegos's post-conviction proceedings and was "identical to the profile at the time of resentencing."[12] *Id.*

After denying the claim, the court commented that if Gallegos had been sentenced by a jury instead of the trial judge, "his sentence may very well have been different." *Id.* at 1039. Although the crime was "unspeakable," the court found that "it is nothing short of remarkable that the two detectives in charge of his case both testified *against* imposition of the death penalty, especially considering that neither officer had ever so recommended. Perhaps a jury would not unanimously have sentenced Gallegos to die after hearing that the two officers most familiar with his case found such a punishment unwarranted." *Id.* The court also noted that "Gallegos was barely eighteen years old at the time of the crime and had no serious criminal background. A jury could have viewed the horrendous offense as aberrational and declined to impose the death penalty." *Id.*

Thus, in the Ninth Circuit's view, a juror could have recommended a life sentence based on the mitigating evidence presented in state court, which consisted of lay testimony

---

[11] Antiterrorism and Effective Death Penalty Act of 1996. Under 28 U.S.C. § 2254(d)(1), a habeas petitioner is not entitled to relief unless the state court's decision on the merits of his claim was contrary to or an unreasonable application of clearly established law federal law. As noted previously, in reviewing such a claim, the federal habeas court is limited to the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011).

[12] The court held an evidentiary hearing during the post-conviction proceedings at which trial counsel and Gallegos testified. (*See* RT 12/01/00.)

outlining Gallegos's substance abuse, learning disability, and tendency to be a follower, together with the detectives' recommendations of leniency and Gallegos's youth.

Now, however, the totality of the case in mitigation includes new evidence of organic brain damage.  Adding this compelling evidence to the mitigating information already presented is sufficient to undermine this Court's confidence in the outcome of the resentencing proceedings.  *Strickland*, 466 U.S. at 694.

## VIII.  CONCLUSION

Reviewing the claims de novo, the Court finds that resentencing counsel Antieau performed ineffectively by failing to present evidence of Gallegos's organic brain damage.

Accordingly,

(1)     IT IS HEREBY ORDERED Gallegos's Petition for a Writ of Habeas Corpus is **GRANTED**.

(2)     As provided in the judgment filed herewith, the State of Arizona is directed to vacate Gallegos's death sentence and impose a lesser sentence unless it notifies this Court, within 120 days from the entry of this Judgment, that it has initiated a new sentencing hearing or vacated Gallegos's sentence and imposed a lesser sentence in accordance with state and federal law.

(3)     IT IS FURTHER ORDERED that the Clerk of Court close this case.

(4)     IT IS FURTHER ORDERED that the Clerk of Court forward a copy of this Order to Janet Johnson, Clerk of the Arizona Supreme Court, 1501 W. Washington, Suite 402, Phoenix, Arizona, 85007-3329.

Dated: December 7, 2020.

Neil V. Wake
Senior United States District Judge